UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - -x

UNITED STATES OF AMERICA      :

    - v. -             :

JAMES J. TREACY,         :

           Defendant.

- - - - - - - - - - - - - - - - - - -x



INDICTMENT

08 Cr.

**08 CRIM.    366**

### COUNT ONE

**(Conspiracy To Commit Securities Fraud, File False Reports
with the SEC, Make False Statements to Auditors,
and Falsify Books and Records)**

    The Grand Jury charges:

### RELEVANT PERSONS AND ENTITIES

    1.   At all times relevant to this Indictment, Monster Worldwide, Inc. ("Monster" or the "Company"), formerly TMP Worldwide Inc., was a corporation organized under the laws of the State of Delaware with its headquarters in New York, New York.

    2.   At all times relevant to this Indictment, Monster's common stock was listed on the NASDAQ National Market System, an electronic securities market, first under the symbol "TMPW" and later under the symbol "MNST."

    3.   From in or about 1998 until in or about November 2001, JAMES J. TREACY, the defendant, who holds a BBA in Accounting, served as Chief Operating Officer ("COO") and Executive Vice-President of Monster. From in or about November 2001 until in or about December 2002, TREACY served as President

and COO of Monster, in which positions TREACY was responsible for the day-to-day direction and management of all Monster business, corporate strategy and development, company financing and investor relations.  From in or about 1998 until in or about December 2003, TREACY served as a member of the Board of Directors.

4.    At all times relevant to this Indictment, Andrew J. McKelvey, a co-conspirator not named as a defendant herein, served as Chief Executive Officer and a director of Monster.

5.    At all times relevant to this Indictment, Myron Olesnyckyj, a co-conspirator not named as a defendant herein, served as the General Counsel of Monster.

## BACKGROUND

### Monster's Business

6.    At all times relevant to this Indictment, Monster provided a broad range of online recruitment services to businesses, government agencies, educational institutions and consumers around the world.  Monster operated several business segments, including "Monster" and "Advertising and Communications."

7.    At all times relevant to this Indictment, the Monster segment operated a global career management website, Monster.com, on the Internet, which connected companies with individuals and offered searchable job postings, a resume

database and career management content and advice.  The
Advertising and Communications segment designed global, national
or local recruitment advertising for Fortune 500 clients and
government agencies and offered employee retention programs,
website development, resume screening and media planning
services.

### Stock Options

8.    A stock option typically gives its holder the
right to buy a share of stock on a future date at a set price,
known as the "exercise" or "strike" price.  Typically, when a
company grants stock options to employees, the employee cannot
exercise the option until the end of a "vesting period."  When
the holder of an option exercises it, he or she purchases the
stock from the company at the exercise price.  Companies
frequently grant stock options to employees as a retention
measure and performance incentive.  More specifically, granting
stock options to employees provides them with an incentive to,
among other things, (a) boost the company's share price, and (b)
remain at the company through the vesting period.

9.    The exercise price of an option is typically the
price at which the underlying stock trades in the market (i.e.,
the fair market value) on the date of the option grant.  Options
with an exercise price equal to the current trading price of the
underlying stock are commonly referred to as being "at the

money"; options with an exercise price below the current trading price of the stock are "in the money."

10.   Stock option grants were a substantial and important component of TREACY's compensation at Monster.  While he was employed by Monster, TREACY received in excess of one million options (adjusted for a stock split and a spin-off of a Monster division) on eight different grant dates.  TREACY exercised approximately 745,000 of these options for a total gain of more than $23 million, approximately $13.5 million of which was derived from the in-the-money portion of backdated option grants.

## Certain Relevant Reporting Requirements and Accounting Principles

11.   As a company with shares registered with the United States Securities and Exchange Commission ("SEC") pursuant to Section 12(g) of the Securities Exchange Act of 1934, Monster is required by federal law to periodically report the financial results of its operations.  Such reports typically take the form of financial statements that include both an Income Statement and a Balance Sheet.  A company's Income Statement reports, among other things, revenue recognized, expenses incurred, and income earned during a stated period of time -- usually for a fiscal quarter or a fiscal year.  Within an Income Statement, certain costs or expenses are generally subtracted from revenues to calculate net income or earnings.

4

12.  At times relevant to this Indictment, Monster claimed in its public filings with the SEC that it followed Accounting Principles Board Opinion No. 25, Accounting for Stock Issued to Employees ("APB 25"), when accounting for the costs associated with granting stock options to its employees.  APB 25 required companies to record an expense -- a charge against, or reduction of, its earnings -- for the "intrinsic" value of an employee stock option on its "measurement date," which is the date that the authorized agents of the company issued a specified number of options to specified recipients at a known price.  As a result, under APB 25 a company was required to record and report a compensation expense for any options issued "in-the-money," i.e., with an exercise price lower than the fair market value of the stock on the measurement date.  Like cash compensation, option-related compensation expense -- which is apportioned over the vesting period of the options -- reduces net income in each such period.  Under APB 25, a company was not required to deduct from revenue any compensation expense for granting options priced "at-the-money," i.e., with an exercise price equal to the fair market value of the stock on the measurement date.  In Annual Reports for 1997 through 2000 on Forms 10-K filed with the SEC (which JAMES J. TREACY, the defendant, signed), Monster stated "[u]nder APB 25, because the exercise price of the Company's employee stock options equals the market price of the underlying

stock on the date of grant, no compensation expense is recognized."

## Monster's Stock Option Plans

13.  Monster granted options pursuant to various stock option plans (the "TMP 1996 Employee Stock Option Plan" and the "TMP 1999 Long Term Incentive Plan' hereinafter referred to as "the Plans") ratified by its Board of Directors and approved by its shareholders.  The Plans stated that the purpose of Monster's stock option program was "to foster the Company's ability to attract, retain, and motivate individuals who will be largely responsible for the continued profitability and growth of the Company and its affiliates," and to "promot[e] the long-term financial success of the Company and enhanc[e] stockholder value."  In public proxy filings with the SEC (which were authorized by members of the Board of Directors, including JAMES J. TREACY, the defendant), Monster stated that "[b]y this approach [offering employees incentives consisting of stock options], the best interests of stockholders, executives and employees will be closely aligned."  Monster further stated:

> Options are granted at the prevailing market value of the Company's common stock and will only have value if the Company's stock price increases.

14.  Monster's stock option plans were administered by a committee of independent directors, referred to as the Compensation Committee, that had sole and absolute authority to

grant option awards.  Although the Compensation Committee had authority to administer Monster's stock option programs under the relevant stock option plans, TREACY, McKelvey, Olesnyckyj and others generally initiated and oversaw the option grant process, provided the names of option recipients and the number of options granted, selected grant dates (and thereby exercise prices), and facilitated the approval process for option grants, by, among other things, obtaining, and directing others to obtain, the consent of the Compensation Committee for option grants.  Members of the Compensation Committee relied on TREACY, McKelvey, Olesnyckyj and others to conform the grant process to the applicable stock option plans and to properly account for stock option grants in Monster's books and records and in all public filings.

### THE SCHEME TO DEFRAUD

### Introduction

15.  Monster's option grants fell into two main categories: (i) options granted as part of an annual grant to a large number of recipients, including rank and file employees ("Broad-Based Grants"); and (ii) options granted to newly hired employees, new employees from Monster's acquisition of other companies, or current employees in connection with promotions, retention or productivity goals ("One-Off Grants").  As set forth more fully below, from at least in or about 1996 through in or

about 2006, JAMES J. TREACY, the defendant, and others known and unknown, engaged in an illegal scheme to deceive Monster's Board of Directors, shareholders, and auditors, as well as securities analysts, the SEC, members of the investing public, and others, concerning Monster's systematic backdating of both Broad-Based and One-Off Grants and Monster's failure to record and report any compensation expense in connection with those grants.

16. In furtherance of the scheme to defraud, TREACY and his co-conspirators backdated numerous stock options granted to Monster employees during the period 1997 through April 2003. During that time period, TREACY, and others known and unknown, routinely looked back in time to select grant dates based on historical dates when Monster's stock price had closed at or near a low point for the month or quarter. With the benefit of hindsight, TREACY created an opportunity for himself and others at Monster to reap substantial benefits by awarding backdated option grants with particularly advantageous exercise prices. As a result, a substantial number of Monster's option grants during this time period were in-the-money on the day they were in fact granted and therefore had an immediate compensatory and expense component. Instead of disclosing this information and properly recording and reporting the in-the-money portion of those option grants as an expense, TREACY and his co-conspirators used options

as "free" compensation that did not result in a reduction in the
company's earnings.

17.   During the relevant time period, the Compensation
Committee approved option grants primarily through unanimous
written consent forms ("UWCs") signed by Compensation Committee
members.  The UWCs contained an "as of" grant date.  On backdated
option grants, the "as of" date was chosen in hindsight and did
not correspond to the actual date of any action taken by the
Compensation Committee.  These backdated UWCs created the false
appearance that the "as of" dates were the actual dates on which
the option grants were approved by the Compensation Committee
when in fact, as TREACY and his co-conspirators well knew, those
dates did not reflect the date on which the Compensation
Committee took action, but rather had been selected with the
benefit of hindsight to take advantage of a fortuitously low
price for Monster's stock.

18.   The UWCs typically referred to a "Schedule A," a
separate document listing the names of the option recipients, or
"optionees," and the number of shares granted to each optionee.
During the relevant time period, however, the referenced Schedule
As often were neither attached to the UWCs nor even created by
the time the UWCs were sent to the Compensation Committee.
Moreover, on certain occasions, TREACY and his co-conspirators
created, added or modified option grants after the Compensation

Committee had executed a UWC, without seeking approval of the
Compensation Committee.  In furtherance of this aspect of the
scheme, Olesnyckyj and others often sent UWCs to the Compensation
Committee without attaching Schedule As so that they could
subsequently grant stock options with the benefit of hindsight,
while giving the appearance that the grants had, in fact, been
approved on the dates appearing on the UWCs.  In part to conceal
this practice from Monster's auditors, BDO Seidman, LLP ("BDO"),
the co-conspirators failed to maintain a complete set of Schedule
As in the Company's records, and provided BDO with documents that
falsely indicated when the options had been granted.

        19.  During the relevant time period, TREACY was
involved in communications about accounting issues relating to
options, including the requirement under APB 25 that Monster
record a compensation expense for options granted at below market
value.  For example, on or about February 9, 2000, Monster's
then-Chief Financial Officer forwarded an email to TREACY and
others from Monster's outside auditors regarding "Below Market
Option Pricing" containing the following language:

        Options issued at below market price must be
        measured and recorded as compensation expense
        using either the "intrinsic value method"
        (for employees), or the "fair value method"
        (for non-employees), respectively.

        20.  Despite this guidance, during the relevant period,
TREACY and his co-conspirators failed to disclose to BDO that

TREACY and others routinely selected grant dates in the past that had low stock prices.  Nor did TREACY or his co-conspirators disclose that the dates on the UWCs for numerous option grants did not correlate to the dates on which the Compensation Committee actually approved the grants.  In addition, TREACY signed management representation letters to BDO in which he asserted that he was unaware of any ongoing fraud at Monster and that Monster's Financial Statements were presented in accordance with Generally Accepted Accounting Principles ("GAAP").

21.  By failing to record and report a compensation expense for the backdated option grants as required, TREACY and his accomplices caused Monster to report materially false and misleading financial results in public filings for the period from at least in or about 1997 through in or about mid-2006. These public filings created the false impression that Monster did not grant in-the-money options and that it was properly accounting for its option grants.  Proper accounting and reporting of these in-the-money options would have alerted regulators, investors, Monster's auditors and others of the backdating.  Proper accounting and reporting also would have materially impacted Monster's financial statements, and altered, among other things, Monster's reported income or loss and earnings per share, thereby affecting analysts' and investors' views of the financial health of the Company.  In addition,

properly accounting and reporting in-the-money grants would have impacted TREACY's compensation because compensation for TREACY and other members of Monster's senior management was tied to Monster's financial performance.  By perpetuating the backdating scheme, therefore, TREACY and his co-conspirators not only reaped the benefits of receiving in-the-money options, but also misled the public about the financial well-being of the Company.

22.  TREACY benefitted from the backdating scheme in numerous ways.  Most directly, TREACY received valuable in-the-money option grants from Monster, with low exercise prices that were manipulated by TREACY and his co-conspirators through the option grant process.  As explained below, TREACY exercised a majority of these options before the backdating scheme was exposed.  TREACY also benefitted from the scheme through performance bonuses that he received from Monster in part because the Company met certain earnings goals that it would not have met if Monster had properly recorded and reported the compensation expenses arising from the issuance of in-the-money grants.  From 1997 through 2001, TREACY's performance bonuses totaled more than $1 million.

### Backdating Broad-Based Grants

23.  From in or about 1997 through in or about 2002, TREACY, McKelvey and others determined the number of options to be granted to senior management and the number of options to be

allotted to each operating division within the Company.  TREACY
or McKelvey chose, or directed someone, including Olesnyckyj, to
choose, the grant date and/or exercise price for particular
option grants based upon a relatively recent low closing price
for Monster's stock.  Once those decisions were made, Monster's
Human Resources department ("Human Resources") circulated to each
of Monster's divisions memoranda containing the grant price for
the Broad-Based Grant and requesting the options allocations to
employees within that division.  Often after the division heads
sent their allocations to Human Resources, Olesnyckyj and others
prepared the documentation to be sent to the Compensation
Committee for approval.

     24.  Between in or about 1997 and in or about Spring
2002, every Broad-Based Grant, including the December 12, 1997,
December 9, 1998, December 1, 1999, April 4, 2001 and May 5, 2002
grants, was backdated.  The following are two examples of Broad-
Based stock option grants that TREACY and his co-conspirators
backdated during the relevant time period.

**A.   1999 Broad-Based Grant**

     25.  In or about early 2000, TREACY and his co-
conspirators caused Monster to issue a Broad-Based Grant dated
"as of" December 1, 1999 at the closing price of $95, the lowest
strike price from December 1, 1999 through the end of April 2000.
The next day, December 2, 1999, was the second largest percentage

increase in Monster's stock price in the history of Monster due
to the announcement of a transaction between Monster and America
Online ("AOL").  The total number of options granted "as of"
December 1, 1999 was approximately 1.75 million.

26.  As a member of Monster's Board of Directors, which
acted as Monster's Compensation Committee from on or about
October 31, 1999 through on or about February 18, 2000, TREACY
signed the UWC authorizing the backdated grant dated "as of"
December 1, 1999.  In truth and in fact, as TREACY and his co-
conspirators well knew, the 1999 Broad-Based Grant was not
approved by the Compensation Committee on December 1, 1999.

27.  As a result of the scheme to backdate the option
grants "as of" December 1, 1999, senior executives and other
employees at Monster received valuable in-the-money grants,
backdated to a particularly low strike price.  Monster did not
record or report a compensation expense for these grants.
Despite this failure to record or report a compensation expense,
TREACY signed an Annual Report for 1999 on a Form 10-K filed with
the SEC which falsely stated that Monster accounted for "its
stock option awards under the intrinsic value based method of
accounting prescribed by" APB 25, and that "no compensation cost
is recognized" under APB 25 because the exercise price of the
options equaled the market price of the underlying stock on the
date of grant.

B.    <u>**2001 Broad-Based Grant**</u>

28.   In the first half of 2001, TREACY and
his co-conspirators caused Monster to issue a Broad-Based Grant
that was ultimately backdated "as of" April 4, 2001, at the
closing price of $30.63.  The total number of options granted "as
of" April 4, 2001 was approximately 2.3 million options, with
TREACY receiving 5,000 of those options.

29.   This grant was originally dated "as of" January 2,
2001, but as Monster's stock price began to decline in 2001, the
date for the grant was changed several times.  Initially, with
the benefit of hindsight, the grant was dated January 2, 2001.
The closing price for Monster's stock on that date was $40.875,
the lowest price for Monster's stock from on or about December 1,
2000 through in or about early March 2001.

30.   In or about early March 2001, however, Monster's
price began to drop further.  In an email to TREACY and others on
or about March 13, 2001, Olesnyckyj asked whether any information
had been provided to BDO that would preclude Monster from
"ignoring the January option grants (i.e. they never happened)."
In an email to TREACY and others on or about March 20, 2001,
Olesnyckyj stated that McKelvey had asked what the option
exercise price was on the most recent grant, that he had advised
McKelvey that the grant date was March 13, 2001, and that "I
presume you were able to finesse any bdo [sic] issues over this."

As the stock price continued to drop, the grant date was changed
again and a UWC was created with an "as of" date of March 21,
2001 and a strike price of $36.438.  That UWC was not executed by
the Compensation Committee and returned to the Company until in
or about April 2001.

31.  As Monster's stock continued to decline, the grant
date was changed again with the benefit of hindsight, this time
to April 4, 2001.  On or about April 20, 2001, a former Chief
Financial Officer of Monster who reported to TREACY sent TREACY
an e-mail with a copy to the Director of Human Resources stating,
"Jim: As we discussed, I would like to award [an employee] 15,000
options of the 2001 option pool (@30.625 on 4/4/01), instead of
the 6,000 initially requested."  TREACY wrote back, "Approved!"
As late as April 30, 2001, however, Human Resources was not
certain that the grant date would remain as April 4.

32.  As a result of the scheme to backdate the option
grants that were ultimately dated April 4, 2001, TREACY and
others themselves received valuable in-the-money Broad-Based
Grants, backdated to a date that corresponded to a particularly
low strike price.  Monster did not record or report any
compensation expense associated with these grants.  Despite this
failure to record or report a compensation expense, in an Annual
Report for 2001 on a Form 10-K filed with the SEC which TREACY
signed, Monster stated that it "accounts for its stock option

16

awards under the intrinsic value based method of accounting
prescribed by [APB 25].  Under the intrinsic value based method,
compensation cost is the excess, if any, of the quoted market
price of the stock at grant date or other measurement date over
the amount an employee must pay to acquire the stock."

33.  In or about April 2006, TREACY exercised
all of his approximately 5,000 options from the April 4, 2001
grant.  As a result of the backdating, TREACY realized an
additional benefit upon his exercise of the options, because the
shares were purchased from TREACY at a discount from the price he
would have paid if the exercise price had corresponded to the
true measurement date for the grant.

### Backdating One-Off Grants

34.  In furtherance of the scheme to defraud,
TREACY and his co-conspirators also backdated numerous One-Off
Grants, including option grants provided to employees of
Monster's Executive Search division as a substitute for
guaranteed cash bonuses.  These One-Off Grants, like the Broad-
Based Grants, were supposed to be authorized only by the
Compensation Committee.  TREACY and his co-conspirators backdated
the UWCs to an "as of" date tied to the exercise price chosen for
each of these Grants, with the UWCs often executed long after the
"as of" dates appearing on the UWCs.

35.  Starting in or about 2000, Human Resources assumed

17

primary responsibility for options paperwork.  At that time, Human Resources -- at TREACY's direction -- drafted a form to be used for the approval of One-Off Grants.  This form asked for the name of the proposed grantee(s), the specific number of options proposed for each grantee, and a proposed grant date and exercise price.  In a memo dated February 4, 2000 from Human Resources to Monster division heads, on which TREACY was copied, Human Resources distributed this new approval form and discussed the new Stock Option Granting procedure: "Beginning right away, all option grants must be presented to Human Resources (with a copy to Jim Treacy) with all the information on the attached form completed and with Andy McKelvey's signed approval."  Beginning in or about November 2001, TREACY replaced McKelvey as the top Monster executive responsible for approving these grants and signing these forms.  Once the proposed option grants were approved by McKelvey or TREACY, the forms were sent to Human Resources for processing.  UWCs for these grants were not sent to the Compensation Committee for approval until after TREACY or McKelvey had signed the approval form.  Many of these approval forms reflected proposed grant dates that preceded the date of one or both of the approval signatures by days, weeks and even months.

36.  The following are examples of One-Off Grants that were backdated by TREACY and his co-conspirators.

A.    **The November 1, 2001 One-Off Grant**

37.    From in or about late 2001 through in or about early 2002, TREACY and his co-conspirators caused Monster to issue a One-Off Grant dated "as of" November 1, 2001, at a strike price of $27.50.  This was the second lowest stock price during the fourth quarter of 2001 and the lowest price between October 31, 2001 and February 21, 2002.  The total number of options granted "as of" November 1, 2001, was approximately 1.4 million options, including a grant of 100,000 options to TREACY.

38.    On or about November 13, 2001, McKelvey sent an e-mail to the Director of Human Resources instructing her to "please issue another 100,000 shares as we discussed at the lowest price in November."  The Director of Human Resources then sent an e-mail to the Stock Option Administrator on November 16, 2001, stating that "these are for Jim Treacy.  Please use 11/1/01."

39.    TREACY also approved several option grants for his subordinates backdated to November 1, 2001.  For example, in an e-mail dated November 27, 2001 entitled "New Grants," the Director of Human Resources informed the Stock Option Administrator that TREACY had approved options grants to approximately 16 individuals with the grant date of November 1, 2001.  Similarly, in an e-mail dated December 6, 2001, the Director of Human Resources advised a Monster division head that

TREACY had agreed to an option grant for one of his employees effective November 1, 2001 at a price of $27.50.  In the e-mail, the Director noted, "[s]ince this is more than 6 times greater than his last grant (and already significantly in the money!) this should be very positive for him."

40.  In truth and in fact, as TREACY and his co-conspirators well knew, these November 1, 2001 One-Off Grants did not occur and were not approved by the Compensation Committee on November 1, 2001.

41.  As a result of the scheme to backdate the option grants dated November 1, 2001, TREACY and many other executives at Monster received valuable in-the-money grants, backdated to a particularly low strike price.  Further, as TREACY well knew, Monster did not record or report a compensation expense for this grant.  Despite this failure to record or report a compensation expense, in an Annual Report for 2001 on a Form 10-K filed with the SEC, which TREACY signed, Monster stated that it "accounts for its stock option awards under the intrinsic value based method of accounting prescribed by [APB 25].  Under the intrinsic value based method, compensation cost is the excess, if any, of the quoted market price of the stock at grant date or other measurement date over the amount an employee must pay to acquire the stock."

B.    **Executive Search In-The-Money Options for Cash Bonuses**

42.   In an effort to cut costs and meet its budgeted expectations and projections, an employee in the Executive Search division at Monster proposed substituting in-the-money options for guaranteed cash bonuses due certain employees in that division for Monster's fourth fiscal quarter of 2001.  In an e-mail dated October 19, 2001, the Executive Search division suggested a strike price for these options at the lowest price of that quarter to date.  TREACY and Olesnyckyj, among others, discussed this proposal until at least November 2, 2001, and agreed to grant in-the-money options instead of cash bonuses.  By e-mail dated November 5, 2001, TREACY told Olesnyckyj "Okay by me."  Later that same day, TREACY sent an e-mail to Olesnyckyj asking him to "let me know when done."

43.   Ultimately, TREACY and his co-conspirators caused Monster to issue options dated "as of" October 2, 2001 to seven Executive Search division employees as part of this plan.  The options had a strike price of $27.24, the lowest stock price during Monster's fourth fiscal quarter of 2001.

44.   In truth and in fact, as TREACY and his co-conspirators well knew, the option grants to Executive Search division employees dated "as of" October 2, 2001 were not approved by the Compensation Committee on that date.  Monster did not record or report any compensation expense for these grants.

## FALSE STATEMENTS IN PUBLIC FILINGS

45.  To sell securities to members of the public and maintain public trading of its securities in the United States, Monster was required to comply with provisions of the federal securities laws, including the Securities Exchange Act of 1934, and rules and regulations promulgated thereunder, which were designed to ensure that the Company's financial information was fairly and accurately recorded and disclosed to the public.

46.  Under these regulations, Monster was required to, among other things: (a) file with the SEC annual financial statements on Forms 10-K audited by an independent accountant; (b) file with the SEC quarterly updates on Forms 10-Q of its financial statements that disclosed its financial condition and the results of its business operations for each three-month period; (c) devise and maintain a system of internal accounting controls sufficient to provide reasonable assurances that the Company's transactions were recorded as necessary to permit preparation of financial statements in conformity with GAAP and other applicable criteria; and (d) make and keep books, records, and accounts that accurately and fairly reflected the Company's business transactions.

47.  At times relevant to this Indictment, Monster's year-end SEC Forms 10-K and 10-Q ("Forms") were prepared and reviewed by Monster's outside counsel in New York, New York, and

transmitted to the offices of Merrill Corporation in New York,
New York, a filing agent that assists companies in electronically
filing periodic reports with the SEC.  These Forms were
thereafter transmitted electronically and filed with the SEC and
directly disseminated to the public through press releases and in
other communications with investors, credit rating agencies and
securities analysts.

48.  Each of Monster's Forms 10-K for years 1997-2000
and 2002-2005 stated that Monster granted all of its options at
the fair market value on the date of grant and thus, Monster did
not record any compensation expense arising from the option
grants.  Monster's Forms 10-K for the years 1997 to 2005 stated
that Monster accounted for its options grants in accordance with
APB 25.  In truth and in fact, as TREACY and his co-conspirators
well knew, Monster systematically backdated options and failed to
record and report compensation expense for in-the-money options,
as required by APB 25.  As a result, Monster's cumulative
compensation expense was understated by approximately $339
million pre-tax during the period 1997 through 2005.

49.  At all times relevant to this Indictment, JAMES J.
TREACY, the defendant, and other Monster employees, participated
in preparing, reviewing and certifying consolidated financial
statements for Monster that purported to conform with applicable

regulatory requirements (hereinafter, the "Financial Statements").

50.    The Financial Statements filed with Monster's Forms 10-Q and Forms 10-K purported to disclose, among other things, Monster's net income for particular periods.    In truth and in fact, as TREACY well knew, Monster's Forms 10-K for the fiscal years 1997-2005 misstated Monster's net income as a result of Monster's failure to record and report a compensation expense for backdated options.    For example, Monster's Form 10-K for 2001 reported that Monster's net income was approximately $69,020,000. After Monster recorded the appropriate compensation expense, however, the Company's net income dropped to approximately $3,439,000.    Accordingly, Monster's net income for 2001 was overstated by over 1900 percent as a result of the backdating.

## THE CONSPIRACY

51.    From in or about 1996 through in or about June 2006, in the Southern District of New York and elsewhere, JAMES J. TREACY, the defendant, and others known and unknown, unlawfully, willfully, and knowingly did combine, conspire, confederate, and agree together and with each other to commit offenses against the United States, namely (a) to commit fraud in connection with the purchase and sale of securities issued by Monster, in violation of Title 15, United States Code, Sections 78j(b) and 78ff, and Title 17, Code of Federal Regulations, Section 240.10b-5; (b) to make and cause to be made false and

24

misleading statements of material fact in applications, reports,
and documents required to be filed under the Securities Exchange
Act of 1934 and the rules and regulations thereunder, in
violation of Title 15, United States Code, Sections 78m(a) and
78ff; (c) to make and cause to be made false and misleading
statements to Monster's auditors, in violation of Title 15,
United States Code, Section 78ff and Title 17, Code of Federal
Regulations, Section 240.13b2-2; and (d) to falsify books,
records, and accounts of Monster, in violation of Title 15,
United States Code, Sections 78m(b)(2)(A), 78m(b)(5) and 78ff,
and Title 17, Code of Federal Regulations, Section 240.13b2-1.

## Objects Of The Conspiracy

## Fraud In Connection With The
## Purchase And Sale Of Securities

52.    It was a part and an object of the conspiracy that
JAMES J. TREACY, the defendant, and others known and unknown, un-
lawfully, willfully, and knowingly, directly and indirectly, by
use of the means and instrumentalities of interstate commerce,
the mails, and the facilities of national securities exchanges,
would and did use and employ manipulative and deceptive devices
and contrivances in connection with the purchase and sale of
securities issued by Monster, in violation of Title 17, Code of
Federal Regulations, Section 240.10b-5, by (a) employing devices,
schemes, and artifices to defraud; (b) making and causing Monster
to make untrue statements of material facts and omitting to state

material facts necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading; and (c) engaging in acts, practices, and courses of business which operated and would operate as a fraud and deceit upon the purchasers and sellers of Monster securities, in violation of Title 15, United States Code, Sections 78j(b) and 78ff.

### False Statements In
### Annual And Quarterly SEC Reports

53.  It was further a part and an object of the conspiracy that JAMES J. TREACY, the defendant, and others known and unknown, unlawfully, willfully, and knowingly, in applications, reports, and documents required to be filed with the SEC under the Securities Exchange Act of 1934 and the rules and regulations thereunder, would and did make and cause to be made statements that were false and misleading with respect to material facts, in violation of Title 15, United States Code, Sections 78m(a) and 78ff.

### False Statements to Auditors

54.  It was further a part and an object of the conspiracy that JAMES J. TREACY, the defendant, being an officer and director of Monster, an issuer obligated to file reports pursuant to section 15(d) of the Securities Exchange Act of 1934 and subsequently with a class of securities registered pursuant to section 12 of the Securities Exchange Act of 1934, unlawfully,

willfully and knowingly, directly and indirectly, (a) made and caused to be made materially false and misleading statements; and (b) omitted to state, and caused others to omit to state, material facts necessary in order to make statements made, in light of the circumstances under which they were made, not misleading to accountants in connection with (i) audits, reviews and examinations of the financial statements of Monster required to be filed under the Securities Exchange Act of 1934; and (ii) the preparation and filing of documents and reports required to be filed with the SEC pursuant to rules and regulations promulgated by the SEC.

### False Books And Records

55.    It was further a part and an object of the conspiracy that JAMES J. TREACY, the defendant, and others known and unknown, unlawfully, willfully, and knowingly would and did, directly and indirectly, falsify and cause to be falsified books, records, and accounts subject to Section 13(b)(2) of the Securities Exchange Act of 1934, namely books, records, and accounts of Monster, an issuer with a class of securities registered pursuant to the Securities Exchange Act of 1934, which Monster was required to make and keep, accurately and fairly reflecting, in reasonable detail, the transactions and dispositions of the assets of Monster, in violation of Title 15, United States Code, Sections 78m(b)(2)(A), 78m(b)(5) and 78ff,

27

and Title 17, Code of Federal Regulations, Section 240.13b2-1.

## Means And Methods Of The Conspiracy

56.    Among the means and methods by which JAMES J.
TREACY, the defendant, and his co-conspirators would and did
carry out the conspiracy were the following:

a.    TREACY and his co-conspirators picked dates
on which Monster's stock price was at or near a low point for a
certain period, usually within the prior fiscal quarter, and made
it appear as if options were granted at fair market value on
those dates, when in fact they were granted at a later date.

b.    Olesnyckyj and others prepared
and caused others to prepare UWCs for the Compensation
Committee's approval with the backdated "as of" dates to make it
appear as if the Compensation Committee had approved option
grants on those dates.

c.    TREACY and his co-conspirators ignored or
modified existing option grants after the Compensation Committee
had already executed UWCs to take advantage of falling stock
prices.

d.    Olesnyckyj and others destroyed
UWCs or created UWCs without Schedule As attached in order to
conceal Monster's backdating scheme.

e.    TREACY and his co-conspirators caused and directed false and misleading entries in Monster's financial books and records, thereby falsely and materially overstating Monster's publicly reported net income during the period 1997 through 2005.

f.    TREACY and his co-conspirators provided materially false and misleading information to Monster's auditors and concealed from those auditors material facts about Monster's systematic granting of in-the-money options during the period 1997 through 2003.

g.    TREACY and his co-conspirators caused Monster to file publicly with the SEC annual reports and quarterly reports that failed to report Monster's true compensation expenses and therefore materially misstated, among other things, Monster's net income during the period 1997 through 2005.

### **Overt Acts**

57.    In furtherance of the conspiracy and to effect its illegal objects, JAMES J. TREACY, the defendant, and his co-conspirators committed the following overt acts, among others, in the Southern District of New York and elsewhere:

a.    In or about 2000, TREACY signed a UWC authorizing the issuance of a Broad-Based Grant backdated "as of" December 1, 1999.

b.    On or about March 30, 2000, TREACY signed Monster's Annual Report on Form 10-K for the Year Ending December 31, 1999, which was substantially prepared and submitted for filing in New York, New York.

c.    On or about March 13, 2001, Olesnyckyj sent an e-mail to TREACY and others asking whether any information had been provided to BDO that would preclude Monster from "ignoring the January option grants (i.e., they never happened)."

d.    On or about March 20, 2001, Olesnyckyj sent an e-mail to TREACY and others informing them that he had advised McKelvey that the grant date was March 13, 2001 and stated to one of his co-conspirators, "I presume you were able to finesse any bdo issues over this."

e.    On or about April 20, 2001, in New York, New York, TREACY approved an award of 15,000 options to one of his subordinates backdated "as of" April 4, 2001.

f.    On or about May 4, 2001, TREACY signed a letter to Monster's outside auditors falsely representing, among other things, that Monster's financial statements were in accordance with GAAP.

g.    On or about November 5, 2001, TREACY approved a proposal to substitute in-the-money options priced at the lowest price of the quarter to date for guaranteed cash bonuses

due certain employees of Monster's Executive Search division.

h.    On or about November 13, 2001, McKelvey e-mailed the Director of Human Resources and directed that TREACY receive 100,000 options "at the lowest price in November."

i.    In or about mid-late November 2001, Andrew J. McKelvey proposed a grant of 100,000 options to TREACY with a backdated grant date of November 1, 2001, the lowest stock price for that month and the second lowest stock price of the quarter.

j.    On or about March 28, 2002, TREACY signed Monster's Annual Report on Form 10-K for the Year Ending December 31, 2001, which was substantially prepared and submitted for filing in New York, New York.

(Title 18, United States Code, Section 371.)

## COUNT TWO

### (Securities Fraud)

The Grand Jury further charges:

58.    The allegations contained in paragraphs 1 through 50 and paragraphs 56 and 57 of this Indictment are repeated and realleged as if fully set forth herein.

59.    From in or about 1996 up to and including in or about June 2006, in the Southern District of New York and elsewhere, JAMES J. TREACY, the defendant, unlawfully, willfully and knowingly, directly and indirectly, by the use of the means and instrumentalities of interstate commerce, and of the mails,

and of facilities of national securities exchanges, in connection
with the purchase and sale of securities issued by Monster, used
and employed manipulative and deceptive devices and contrivances
in violation of Title 17, Code of Federal Regulations, Section
240.10b-5 by (a) employing devices, schemes and artifices to
defraud; (b) making untrue statements of material fact and
omitting to state material facts necessary in order to make the
statements made, in the light of the circumstances under which
they were made, not misleading; and (c) engaging in acts,
practices and courses of business which operated and would
operate as a fraud and deceit upon purchasers and sellers of
Monster securities.

> (Title 15, United States Code, Sections 78j(b) and 78ff;
> Title 17, Code of Federal Regulations, Section 240.10b-5;
> Title 18, United States Code, Section 2.)

## FORFEITURE ALLEGATION

60. As a result of committing one or more of the
securities fraud offenses alleged in Counts One and Two of this
Indictment, in violation of Title 15, United States Code,
Sections 78j(b) and 78ff, Title 17, Code of Federal Regulations,
Section 240.10b-5, JAMES J. TREACY, the defendant, shall forfeit
to the United States, pursuant to Title 18, United States Code,
Section 981(a)(1)(C) and Title 28, United States Code, Section
2461, any and all property, real and personal, that constitutes
or is derived from proceeds traceable to the commission of the

offenses, including but not limited to at least $13.5 million in
United States currency, representing the proceeds obtained as a
result of the charged securities fraud offenses alleged in this
Indictment.

<u>Substitute Asset Provision</u>

61.    If any of the above-described forfeitable
property, as a result of any act or omission of the defendant:

       a.   cannot be located upon the exercise of due
           diligence;

       b.   has been transferred or sold to, or deposited
           with, a third person;

       c.   has been placed beyond the jurisdiction of
           the Court;

       d.   has been substantially diminished in value;
           or

       e.   has been commingled with other property which
           cannot be subdivided without difficulty;

it is the intent of the United States, pursuant to Title 18, United States Code, Section 982(b) and Title 21, United States Code, Section 853(p), to seek forfeiture of any other property of said defendant up to the value of the forfeitable property described above.

(Title 18, United States Code, Sections 981(a)(1)(C) and 982, Title 21, United States Code, Section 853, and Title 28, United States Code, Section 2461).

_____
FOREPERSON

_____
MICHAEL J. GARCIA
United States Attorney

34

Form No. USA-33s-274 (Ed. 9-25-58)

## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

### UNITED STATES OF AMERICA

### - v. -

### JAMES J. TREACY,

#### Defendant.

### INDICTMENT

08 Cr.

(18 U.S.C. § 371;
15 U.S.C. §§ 78j(b) and 78ff;
17 C.F.R. § 240.10b-5;
18 U.S.C. § 2)

MICHAEL J. GARCIA
United States Attorney.

**A TRUE BILL**

_____ Foreperson.