UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---------------------------------------------------x
                                                    :
UNITED STATES OF AMERICA                            :
                                                    :
v.                                                  :
                                                    :   Case No. 1:08-CR-00366-RLC
JAMES TREACY,                                       :
                                                    :
        Defendant.                                  :
                                                    :
---------------------------------------------------x

## MEMORANDUM OF LAW IN SUPPORT OF DEFENDANT'S MOTION TO STRIKE SPECULATIVE LOSS AND GAIN AMOUNTS FROM THE INDICTMENT

### I. PRELIMINARY STATEMENT

Defendant James Treacy respectfully moves the Court, pursuant to Fed. R. Crim. P. 7(d), for an order striking all references to certain dollar amount calculations contained in the Indictment which purport to reflect the magnitude of an alleged accounting misstatement and an alleged illicit gain resulting from the conspiracy at issue. These numbers should be stricken because they are based on demonstrably imprecise extrapolations which cannot be supported by the evidence at trial, and which could dramatically and unfairly prejudice Mr. Treacy long before the jury ever begins its deliberations.

### II.   FACTUAL BACKGROUND

The Indictment charges Mr. Treacy, former President and Chief Operating Officer of Monster Worldwide Inc. ("Monster"), and other executives at Monster with participating in a scheme to backdate stock option grants made to Monster employees. A stock option is a form of

compensation which gives its holder a right to buy a share of stock on a future date at a set price. The Indictment alleges that Mr. Treacy and others routinely looked back in time to select advantageous grant dates for these options based on instances when Monster's stock price had closed at or near a low point for the month or quarter, resulting in stock option grants which were "in the money" on the day they were in fact awarded.

The Indictment alleges that the co-conspirators deceived the Board of Directors and its Compensation Committee regarding this practice and also failed to properly account for the value of these option grants as a compensation expense in the Company's income statement as incorporated in its public filings with the Securities and Exchange Commission.

The Indictment alleges that Mr. Treacy exercised approximately 745,000 Monster stock options for a total gain of $23 million, approximately $13.5 million of which was derived from the "in-the-money" portion of backdated option grants. Ind. ¶ 10. The Indictment further states that as a result of the alleged failure to properly account for these options, Monster's cumulative compensation expense was understated by approximately $339 million pre-tax during the period 1997 through 2005. Ind. ¶ 48.

These figures are taken directly from an accounting restatement filed by the Company following an internal investigation by a Special Committee of the Board into the stock option backdating practices at issue in the Indictment. *See* Monster Worldwide, Inc. Form 10-K/A, filed Dec. 13, 2006 ("Restatement"), relevant portions attached hereto as Exhibit 1.

According to the Restatement, the date on which a stock option is deemed to have been granted is normally the date that the grant is approved by means of a unanimous written consent ("UWC") executed by members of the Compensation Committee. *See* Restatement Explanatory

Note at 2. However, according to the Restatement, the Board's investigation concluded that the dates on many UWCs did not correspond to the actual dates that grants were made. *Id.* at 2-3.

Because the Company was unable to determine the precise date on which an option had been granted, the Restatement set the grant date as the date that information about the grant recipient was entered into a Company electronic database program, which often did not occur until many months after the options were actually granted. *Id.* at 2-3. For options that were granted before the electronic database program was implemented, the Restatement set the grant date based on the *average* "lag period" between the dates that UWCs were executed and the dates that the grant information was logged into the database. *Id.* at 3.

Based on this methodology, the Restatement repriced the option grants using the arbitrary dates noted above and then concluded that, as a result, Monster had understated its total compensation expense from 1997 through 2005 by approximately $339 million. *Id.* at 4. The Restatement candidly acknowledged that '[g]iven the volatility of the Company's common stock, the use of another measurement date could have resulted in a substantially higher or lower" figure. *Id.* at 3.

The Indictment against Mr. Treacy relies on the same arbitrary "measurement date" (*i.e.*, the date information was logged in the database) as that employed by the Restatement in alleging that Monster understated its compensation expense by $339 million; as applied to Mr. Treacy's own grants, the Restatement methodology leads to the conclusion that Mr. Treacy gained approximately $13.5 million from the "in-the-money" portion of his option grants, and that figure has also been incorporated into the indictment. Ind. ¶¶ 10, 48.

Because these figures are demonstrably speculative, and highly prejudicial, they should be stricken.

3

## III. ARGUMENT

### A. The Dollar Amounts Should Be Stricken Because They Are Speculative and Could Unfairly Prejudice The Jury

The references to a $339 million underreported compensation expense and the alleged $13.5 million illicit gain from backdated options should be stricken from the Indictment because they are based on a demonstrably imprecise extrapolation which bears no relationship to the expected evidence at trial, and which carries the risk of unfair prejudice to Mr. Treacy.

The government asserts that the strike prices of various Monster option grants were selected on dates after those reflected on the UWCs. In other words, the conspirators selected grants and backdated the UWCs. But the measurement dates adopted by the Restatement represent the "worst case scenario" because they are (by definition) the *last* possible dates on which an option could *conceivably* have been granted (namely, when the options were entered into the electronic database).

The Restatement employed a "worst case scenario methodology" because, as the Restatement notes, the Board's investigation was unable to determine (given its inherent limitations) the actual dates when grants were made, and when the UWCs were backdated. Presumably, the government at trial, however, must present such evidence in order to prove its case. And whatever dates that evidence reflects will certainly be earlier than the "last possible" default dates used by the Restatement, which lacked sufficient information to come up with more accurate numbers.

A "worst case scenario" approach regarding the amount of loss to a company makes sense for a company restating its financials and concerned about investor confidence. But it is a highly inappropriate and unfairly prejudicial approach for the government to adopt in a criminal prosecution. Further, the allegations in the Indictment regarding the magnitude or Mr. Treacy's

4

purported gain, or the magnitude of the Company's underreported compensation expense are unnecessary, since neither is an element of the offense. Accordingly, the $339 million and $13.5 million figures cited in paragraphs 10 and 48 of the Indictment should be stricken.

Rule 403 of the Federal rules of Evidence provides that relevant evidence "may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury...." Fed. R. Evid. 403. With respect to Rule 403, the Supreme Court has held that "[t]he term 'unfair prejudice,' as to a criminal defendant, speaks to the capacity of some concededly relevant evidence to lure the factfinder into declaring guilt on a ground different from proof specific to the offense charged." *Old Chief v. United States*, 519 U.S. 172, 180 (1997); *see also* Fed. R. Evid. 403 (1972 Advisory Committee Notes) (Prejudice is "unfair" if the evidence has "an undue tendency to suggest decision on an improper basis, commonly, though not necessarily, an emotional one."). Thus, "[u]nder Rules 401 and 403 of the Federal Rules of Evidence, in order for evidence to be admissible . . . its prejudicial effect must not substantially outweigh its probativeness." *United States v. Harvey*, 991 F.2d 981, 996 (2d Cir. 1993).

In addition, under Rule 7(d) of the Federal Rules of Criminal Procedure, a district court may "strike surplusage from the indictment." Fed. R. Crim. P. 7(d). Rule 7(d) is "a means of protecting the defendant against immaterial or irrelevant allegations in an indictment or information, which may, however, be prejudicial." Fed. R. Crim. P. 7(d) (Original (1944) committee note to subdivision (d)).

Courts often strike irrelevant, inaccurate, or prejudicial numbers from indictments. *See, e.g., United States v. Rush*, 807 F. Supp. 1263 (E.D. La. 1992); *United States v. Cormier*, 226 F.R.D. 23 (D. Me. 2005) (striking drug quantity amounts where specifying the applicable penalty

subsections statutes already alerted the defendant to the maximum drug amounts he was being charged with possessing). *Rush, supra,* is particularly instructive. In striking an allegation that the defendant in that case had caused $10 million in losses to the state, the district court observed:

> The Government is free to prove during trial specific monetary harm, but such allegation is not necessary in the indictment, and, in fact, its inclusion could prejudice the defendant.
>
> While that number may at some time during trial become relevant evidence, it has no place in the indictment. Indeed, its presence simply is further evidence of the dangers inherent in the Government pleading and presenting arguments on so called "narrative accounts."

807 F. Supp. at 1266 (E.D. La. 1992).

The same is true here: the government is free to prove at trial the specific amount allegedly gained by Mr. Treacy and the amount of the Company's underreported compensation expense, but the methodology employed by the Restatement is by its own terms an imprecise extrapolation and potentially highly prejudicial to Mr. Treacy. The jury may well be blinded by the seemingly huge numbers at issue, and be unable to focus on the more specific and accurate evidence we would anticipate at trial.

The potential impact of these inflated and imprecise numbers can be seen by reference to governing Second Circuit precedent on sentencing calculations in securities fraud cases. In securities fraud cases, a key component of the calculation under the federal sentencing guidelines is the amount of loss caused by the wrongful conduct. *See United States v. Rutkoske,* 506 F.3d 170, 178 (2d Cir. 2007) (citing U.S.S.G. § 2F1.1(b)(1)). The caselaw on calculating the amount of loss for sentencing purposes precludes the use of speculative methodologies.

6

In *Rutkoske, supra,* the district court had based its loss calculation on the last date for which the company had "blue sheets," which are reporting forms for submitting certain information to the SEC. 506 F.3d at 178. The Second Circuit held that this arbitrary date did not accurately reflect the amount of loss attributable to the fraudulent conduct. *Id.* at 179-80. (citing *United States v. Ebbers*, 458 F.3d 110, 128 (2d Cir. 2006)). Like the blue sheet data in *Rutkoske*, the Restatement methodology here is not intended (and does not claim) to reflect an accurate loss amount. Rather, it contains admittedly imprecise estimates of the loss based on the last possible grant dates. Since Second Circuit precedent makes clear that such a methodology would be unacceptable for sentencing purposes, it surely does not belong in the Indictment, where it could only serve to potentially mislead and inflame the jury into thinking the amounts at issue here are much larger than in actuality.

## IV.  CONCLUSION

For the reasons set forth above, the Court should strike the amounts of $339 million and $13.5 million set forth in paragraphs 1 and 48 of the Indictment.

Respectfully submitted,

_____
Reid H. Weingarten
Evan T. Barr
Sandra E. Cavazos
STEPTOE & JOHNSON LLP
750 Seventh Avenue, Suite 1900
New York, NY 10019
(212) 506-3900

Counsel for Defendant James Treacy

Dated: June 30, 2008

EXHIBIT 1



# FORM 10-K/A

**MONSTER WORLDWIDE INC - MNST**

**Filed: December 13, 2006 (period: December 31, 2005)**

Amendment to a previously filed 10-K

QuickLinks -- Click here to rapidly navigate through this document

# UNITED STATES SECURITIES AND EXCHANGE COMMISSION
WASHINGTON, D.C. 20549

# FORM 10-K/A

☒ ANNUAL REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934 FOR THE FISCAL YEAR ENDED DECEMBER 31, 2005

OR

☐ TRANSITION REPORT PURSUANT TO SECTION 13 OR 15 OF THE SECURITIES EXCHANGE ACT OF 1934 FOR THE TRANSITION PERIOD FROM        TO

COMMISSION FILE NUMBER 000-21571

# MONSTER WORLDWIDE, INC.
(EXACT NAME OF REGISTRANT AS SPECIFIED IN ITS CHARTER)

| DELAWARE | 13-3906555 |
|---|---|
| (STATE OR OTHER JURISDICTION OF INCORPORATION OR ORGANIZATION) | (I.R.S. EMPLOYER IDENTIFICATION NUMBER) |

622 Third Avenue, New York, New York 10017
(ADDRESS OF PRINCIPAL EXECUTIVE OFFICES)

(212) 351-7000
(REGISTRANT'S TELEPHONE NUMBER, INCLUDING AREA CODE)

SECURITIES REGISTERED PURSUANT TO SECTION 12(b) OF THE ACT: None

SECURITIES REGISTERED PURSUANT TO SECTION 12(g) OF THE ACT:

Common Stock, par value $.001 per share

Indicate by checkmark if the registrant is a well-known seasoned issuer, as defined under Rule 405 of the Securities Act. Yes ☒  No ☐

Indicate by checkmark if the registrant is not required to file reports pursuant to Section 13 or Section 15(d) of the Act. Yes ☐  No ☒

Indicate by check mark whether the registrant (1) has filed all reports required to be filed by Section 13 or 15(d) of the Securities Exchange Act of 1934 during the preceding 12 months (or for such shorter period that the registrant was required to file such reports) and (2) has been subject to such filing requirements for the past 90 days. Yes ☐  No ☒

Indicate by check mark if disclosure of delinquent filers pursuant to Item 405 of Regulation S-K is not contained herein, and will not be contained, to the best of Registrant's knowledge, in definitive proxy or information statements incorporated by reference in Part III of this Form 10-K/A or any amendment to this Form 10-K/A. ☒

Indicate by checkmark whether the registrant is a large accelerated filer, an accelerated filer or a non-accelerated filer. (See definition of accelerated filer and large accelerated filer in Rule 12b-2 of the Exchange Act). Large accelerated filer ☒  Accelerated filer ☐  Non-accelerated filer ☐

Indicate by checkmark whether the registrant is a shell company (as defined in Rule 12b-2 of the Exchange Act). Yes ☐  No ☒

The aggregate market value of the voting stock held by non-affiliates of the registrant was approximately $3,133,721,175 as of the last business day of the registrant's second fiscal quarter of 2005.

The number of shares of common stock, $.001 par value, outstanding as of February 8, 2006 was approximately 126,440,398.

## DOCUMENTS INCORPORATED BY REFERENCE

Portions of the registrant's definitive Proxy Statement used in connection with its 2006 Annual Meeting of Stockholders are incorporated by reference into Part III of this report.

Source: MONSTER WORLDWIDE IN, 10-K/A, December 13, 2006

## EXPLANATORY NOTE

Monster Worldwide, Inc. ("Monster Worldwide" or the "Company") is amending its Annual Report on Form 10-K for the year ended December 31, 2005 (the "Form 10-K" or the "Original Filing"). The Company is restating its consolidated financial statements to reflect additional non-cash stock based compensation costs and related income tax effects, relating to stock option awards that were granted during the periods 1997 through March 31, 2003. This amended Form 10-K/A reflects the restatement of our consolidated financial statements as of December 31, 2005 and 2004 and for the years ended December 31, 2005, 2004 and 2003, as previously reported in the Original Filing. We have also included under "Item 6. Selected Financial Data," restated financial information as of and for the years ended December 31, 2002 and 2001.

On June 12, 2006, the Company announced that a committee of independent directors of the Board of Directors (the "Special Committee") assisted by independent legal counsel and outside accounting experts was conducting an independent investigation to review the Company's historical stock option grant practices and related accounting. The Special Committee and its advisors conducted an extensive review of the Company's historical stock option grants and related accounting, including an assessment and review of the Company's accounting policies, internal records, supporting documentation and e-mail communications, as well as interviews with current and former employees and current and former members of the Company's executive management and Board of Directors.

On July 26, 2006, the Company announced that although the Special Committee investigation had not yet reached a conclusion, the Company cautioned shareholders and the investing public against relying on previously published financial statements. On October 25, 2006, the Company announced that its Audit Committee, after consultation with senior management, the Special Committee and the Company's independent registered public accounting firm, determined that the consolidated financial statements and related financial information contained in its Annual Reports on Form 10-K through December 31, 2005 should no longer be relied upon.

The consolidated financial statements and related financial information contained in the Company's Annual Reports on Form 10-K through December 31, 2005 should be read only in conjunction with the information contained in this Form 10-K/A. See Note 2 of our consolidated financial statements included in this Form 10-K/A for further discussion.

The Special Committee has determined that the exercise price of a substantial number of stock option grants during the periods between 1997 through March 31, 2003 differed from the fair market value of the underlying shares on the measurement date. In most cases, the original date assigned to the grant corresponded to the date as of which a unanimous written consent ("UWC") was executed by the members of the Compensation Committee of the Company's Board of Directors, but the date of that consent did not correspond to the actual date on which the identities of the individual optionees and the number of shares underlying each option was determined. The Company believes that the dates as of which the UWC's were dated were earlier than the dates on which they were actually executed. In a significant number of instances, the stock price on the assigned date (the date as of which the UWC was executed) was lower, sometimes substantially lower, than the price on the date the award may be deemed to have actually been determined. The Company believes that this practice was done intentionally, by persons formerly in positions of responsibility at the Company for the purpose of issuing options at a higher intrinsic value than would have otherwise been the case.

*Restatement Methodology*

Historically, the Company has generally accounted for stock option grants as if the options were granted at an exercise price no less than fair market value as indicated by the closing price of a share of the Company's common stock trading on the NASDAQ National Market on either the "as of" date reflected on the relevant UWC of the Compensation Committee of the Board of Directors or the date

2

Source: MONSTER WORLDWIDE IN, 10-K/A, December 13, 2006

of minutes of an actual Compensation Committee meeting ("Minutes"). A majority of stock options granted during the period under review were granted pursuant to UWC's. The UWC's, by their terms, typically referred to an attached Schedule A listing the specific names of the grantees and the number of shares subject to each option. The UWC's that have been located by the Company, however, either have no Schedule A annexed to them, or where one is attached, it frequently does not match the Company's electronic stock option database.

The Company has therefore concluded that neither the "as of" dates referenced on Compensation Committee UWCs nor the dates of Minutes can be relied on as proper option grant measurement dates. The Company has been unable to ascertain with any degree of certainty when, if ever, UWC's or Minutes with full, complete and final Schedule A's were reviewed and approved by the Compensation Committee.

In light thereof, the Company has concluded that the most appropriate and accurate source of data to determine option grant measurement dates is the electronic record of option grant information resident in its electronic stock option database program known as Transcentive, which went into use in late 1998. The entry into Transcentive of the specific grantee information as to each stock option grant constituted an acknowledgement by the Company to the grantee of the grantee's legal entitlement to the grant and, in the absence of authoritative information as to when grants were actually approved by the Company provides an appropriate measurement date framework based on entitlement. For option grants made subsequent to the implementation of Transcentive, the Company has calculated the restated intrinsic value using a grant measurement date based on when the option data was entered into the database program (the "Creation Date"). For options granted prior to the implementation of Transcentive, the new measurement date was determined by applying the average lag time between the "as of" date and the Creation Date for options granted subsequent to the implementation of Transcentive to the originally utilized measurement date in order to approximate a reliable measurement date. The average lag period between the date as of which UWC's were executed and the date that options purportedly granted by such consents were inputted into the Company's Transcentive system was ninety-seven days. For grants prior to December 1998, the Company has therefore used measurement dates equating to ninety-seven days following the date as of which the UWC relating to such options were executed.

Given the volatility of the Company's common stock, the use of another measurement date could have resulted in a substantially higher or lower cumulative compensation expense. This in turn would have caused net income or loss to be different than amounts reported in the restated consolidated financial statements.

*Findings*

Based on the findings of the Special Committee, management of the Company has concluded that the Company's consolidated financial statements as of December 31, 2005 and 2004 and for the years ended December 31, 2005, 2004 and 2003, the selected financial information as of and for the years ended December 31, 2002 and 2001 and the quarterly periods in 2005 and 2004 should be restated to record additional non-cash stock based compensation expenses and related income tax effects resulting from the stock option review. As of December 31, 2005, the Company had accelerated substantially all unvested outstanding stock options in order to mitigate compensation expense that would have been required upon the effectiveness of SFAS 123R beginning January 1, 2006. Accordingly, the 2006 periods will not be materially affected as a result of this restatement.

The restatement of the Company's previously issued financial statements reflects the following:

(a) the recognition of non-cash stock based compensation expense and related income tax effects related to stock options affected by the grant dating issues; and

3

Source: MONSTER WORLDWIDE IN, 10-K/A, December 13, 2006

(b) adjustments to previously recognized income tax benefits as a result of certain stock options that were granted to certain of the Company's executive officers with exercise prices that were less than the fair market value of the Company's common stock on the actual date of grant and, therefore, did not qualify as deductible performance-based compensation in accordance with Internal Revenue Code section 162(m) ("IRC 162(m)").

The Company has notified the Internal Revenue Service of the stock option review. Under Section 162(m), stock options that are in-the-money at the time of grant do not qualify as performance-based compensation. The Company is not entitled to a deduction for the compensation expense related to the exercise of those options held by officers who are covered by IRC 162(m).

The Company has restated its consolidated financial statements for the years ended December 31, 2005, 2004 and 2003 and all quarterly periods in 2005 and 2004. The impacts of the restatement adjustments extended to annual periods back to the year ended December 31, 1997 through the year ended December 31, 2005. In these restated consolidated financial statements, the cumulative compensation expense, including the related income tax impact, as of December 31, 2002 is recognized as a net increase to beginning accumulated deficit as of December 31, 2002. In addition, for purposes of the "Selected Financial Data" for the years ended December 31, 2002 and 2001, the cumulative compensation expense from January 1, 1997 through December 31, 2000 has been recognized as an increase to beginning accumulated deficit as of January 1, 2001 and the 2001 and 2002 impacts associated with such items have been reflected in the Company's balance sheet and statement of operations data set forth in Item 6 "Selected Financial Data" in this Form 10-K/A.

In connection with the restatement, the Company has recorded cumulative non-cash stock based compensation of $339.6 million through December 31, 2005, offset by a cumulative income tax benefit of $67.7 million, totaling $271.9 million on an after-tax basis. The table below reflects the impacts of the restatement adjustments discussed above on the Company's statement of operations for the periods presented below:

| Category of adjustments: (in thousands) | Years Ended December 31, | | | | | Cumulative (January 1, 1997 through December 31, 2000)(c) |
|---|---|---|---|---|---|---|
| | 2005(a) | 2004(a) | 2003(a) | 2002(b) | 2001(b) | |
| Stock option grant date changes—continuing operations(d) | $ 12,239 | $ 13,118 | $ 23,529 | $ 33,638 | $ 46,400 | $ 88,862 |
| Stock option grant date changes—discontinued operations | 494 | 2,946 | 11,168 | 22,851 | 34,392 | 49,949 |
| **Pre-tax stock option expense adjustments** | **12,733** | **16,064** | **34,697** | **56,489** | **80,792** | **138,811** |
| Income tax impact on grant date changes—continuing operations | (3,377) | (3,499) | (5,806) | (8,000) | (11,327) | (21,853) |
| Income tax impact on grant date changes—discontinued operations | (118) | (694) | (1,931) | (3,546) | (5,270) | (7,035) |
| Income tax adjustments related to IRC 162(m) resulting from adjustments due to grant date changes—continuing operations | — | 2,497 | — | — | 1,386 | 917 |
| **Income tax benefit** | **(3,495)** | **(1,696)** | **(7,737)** | **(11,546)** | **(15,211)** | **(27,971)** |
| Net charge to net income (loss) | $ 9,238 | $ 14,368 | $ 26,960 | $ 44,943 | $ 65,581 | 110,840 |

(a) See Note 2 of our consolidated financial statements included in this Form 10-K/A for additional information regarding the adjustments made to our restated consolidated financial statements.

(b) The impact on the 2002 and 2001 periods has been reflected in Item 6. Selected Financial Data in this Form 10-K/A which is derived from the unaudited consolidated financial statements of Monster Worldwide, Inc.

4