**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

UNITED STATES OF AMERICA      :

       - v. -            :

JAMES J. TREACY,          :

              **Defendant.**   :

   **S1 08 Cr. 366 (RLC)**

- - - - - - - - - - - - - - - - - - - - - - - - - - -- - - - -x


**MEMORANDUM OF LAW IN OPPOSITION**
**TO DEFENDANT'S PRE-TRIAL MOTIONS**


MICHAEL J. GARCIA
United States Attorney for the
Southern District of New York
Attorney for the United States
of America

DEIRDRE A. McEVOY
JOSHUA A. GOLDBERG
Assistant United States Attorneys,
     Of Counsel.

## TABLE OF CONTENTS

BACKGROUND. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

DISCUSSION. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

POINT I —   THE INDICTMENT IS NOT BARRED BY THE STATUTE OF
LIMITATIONS. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

    A.   Applicable Law. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

    B.   Discussion. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

POINT II —   TREACY'S MOTION TO DISMISS PORTIONS OF COUNT
TWO OF THE INDICTMENT SHOULD BE DENIED. . . . . . . . . . . . . 11

    A.   Applicable Law. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

        1.   Pleading Requirements. . . . . . . . . . . . . . . . . . . . . . . . . . . 11

        2.   Section 10(b) and Rule 10b-5. . . . . . . . . . . . . . . . . . . . . 12

    B.   Discussion. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

        1.   The Indictment Tracks the Language of the Statute. . . . . 16

        2.   Treacy's Conduct, as Alleged, Violated § 10(b) and
Rule 10b-5. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

            a.   The Purpose and Scope of Section 10(b) and
Rule 10b-5. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

            b.   The Allegations of Backdating and Accounting
Fraud. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

            c.   Defendant's Conduct Violated Rule 10b-5(a)
and (c). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

POINT III —   COUNTS ONE AND TWO ARE NOT MULTIPLICITOUS. . . . . . . . . 25

    A.   Applicable Law. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

    B.   Discussion. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

POINT IV — THERE IS NO BASIS TO PRECLUDE THE GOVERNMENT
FROM USING THE TERM "BACKDATING" AT TRIAL. . . . . . . . . 33

POINT V — THE ALLEGATIONS REGARDING THE AMOUNT OF THE
ACCOUNTING MISSTATEMENT AND ILLICIT GAIN
RESULTING FROM THE BACKDATING SCHEME SHOULD
NOT BE STRICKEN FROM THE INDICTMENT. . . . . . . . . . . . . . . 37

    A.    Applicable Law. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 38

    B.    Discussion. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 38

POINT VI — TREACY'S MOTION TO ISSUE RULE 17(c) SUBPOENAS
SHOULD BE DENIED. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 40

    A.    Applicable Law. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 41

    B.    Discussion. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 45

CONCLUSION. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 48

## <u>TABLE OF AUTHORITIES</u>

### FEDERAL CASES

*Affiliated Ute Citizens v. United States*, 406 U.S. 128 (1972)............................. 23

*Albernaz v. United States*, 450 U.S. 333 (1981). ............................... 25, 27-28

*Albrecht v. United States*, 273 U.S. 1 (1927)........................................... 27

*A.T. Brod & Co. v. Perlow*, 375 F.2d 393 (2d Cir. 1967). ............................. 22

*Blockburger v. United States*, 284 U.S. 299 (1932)............................... 26, 30, 32

*Bowman Dairy Co. v. United States*, 341 U.S. 214 (1951). ......................... 41, 42, 44

*Charles Hughes & Co. v. SEC*, 139 F.2d 434 (2d Cir. 1943). ............................. 19

*Chemical Bank v. Arthur Andersen & Co.*, 726 F.2d 930 (2d Cir. 1984). .................. 17

*Chiarella v. United States*, 445 U.S. 222 (1980)....................................... 23

*Costello v. United States*, 350 U.S. 359 (1956)...................................... 7, 12

*Ganino v. Citizens Utils. Co.*, 228 F.3d 154 (2d Cir. 2000). ............................. 39

*Garrett v. United States*, 471 U.S. 773 (1985)........................................ 25

*Harris v. United States*, 359 U.S. 19 (1959). ......................................... 27

*Iannelli v. United States*, 420 U.S. 770 (1975). ...................................... 28

*In re Alstom SA Securities Litigation*, 406 F. Supp. 2d 433 (S.D.N.Y. 2005)............. 19, 22

*In re Global Crossing Ltd. Securities Litig.*, 322 F. Supp. 2d 319 (S.D.N.Y. 2004)......... 19, 23

*In re Parmalat*, 376 F. Supp. 2d 472 (S.D.N.Y. 2005) ........................... 17, 18, 24

*In re Royal Dutch/Shell Transport Sec. Litig.*, 2006 WL 2355402 (D.N.J. Aug. 14, 2006). .... 21

*Lentell v. Merrill & Co. Inc.*, 396 F.3d 161 (2d Cir. 2005). .............................. 21

*United States v. Cuthbertson*, 630 F.2d 139 (3d Cir. 1980);................... 41-43, 46, 48

*United States v. Giampa*, Cr. No. 92-437, 1992 WL 296440 (S.D.N.Y. 1992).. . . . . . . . . . . . 44

*Pereira v. United States*, 347 U.S. 1 (1954). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

*United States v. Russo*, 74 F.3d 1383 (2d Cir. 1996).. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

*SEC v. KPMG LLC*, 412 F. Supp.2d 349, 378 (S.D.N.Y. 2006). . . . . . . . . . . . . . . . . . . . . . . 21

*SEC v. Zandford*, 535 U.S. 813 (2002). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

*United States v. Ben Zvi*, 168 F.3d 49, 54 (2d Cir. 1999). . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

*United States v. Ben Zvi*, 242 F.3d 89 (2d Cir. 2001). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

*United States v. Bicoastal Corp.*, 819 F. Supp. 156 (N.D.N.Y. 1993). . . . . . . . . . . . . . . . . . . 7

*United States v. Bin Laden*, 91 F. Supp.2d 600 (S.D.N.Y. 2000) . . . . . . . . . . . . . . . . . . . . . . 28

*United States v. Bongiorno*, 2006 WL 1140864 (S.D.N.Y. 2006).. . . . . . . . . . . . . . . . . . . . . . 23

*United States v. Bradley*, 812 F.2d 774 (2d Cir. 1987). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

*United States v. Burger*, 773 F. Supp. 1419 (D. Kan. 1991). . . . . . . . . . . . . . . . . . . . . . 43, 44

*United States v. Calandra*, 414 U.S. 338 (1974). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

*United States v. Chacko*, 169 F.3d 140 (2d Cir. 1999). . . . . . . . . . . . . . . . . . . . . . . . . . . 26, 29

*United States v. Cherry*, 876 F. Supp. 547 (S.D.N.Y. 1995). . . . . . . . . . . . . . . . . . . . . . . 41-43

*United States v. Ciambrone*, 787 F.2d 799 (2d Cir. 1986). . . . . . . . . . . . . . . . . . . . . . . . . . . 29

*United States v. Dacunto*, 2001 WL 13343 (S.D.N.Y. 2001). . . . . . . . . . . . . . . . . . . . . . . . . 15

*United States v. Dixon*, 509 U.S. 688 (1993).. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

*United States v. Earls*, 2004 WL 350725 (S.D.N.Y. Feb. 25, 2004) . . . . . . . . . . . . . . . . . . . 38

*United States v. Elson*, 968 F. Supp. 900 (S.D.N.Y. 1997). . . . . . . . . . . . . . . . . . . . . . . . . . . 33

*United States v. Felix*, 503 U.S. 378 (1992). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

*United States v. Feola*, 420 U.S. 671 (1975). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

*United States v. Ferguson*, 2007 WL 2815068 (D. Conn. Sept. 26, 2007). . . . . . . . . . . . . . . . . 44

*United States v. Ferguson*, – F. Supp. 2d –,  2008 WL 2067995 (D. Conn. May 15, 2008). . . . . 39

*United States v. Ferrarini*, 9 F. Supp. 2d 284 (S.D.N.Y. 1998). . . . . . . . . . . . . . . . . . . . . . . . . . 15

*United States v. Fields*, 663 F.2d 880 (9th Cir. 1981). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 43-44

*United States v. Finnerty*, 2006 WL 2802042 (S.D.N.Y. Oct. 2, 2006). . . . . . . . . . . . . . . . . . . 24

*United States v. Fiore*, 821 F.2d 127 (2d Cir. 1987). . . . . . . . . . . . . . . . . . . . . . . . . . 25-27, 29, 32

*United States v. Fletcher*, 928 F.2d 495 (2d Cir. 1991). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

*United States v. Fowler*, 932 F.2d 306 (4th Cir. 1991). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 41

*United States v. Gel Spice Co.*, 601 F. Supp. 1214 (E.D.N.Y. 1985). . . . . . . . . . . . . . . . . . . 41, 45

*United States v. Gengo*, 808 F.2d 1 (2d Cir. 1986). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

*United States v. Gotti*, 42 F. Supp. 2d 252 (S.D.N.Y. 1999). . . . . . . . . . . . . . . . . . . . . . . . . . . . 38

*United States v. Grady*, 544 F.2d 598 (2d Cir. 1976).  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

*United States v. Gross*, 24 F.R.D. 138 (S.D.N.Y. 1959). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 43

*United States v. Grossman*, 843 F.2d 78 (2d Cir. 1998). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

*United States v. Hanna*, 198 F. Supp. 2d 236 (E.D.N.Y. 2002). . . . . . . . . . . . . . . . . . . . . . 15, 40

*United States v. Heredia*, 2003 WL 21524008 (S.D.N.Y. 2003). . . . . . . . . . . . . . . . . . . . . . . . . 14

*United States v. Hernandez*, 85 F.3d 1023 (2d Cir. 1996). . . . . . . . . . . . . . . . . . . . . . . . . . . 33, 38

*United States v. Hernandez*, 980 F.2d 868 (2d Cir. 1992). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

*United States v. Hughes*, 895 F.2d 1135 (6th Cir. 1990). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 43

*United States v. Kelly*, 91 F. Supp. 2d 580, 583 (S.D.N.Y. 2000). . . . . . . . . . . . . . . . . . . . . . . . 17

*United States v. King*, 194 F.R.D. 569 (E.D. Va. 2000). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 44

*United States v. Knuckles*, 581 F.2d 305 (2d Cir. 1978). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

*United States v. Labat*, 905 F.2d 18 (2d Cir. 1990). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32

*United States v. Langella*, 776 F.2d 1078 (2d Cir. 1985). . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

*United States v. LaSpina*, 299 F.3d 165 (2d Cir. 2002). . . . . . . . . . . . . . . . . . . . . . . . . . . 6, 11, 12

*United States v. Leonard*, 817 F. Supp. 286 (E.D.N.Y. 1992). . . . . . . . . . . . . . . . . . . . . . . . . 45

*United States v. Maldonado-Rivera*, 922 F.2d 934 (2d Cir. 1990). . . . . . . . . . . . . . . . . . . . . . 29

*United States v. Marchisio*, 344 F.2d 653 (2d Cir. 1965). . . . . . . . . . . . . . . . . . . . . . . . . . . . . 43

*United States* v. *Mennuti*, 679 F.2d 1032 (2d Cir. 1982). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

*United States v. Mulder*, 273 F.3d 91 (2d Cir. 2001). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 38

*United States v. Murray*, 297 F.2d 812 (2d Cir. 1962). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 41

*United States v. Myerson*, 684 F. Supp. 41 (S.D.N.Y. 1988). . . . . . . . . . . . . . . . . . . . . . . . . . 44

*United States v. Nakashian*, 820 F.2d 549 (2d Cir. 1987). . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

*United States v. Nixon*, 418 U.S. 683 (1974). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 42-44

*United States v. Noriega*, 764 F. Supp. 1480 (S.D. Fl. 1991). . . . . . . . . . . . . . . . . . . . . . . 42, 45

*United States v. Reed*, 639 F.2d 896 (2d Cir. 1981). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31, 32

*United States v. Reyes*, 2007 WL 2462147 (N.D. Cal. Aug. 29, 2007). . . . . . . . . . . . . . . . . 35, 36

*United States v. Rittweger*, 259 F. Supp. 2d 275 (S.D.N.Y. 2003). . . . . . . . . . . . . . . . . . . . . . 14

*United States v. Rucker*, 586 F.2d 899 (2d Cir. 1978). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

*United States v. Rutkoske*, 506 F.3d 170 (2d Cir. 2007). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 39

*United States v. Sabbeth*, 262 F.3d 207 (2d Cir. 2001). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

*United States v. Salmonese*, 352 F.3d 608 (2d Cir. 2003). . . . . . . . . . . . . . . . . . . . . . . . . . 5, 8, 9

*United States v. Sattar*, 314 F. Supp. 2d 279 (S.D.N.Y. 2004) . . . . . . . . . . . . . . . . . . . . . . . . 28

*United States* v. *Scarpa*, 913 F.2d 993 (2d Cir. 1990) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33, 38

*United States v. Scop*, 846 F.2d 135 (2d Cir. 1988).. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

*United States v. Stavroulakis*, 952 F.2d 686 (2d Cir. 1992). . . . . . . . . . . . . . . . . . . . . . . . . . . . 32

*United States v. Stewart*, 420 F.3d 1007 (9th Cir. 2005). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32

*United States v. Thomas*, 757 F.2d 1359 (2d Cir. 1985). . . . . . . . . . . . . . . . . . . . . . . . . . . . 27, 29

*United States v. Tucker*, 2008 WL 361127 (S.D.N.Y. 2008).. . . . . . . . . . . . . . . . . . . . . . . . . . . 44

*United States v. Woodward*, 469 U.S. 105 (1985). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

## FEDERAL STATUTES, RULES AND REGULATIONS

15 U.S.C. § 78j(b). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

18 U.S.C. § 3282. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

Fed. R. Crim. P. 7(c)(1). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

Fed. R. Crim. P. 7(d). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 38

17 C.F.R. § 240.10b-5. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

UNITED STATES OF AMERICA  :

     - v. -     :

JAMES J. TREACY,    :

     Defendant.  :

- - - - - - - - - - - - - - - - - - - - - - - - - -- - - - -x

     S1 08 Cr. 366 (RLC)

## MEMORANDUM OF LAW IN OPPOSITION <br> TO DEFENDANT'S PRE-TRIAL MOTIONS

    The Government respectfully submits this memorandum of law in opposition to defendant James J. Treacy's pre-trial motions.  By those motions, Treacy seeks orders (1) dismissing the indictment as barred by the statute of limitations; (2) dismissing portions of Count Two alleging violations of Rule 10b-5(a) and (c); (3) compelling the Government to elect between Counts One and Two because those counts purportedly are multiplicitous; (4) striking the term "backdating" from the Indictment and precluding the Government from using the term at trial; (5) striking references in the Indictment to the amount of the accounting misstatement and illicit gain; and (6) authorizing the issuance of seven Rule 17(c) subpoenas prior to trial.  For the reasons stated below, Treacy's motions should be denied in their entirety.

## BACKGROUND

    Superseding Indictment S1 08 Cr. 366 (RLC) was filed on July 11, 2008 in two counts, replacing Indictment 08 Cr. 366 (RLC), which was filed on April 24, 2008.  The Superseding Indictment is substantially identical to the underlying Indictment, except that it includes additional overt acts and provides additional details about certain aspects of the charged

conduct.

Count One of the Superseding Indictment charges Treacy with conspiracy to commit securities fraud, file false reports with the United States Securities and Exchange Commission ("SEC"), make false statements to auditors, and falsify books and records, in violation of Title 18, United States Code, Section 371. Count Two charges Treacy with committing securities fraud, in violation of Title 15, United States Code, Sections 78j(b) and 78ff, Title 17, Code of Federal Regulations, Section 240.10b-5, and Title 18, United States Code, Section 2.

The charges in this case relate to allegations that the defendant and others engaged in a multi-year scheme to backdate numerous stock option grants at Monster Worldwide, Inc. ("Monster"), formerly known as TMP Worldwide, Inc. By backdating the grants, the defendant and others were able to obtain stock option grants at historically low exercise prices, while giving the appearance that such grants had been given at fair market value on the date of grant. As part of the scheme, the defendant and others failed to properly account for the option grants, thereby materially misstating Monster's financial results in numerous public filings.

A stock option gives its holder the right to buy a share of stock on a future date at a set price, known as the "exercise" or "strike" price. During the relevant time period, Monster used stock options as an important recruitment and retention tool. In addition, top executives, including Treacy, received massive stock option grants as a major component of their compensation.

The exercise price of an option is typically the price at which the underlying stock trades in the market (*i.e.*, the fair market value) on the date of the option grant. Options issued

with an exercise price equal to the current market price of the underlying stock on the date of the grant are commonly referred to as being "at the money"; options issued with an exercise price below the current market value of the stock are considered "in the money."  During the relevant time period, controlling accounting rules set forth in Accounting Principles Board Opinion No. 25, Accounting for Stock Issued to Employees ("APB 25"), which Monster purported to follow, allowed companies to avoid recording a compensation expense — a charge against, or reduction of, its earnings — for any options that were issued at-the-money.  If, however, Monster granted options in-the-money, the company was required to record a compensation expense.  Like cash compensation, option-related compensation expense — which is apportioned over the vesting period of the options — reduces net income in each such period.

   In numerous public filings with the SEC, including several that were signed by Treacy, Monster represented, in substance, that it followed these accounting rules and that no compensation was recorded because Monster did not grant in-the-money options.  This was false.  Monster also filed materially false financial statements that failed to properly record and report compensation expenses that it should have incurred as a result of its granting process.

   Indeed, between in or about 1997 and in or about April 2003, Treacy and his co-conspirators granted numerous in-the-money options by looking back in time to select favorable strike prices.  They did so both in annual "broad-based grants" that went to large numbers of employees and in periodic "one-off grants" that were made to new employees and current employees in connection with promotions, retention or productivity goals.  To avoid detection of the scheme — and to avoid the resulting accounting charges that would have both revealed the scheme and materially impacted Monster's financial reports — Treacy and others working in

3

concert with him and at his direction backdated numerous documents to make it look as if the option grants had in fact been made on the day that they had retroactively selected.

In connection with the scheme, Treacy and his accomplices caused Monster to report materially false and misleading financial results in public filings for the period from at least in or about 1997 through in or about mid-2006. As a result, Monster's cumulative compensation expense between 1997 and 2005 was understated by approximately $339 million pre-tax.

During the course of the scheme, Treacy received in excess of one million options (adjusted for a stock split and a spin-off of a Monster division) on eight different grant dates. Between December 2005 and April 2006 — just before the scheme was uncovered — Treacy exercised approximately 745,000 of these options for a total gain of more than $23 million. Of this, approximately $13.5 million was derived from the in-the-money portion of backdated option grants.

## DISCUSSION

### POINT I

### THE INDICTMENT IS NOT BARRED BY THE STATUTE OF LIMITATIONS

Treacy moves to dismiss the Indictment based on the statute of limitations. All of Treacy's arguments relate to the underlying Indictment, which, as noted above, was superseded by the Superseding Indictment filed on July 10, 2008, after Treacy filed his motion. In making his claim, Treacy misrepresents the allegations in the underlying Indictment and misconstrues controlling law. For this reason, Treacy's attacks on the underlying Indictment should be rejected. Moreover, to the extent that there is any question about the timeliness of the charges,

Treacy's claims have been rendered moot by the Superseding Indictment.

### A.     **Applicable Law**

The statute of limitations for the crimes charged in this case is five years.  *See* 18 U.S.C. § 3282.  The filing of an indictment tolls the limitations period for the charges contained in the indictment, *see United States v. Grady*, 544 F.2d 598, 601 (2d Cir. 1976), and a superseding indictment relates back to the date of the original indictment as long as the superseding indictment does not "broaden or substantially amend the original charges," *United States v. Gengo*, 808 F.2d 1, 3 (2d Cir. 1986).  *See also United States v. Ben Zvi*, 168 F.3d 49, 54 (2d Cir. 1999).

When the defendant is charged with a conspiracy, the statute of limitations is satisfied as long as the Government establishes that the "conspiracy operated within the five-year period preceding the indictment, and a conspirator knowingly committed at least one overt act in furtherance of the scheme within that period."  *United States v. Salmonese*, 352 F.3d 608, 614 (2d Cir. 2003).  Every act in furtherance of the conspiracy is regarded as a continuance of the unlawful agreement, "and the conspiracy continues so long as overt acts in furtherance of its purposes are done."  *See United States* v. *Rucker*, 586 F.2d 899, 906 (2d Cir. 1978).  As the Second Circuit has noted, a conspiracy continues "until its aim has been achieved, it has been abandoned, or otherwise terminated."  *United States v. Rucker*, 586 F.2d 899, 906 (2d Cir. 1978).  Moreover, "absent withdrawal, a conspirator's 'participation in a conspiracy is presumed to continue until the last overt act by any of the conspirators.'"  *Salmonese*, 352 F.3d at 615 (quoting *United States v. Diaz*, 176 F.3d 52, 98 (2d Cir. 1999)).

"Where the object of a conspiracy is economic, the conspiracy generally

'continues until the conspirators receive their anticipated economic benefits.'" *United States* v. *LaSpina*, 299 F.3d 165, 175 (2d Cir. 2002) (quoting *United States* v. *Mennuti*, 679 F.2d 1032, 1035 (2d Cir. 1982)); *see also Ben Zvi*, 242 F.3d 89, 98 (2d Cir. 2001); *United States* v. *Fletcher*, 928 F.2d 495, 500 (2d Cir. 1991). Phrased differently, "where a general objective of the conspirators is money, the conspiracy does not end, of necessity, before the spoils are divided among the miscreants." *United States* v. *Knuckles*, 581 F.2d 305, 313 (2d Cir. 1978) (rejecting challenge to admissibility of hearsay statements against appellants on the ground that narcotics conspiracy had terminated; statements were made "before the spoils [were] divided among the miscreants"). Even where the objective of the conspiracy is to defraud, the conspiracy continues until its other objectives, including the "payoff," are achieved. *See Mennuti*, 679 F.2d at 1036 (scope of mail fraud conspiracy stemming from destruction of property and filing false insurance claim not limited to receipt of check from insurance company, but includes co-conspirator's "bargain purchase" of property).

In the context of securities fraud prosecutions, "evidence of continued stock purchases and sales at prices affected . . . by earlier artificial trades" constitute overt acts in furtherance of the conspiracy. *United States* v. *Scop*, 846 F.2d 135, 139 (2d Cir. 1988), *modified in part*, 856 F.2d 5 (2d Cir. 1988) (evidence sufficient to convict defendant charged with conspiracy to commit securities fraud, mail fraud and wire fraud in connection with scheme to manipulate the price of securities traded in public offering where, among other things, defendants' nominees sold shares at prices that were still higher than what they had paid).

In deciding a motion to dismiss, the court must accept all factual allegations in the indictment as true. *See Costello v. United States*, 350 U.S. 359 (1956). "[W]here a grand jury

6

has determined that there is probable cause to believe that a fact constituting an element of a crime has occurred, and where this fact is alleged in an indictment, a defendant may not challenge this factual assertion short of a trial on the merits." *United States v. Bicoastal Corp.*, 819 F. Supp. 156, 158 (N.D.N.Y. 1993).

### B.    Discussion

In this case, both the underlying Indictment and the Superseding Indictment allege that conduct in furtherance of the charged crimes occurred well within five years of the charges being filed.  The underlying Indictment alleges that the conspiracy existed between in or about 1996 through in or about June 2006.  Indictment ¶ 51.  More specifically, the Indictment alleges that Treacy and his accomplices "caused Monster to report materially false and misleading financial results in public filings for the period from at least in or about 1997 through in or about mid-2006."  Indictment ¶ 21.  The Indictment further alleges that "[e]ach of Monster's Forms 10-K for the years 1997-2000 and 2002-2005 stated that Monster granted all of its options at the fair market value on the date of grant and thus, Monster did not record compensation expense arising from the option grants."  *Id.* ¶ 48.  The filings for the years 1997 to 2005 further "stated that Monster accounted for its options grants in accordance with APB 25."  *Id.*  As alleged in the Indictment, these statements were false.  As further alleged in the Indictment, as a result of the backdating scheme, "Monster's cumulative compensation expense was understated by approximately $339 million pre-tax during the period 1997 through 2005."  *Id.*; *see also* Indictment ¶ 50 (alleging that "Monster's Forms 10-K for the fiscal years 1997-2005 misstated Monster's net income as a result of Monster's failure to record and report a compensation expense for backdated options.").  The Indictment also alleges that in April 2006, Treacy

7

exercised all of his options from a backdated grant, thereby realizing the benefit of that portion of the scheme. *Id.* ¶ 33.

The Superseding Indictment alleges additional specific conduct within the past five years, including the filing of Forms 10-K on March 4, 2004 (*see* Superseding Indictment ¶ 62(p)), March 4, 2005 (¶ 62(q)), and February 16, 2006 (¶ 62(y)); and numerous instances between December 1, 2005 and April 27, 2006 in which Treacy exercised options that had been backdated as part of the charged scheme (¶ 62(r)-(x) and (z)-(ad)).[1]  Accordingly, both the underlying Indictment and the Superseding Indictment are replete with allegations of conduct by Treacy and his co-conspirators within the five-year statute of limitations.

Nevertheless, Treacy raises a series of challenges to the timeliness of the underlying Indictment.  First, Treacy argues that notwithstanding the allegations in the underlying Indictment, the charges must be dismissed as untimely because no single *overt act* is alleged to have occurred within five years of the charges being filed.  *See* Memorandum of Law in Support of Defendant's Motion to Dismiss the Indictment Based on the Statute of Limitations ("Treacy's Statute of Limitations Motion") at 5.  This argument is moot in light of the Superseding Indictment, which alleges numerous overt acts within the five-year period.[2]

---

[1]    The Superseding Indictment specifically alleges that the exercise of options to obtain the in-the-money value of backdated option grants was a means and method by which Treacy and his co-conspirators carried out the conspiracy.  *See* Superseding Indictment ¶ 61(h).

[2]    Treacy's argument also is incorrect.  To be sure, at trial the Government will have to prove that the conspiracy operated within the five-year period preceding the Indictment and that at least one overt act was committed in furtherance of the scheme within that period.  *See Salmonese*, 352 F.3d at 614.  But that does not mean that an indictment is subject to dismissal for failing to specifically allege specific conduct within five years as an overt act.  In *Salmonese*, the Second Circuit affirmed the defendant's conviction of securities fraud charges even though the indictment failed to allege any valid overt acts within the five-year period.  *Salmonese*, 352 F.3d

Second, Treacy argues that the allegations in the underlying Indictment related to the filing of materially false Forms 10K for the years 2003 through 2005 cannot extend the statute of limitations period "to the extent that the government is relying on filings that merely *failed to correct* misstatements of earnings contained in previous filings." Treacy's Statute of Limitations Motion at 5-6. The Government is not, however, merely relying on the fact that these filings failed to correct prior misstatements. The Government expects the evidence at trial to show that those filings were materially and affirmatively false in at least two respects: (1) each of those filings reported financial results for each of the prior two years, thereby creating new false statements regarding the results of those prior years; and (2) each of those filings reported materially false financial results for the year in question because proper accounting for the in-the-money options required Monster to record a compensation expense over the vesting period of the backdated options; since the vast majority of the backdated options had four-year vesting periods, a backdated option granted in 2002 would continue to require the recording of an expense into 2006. Accordingly, the filings of Forms 10K for the years 2003 through 2005 are properly alleged as overt acts within the past five years.

Finally, Treacy argues that his exercise of backdated options in April 2006 (and as alleged in the Superseding Indictment, on numerous occasions between December 2005 and April 2006), cannot constitute an overt act. *See* Treacy's Statute of Limitations Motion at 7-8. In support of this argument, Treacy argues that the scope of the charged conspiratorial agreement did not encompass economic enrichment, and instead was limited to deceiving the investing

---

at 613-14, 618 (noting that none of the three "timely" pleaded overt acts were committed in furtherance of the charged conspiracy, but nevertheless affirming conviction where the Government *proved* a valid overt act at trial).

9

public and the SEC about the backdating scheme by failing to properly account for the options

backdating.  *See id.* at 7.  This argument is belied by the allegations in the Indictment and is

absurd on its face.

The underlying Indictment specifically alleges that as part of the scheme, "Treacy

created an opportunity for himself and others at Monster *to reap substantial benefits* by awarding

backdated option grants with particularly advantageous exercise prices."  Indictment ¶ 16

(emphasis added).  The Indictment further alleges that proper accounting and reporting of the

backdated option grants not only would have materially impacted Monster's financial statements,

but also would have "alerted regulators, investors, Monster's auditors and others of the

backdating."  *Id.* ¶ 21.  "By perpetuating the backdating scheme, therefore, TREACY and his co-

conspirators *not only reaped the benefits of receiving in-the-money options*, but also misled the

public about the financial well-being of the Company."  *Id.* (emphasis added).  The Indictment

specifically alleges that Treacy financially benefitted from the scheme in numerous ways,

including by exercising "a majority of [his] options before the backdating scheme was exposed."

*Id.* ¶ 22.  By any reading, therefore, the scope of the conspiracy included financial objectives that

Treacy realized when he exercised options in late 2005 and early 2006, thereby reaping millions

of dollars in ill-gotten gains.

In short, the indictments in this case (both the underlying and the Superseding

Indictment) properly allege that the charged crimes continued until well within five years of the

filing of the charges.  Accordingly, Treacy's motion to dismiss the charges based on the statute of

limitations should be denied.

10

**POINT II**

**TREACY'S MOTION TO DISMISS PORTIONS OF COUNT
TWO OF THE INDICTMENT SHOULD BE DENIED**

Treacy moves to dismiss portions of Count Two of the Indictment alleging

violations of Rule 10b-5(a) and (c) on the grounds that the facts alleged in the Indictment do not

state an offense under subsections (a) and (c) as a matter of law.  Because the Indictment properly

pleads the charges against Treacy and the facts alleged – if proven at trial – will satisfy the

elements of prongs (a) and (c), defendant's argument is meritless and the motion should be

denied.

**A.    Applicable Law**

**1.    Pleading Requirements**

Rule 7(c)(1), Fed. R. Crim. P., sets forth the general requirements for the nature

and contents of an indictment.  The rule provides, in relevant part:

> The indictment or information must be a plain, concise, and
> definite written statement of the essential facts constituting the
> offense charged . . . . A count may incorporate by reference an
> allegation made in another count. . . . For each count, the
> indictment or information must give the official or customary
> citation of the statute, rule, regulation, or other provision of law
> that the defendant is alleged to have violated.

It is well-settled that "[t]o satisfy the pleading requirements of Fed. R. Crim. P. 7(c)(1), 'an

indictment need do little more than to track the language of the statute charged and state the time

and place (in approximate terms) of the alleged crime.'" *United States v. LaSpina*, 299 F.3d at

177 (quoting *United States v. Stavroulakis*, 952 F.2d 686, 693 (2d Cir. 1992)) (additional

citations and internal quotation marks omitted).  Moreover, an indictment "'must be read to

11

include facts which are necessarily implied by the specific allegations made.'" *United States v. Stavroulakis*, 952 F.2d at 693 (quoting *United States v. Silverman*, 430 F.2d 106, 111 (2d Cir. 1970)). "In short, 'an indictment is sufficient if it, first, contains the elements of the offense charged and fairly informs a defendant of the charge against which he must defend, and, second, enables him to plead an acquittal or conviction in bar of future prosecutions for the same offense.'" *United States v. LaSpina*, 299 F.3d at 177 (quoting *Hamling v. United States*, 418 U.S. 87, 117 (1974)).

An indictment, "if valid on its face, is enough to call for trial of the charges on the merits." *Costello v. United States*, 350 U.S. at 364. If pretrial challenges to the evidence were permitted, "a defendant could always insist on a kind of preliminary trial to determine the competency and adequacy of the evidence before the grand jury" which would result "in interminable delay but add nothing to the assurance of a fair trial." *Costello*, 350 U.S. at 363; *see also United States v. Calandra*, 414 U.S. 338, 345 (1974).

## 2.     Section 10(b) and Rule 10b-5

Section 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78j(b), provides in relevant part:

> It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce or of the mails, or of any facility of any national securities exchange-
>
> ...
>
> (b) To use or employ, in connection with the purchase or sale of any security registered on a national securities exchange or any security not so registered, or any security not so registered, any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection

of investors.

15 U.S.C. § 78j(b).  Similarly, Rule 10b-5, promulgated under § 10(b) and codified at 17 C.F.R.

§ 240.10b-5, provides:

> It shall be unlawful for any person, directly or indirectly by the use of any means or instrumentality of interstate commerce, or of the mails or of any facility of any national securities exchange,
>
> (a) To employ any device, scheme, or artifice to defraud,
>
> (b) To make any untrue statement of material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or
>
> (c) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security.

17 C.F.R. § 240.10b-5.

To establish that a defendant committed securities fraud in violation of Section

10(b) and Rule 10b-5, the Government must prove:

> First, that in connection with the purchase or sale of [a security] the defendant did any one or more of the following:
>
> (1) employed a device, scheme, or artifice to defraud, or
>
> (2) made an untrue statement of a material fact or omitted to state a material fact which made what was said, under the circumstances, misleading, or
>
> (3) engaged in an act, practice, or course of business that operated, or would operate, as a fraud or deceit upon a purchaser or seller.
>
> Second, that the defendant acted willfully, knowingly, and with the

13

intent to defraud.

Third, that the defendant knowingly used, or caused to be used, any means or instruments of transportation or communication in interstate commerce or the use of the mails in furtherance of the fraudulent conduct.

L. Sand et al., *Modern Federal Jury Instructions*, Instr. 57-21.

Courts apply the pleading standard set forth above in rejecting motions to dismiss securities fraud charges, just as they do in addressing motions to dismiss any other charge.  *See United States v. Grossman*, 843 F.2d 78, 84 (2d Cir. 1998) (quoting *United States* v. *Tramunti*, 513 F.2d 1087, 1113 (2d Cir. 1975)) (securities fraud indictment "need do little more than to track the language of the statute charged and state the time and place . . . of the alleged crime"); *United States v. Rittweger*, 259 F. Supp. 2d 275, 288 (S.D.N.Y. 2003)  (Koeltl, J.) (denying motion to dismiss indictment charging securities fraud, wire fraud and violations of the Travel Act, stating that the charges "satisfy the well-established pleading requirements in this Circuit – they are pleaded in the language of the statute and provide sufficient particulars to provide notice to the defendants and to permit the defendants to plead double jeopardy"); *United States v. Heredia*, 2003 WL 21524008, at *3 (S.D.N.Y. July 3, 2003) (Kram, J.) (denying motion to dismiss indictment charging conspiracy to commit securities fraud and wire fraud because the indictment "cites the applicable statutes;" "the language of the indictment essentially tracks these statutes *verbatim* and also contains extensive factual allegations as to [defendant's] alleged agreement to enter into conspiracy and his alleged involvement in it;" "identifies the approximate dates of defendant's alleged crimes, and the approximate location of the conspiracy," and therefore "provides [defendant] with required adequate notice of the nature of the charged

14

conspiracy"); *United States v. Dacunto*, 2001 WL 13343, at *12 (S.D.N.Y. Jan. 5, 2001) (Schwartz, J.) (denying motion to dismiss securities fraud indictment because charge "track[s] the language of the underlying statute and provide[s] a background that describes the alleged scheme in general terms"); *United States v. Ferrarini*, 9 F. Supp. 2d 284, 296 (S.D.N.Y. 1998) (Cote, J.) (denying motion to dismiss securities fraud indictment, finding that the "allegations, which track the language of Section 10b, and explicitly invoke Rule 10b-5, provide sufficient notice to the defendants of the crimes with which they are charged").

For example, in *United States v. Hanna*, 198 F. Supp.2d 236 (E.D.N.Y. 2002), the defendants, employees of broker-dealers, were charged with securities fraud in connection with defrauding customers by, among other things, engaging in deceptive sales practices. The defendants moved to dismiss the securities fraud indictment arguing that the indictment failed to allege any material misrepresentations. *Hanna*, 198 F. Supp.2d at 243. The District Court denied the motion to dismiss, because the indictment contained the statutes charged and "the language of the indictment essentially tracks these statutes *verbatim* and provides the dates and places . . . of the alleged crimes." *Id*. at 243. In the words of the District Court, "More is not needed." *Id.* at 243.

### B.     Discussion

The charges in the Indictment track the language of the relevant statute. No more is needed and the defendant's motion should be denied without further inquiry.

Moreover, although no more is needed to properly plead the defendant's crimes, the Indictment goes much further. The Indictment describes the defendant's deceptive and fraudulent conduct with particularity. Viewed in the light of well-settled precedents, the

defendant's conduct clearly violated Section 10(b) and Rule 10b-5.  Accordingly, defendant's

motion is without merit.

### 1.    The Indictment Tracks the Language of the Statute

The charging language in Count Two of the Indictment tracks the language of

Section 10(b) and Rule 10b-5 and provides notice of the time and place of the alleged crimes.

(*See* Ind. ¶¶ 63-64).  The Indictment also alleges specific examples of option grants the defendant

and his co-conspirators backdated (Ind. ¶¶ 23-49), specific examples of misrepresentations made

by the defendant and his co-conspirators to Monster's auditors, the SEC, and the public, (Ind. ¶

62), and the defendant's total illegal profits earned as a result of the backdating scheme. (Ind. ¶

22).

In addition to incorporating the allegations contained in paragraphs One through

Fifty-Five, Sixty-One and Sixty-Two of the Indictment, Count Two reads, in pertinent part:

> From in or about 1996 up to and including in or about June 2006,
> in the Southern District of New York and elsewhere, JAMES J.
> TREACY, the defendant, unlawfully, wilfully and knowingly,
> directly and indirectly, by use of the means and instrumentalities of
> interstate commerce, the mails and the facilities of national
> securities exchanges, did use and employ manipulative and
> deceptive devices and contrivances, in violation of Title 17, Code
> of Federal Regulations, Section 240.10b-5, by:  (a) employing
> devices, schemes, and artifices to defraud; (b) making untrue
> statements of material fact and omitting to state material facts
> necessary in order to make the statements made, in light of the
> circumstances under which they were made, not misleading; and
> (c) engaging in acts, practices, and courses of business which
> operated and would operate as a fraud and deceit upon purchasers
> and sellers of Monster securities.

(Ind. ¶¶ 64).  These allegations, which track the language of Section 10(b) and explicitly invoke

Rule 10b-5, provide sufficient notice to the defendant of the crimes with which he is charged and

allow the defendant to "plead former jeopardy upon prosecution and to enable [him] to prepare a

defense." *United States v. Hernandez*, 980 F.2d 868, 871 (2d Cir. 1992); *see also United States

v. Sabbeth*, 262 F.3d 207, 217-18 (2d Cir. 2001); *United States v. Kelly*, 91 F. Supp. 2d 580, 583

(S.D.N.Y. 2000).  At this stage of the proceedings, the law requires nothing more.  On that basis

alone, the defendant's motion to dismiss portions of Count Two of the Indictment should be

denied.

### 2.        Treacy's Conduct, as Alleged, Violated § 10(b) and Rule 10b-5

Against the backdrop of Section 10(b)'s clear purpose to protect broadly investors

in the securities markets, the charge of backdating option grants without properly recording and

reporting the in-the-money portion of those option grants as an expense, adequately alleges a

violation of the securities laws.  The fraudulent and deceptive conduct by the defendant and his

co-conspirators and their failure to disclose their violative conduct violated all three prongs of

Rule 10b-5.

### a.        The Purpose and Scope of Section 10(b) and Rule 10b-5

"Section 10(b) was enacted as part of an effort "to insure honest securities markets

and thereby promote investor confidence."  *In re Parmalat*, 376 F. Supp.2d 472, 493 (S.D.N.Y.

2005) (citations omitted). "The purpose of § 10(b) and Rule 10b-5 is to protect persons who are

deceived in securities transactions."  *Chemical Bank v. Arthur Andersen & Co.*, 726 F.2d 930,

943 (2d Cir. 1984).  As the Second Circuit noted in *United States v. Russo*:

> [t]he Supreme Court has interpreted Section 10(b) and Rule 10b-5
> expansively in accordance with congressional intent to minimize
> fraud in securities trading . . . .  The purpose of the Section and its
> implementing regulations is to prevent fraud, whether it is "a
> garden type variety of fraud, or present[s] a unique form of

> deception. Novel or atypical methods should not provide immunity
> from the securities laws."

*Russo*, 74 F.3d 1383, 1390 (2d Cir. 1996) (quoting *Superintendent of Ins. v. Bankers Life & Cas. Co.*, 404 U.S. 6, 11 n.7 (1971)).  *See In re Parmalat*, 376 F. Supp.2d at 501 ("the language of section 10(b) and subsections (a) and (c) is quite broad and . . . the Supreme Court has emphasized repeatedly that Section 10(b) 'should be construed not technically and restrictively, but flexibly to effectuate its remedial purposes.'") (quoting *SEC v. Zandford*, 535 U.S. 813, 819 (2002)).  This "expansive approach" to §10(b) and Rule 10b-5 reflects the Supreme Court's view that frauds that "affect the 'integrity of the securities markets' . . . fall well within [§10(b) and Rule 10b-5]."  *United States* v. *Russo*, 74 F.3d at 1391 (quoting *In re Ames Dep't Stores Inc. Stock Lit.*, 991 F.2d 953, 966 (2d Cir. 1993)).

Each of Rule 10b-5's three subsections describes particular categories of prohibited conduct.  Subsection (a) prohibits "any device, scheme, or artifice to defraud."  Subsection (b) prohibits material misrepresentations and omissions.  And subsection (c) prohibits the use of "any act, practice, or course of business that operates or would operate as a fraud or deceit."  While there is overlap between each of these three prongs, and certain conduct can simultaneously violate all three prongs, they remain distinct components of the rule that have been construed distinctly.

The most common types of securities fraud claims involve misrepresentations or omissions, which can constitute a violation of any of Rule 10b-5's prongs.  "Presumably one reason for this is that the essence of fraud or deceit . . . is a misrepresentation."  *In re Parmalat*, 376 F. Supp. 2d at 497.  However, a violation of "Rule 10b-5(a) or (c) does not *require* an

18

allegation that the defendant made a statement, as liability is premised on a course of deceptive conduct undertaken by the defendant, rather than on misrepresentations or omissions." *In re Alstom SA Securities Litigation*, 406 F. Supp. 2d 433, 474 (S.D.N.Y. 2005) (emphasis added). *See also In re Global Crossing Ltd. Securities Litig.*, 322 F. Supp. 2d 319, 335-36 (S.D.N.Y. 2004) ("It is apparent from Rule 10b-5's language and the caselaw interpreting it that a cause of action exists under subsections (a) and (c) for behavior that constitutes participation in a fraudulent scheme, even absent a fraudulent statement by the defendant. . . Claims for engaging in a fraudulent scheme and for making a fraudulent statement or omission are thus distinct claims, with distinct elements.").   And, as noted above, "it is possible for liability to arise under both subsection (b) and subsections (a) and (c) of Rule 10b-5 out of the same set of facts, where the [allegations are] both that the defendants made misrepresentations in violations of Rule 10b-5, as well as that the defendants undertook a deceptive scheme or course of conduct that went beyond the misrepresentations." *In re Alstom Sec. Litig.*, 406 F. Supp. 2d at 475.  *See Charles Hughes & Co. v. SEC*, 139 F.2d 434, 436 (2d Cir. 1943) (broker's course of business in charging customer undisclosed excessive markup on securities "operated as a fraud and deceit upon the purchasers, as well as constituting an omission to state a material fact").

### b.      The Allegations of Backdating and Accounting Fraud

The Indictment adequately alleges violations of all three prongs of Rule 10b-5 based on the defendant and his co-conspirators' deceptive and fraudulent backdating scheme and their material misrepresentations and omissions.  During the relevant time period, Treacy and his co-conspirators engaged in an illegal scheme to deceive Monster's Board of Directors, shareholders and auditors, as well as securities analysts, the SEC, members of the investing

19

public, and others, concerning Monster's systematic backdating of both Broad-Based and One-Off Grants and Monster's failure to record and report any compensation expense in connection with those grants. (Ind. ¶ 15).  The co-conspirators perpetrated this scheme by routinely looking back in time to select grant dates for option grants based on historical dates when Monster's stock price had closed at or near a low point for the month or quarter.  As the Indictment alleges, "[w]ith the benefit of hindsight, Treacy created an opportunity for himself and others at Monster to reap substantial benefits by awarding backdated option grants with particularly advantageous exercise prices."  According to the Indictment, the majority of Monster's option grants during the relevant time period were in-the-money on the day they were in fact granted and therefore had an immediate compensatory and expense component.  Instead of disclosing the fact that Treacy and his co-conspirators backdated option grants and properly recording and reporting the in-the-money portion of those option grants as an expense, "Treacy and his co-conspirators used options as 'free' compensation that did not result in a reduction in the company's earnings." (Ind. ¶ 16).

These fraudulent and deceptive practices plainly constituted a "device, scheme, [and] artifice to defraud" in violation of the first prong of Rule 10b-5.  Simultaneously, the same conduct was a "practice, or course of business" which operated as a fraud on the public customers in violation of the Rule's third prong.  Treacy and his co-conspirators' misrepresentations about and failure to disclose these practices, in light of their fiduciary obligations to Monster and its public customers, also constituted material misrepresentations and omissions in violation of all three prongs of Rule 10b-5.

      c.      **Defendant's Conduct Violated Rule 10b-5(a) and (c)**

Treacy argues that "[t]his case solely turns on the alleged failure to disclose the

20

legal practice of backdating stock options." *See* Memorandum of Law in Support of Defendant's Motion to Dismiss Portions of Count Two Alleging Violations of Rule 10b-5(a) and (c) ("Treacy's Motion to Dismiss") at 1. Accordingly, Treacy argues that a "pure 'failure to disclose' case cannot be transformed into a 'scheme' case under Rule 10b-5(a) or (c)." *Id.* Treacy's argument fails because this is not a "pure" failure to disclose case. Here, the Indictment alleges, and the proof at trial will establish, that Treacy and his co-conspirators not only failed to disclose their backdating practices to the investing public, but, notably, also: (1) engaged in accounting fraud by reporting false earnings and failing to record a compensation expense associated with backdated option grants and (2) deceived and misled the public, the SEC, and others by making affirmative misrepresentations about their backdating practices in their Forms 10-K, proxy statements and other public filings and management representation letters submitted to their outside auditors. Thus, Treacy's characterization of this case as a failure to disclose case is belied by the allegations in the Indictment which plainly assert that Treacy's conduct was deceptive and fraudulent and that Treacy and his co-conspirators engaged in accounting fraud and made material misrepresentations in furtherance of their backdating scheme. This case stands in sharp contrast, therefore, to those cases cited by Treacy where no deception or scheme to defraud was alleged. *See Lentell v. Merrill & Co. Inc.*, 396 F.3d 161 (2d Cir. 2005) (Rule 10b-5 market manipulation claim cannot be supported solely by showing of misrepresentations or omissions); *SEC v. KPMG LLC*, 412 F. Supp.2d 349, 378 (S.D.N.Y. 2006) (declining to impose primary liability on defendant where the core misconduct involved a misrepresentation in an audit opinion and where there was no allegation of a device or scheme); *In re Royal Dutch/Shell Transport Sec. Litig.*, No. 04-373 (JAP), 2006 WL 2355402, at * 9 (D. N.J. Aug. 14, 2006)

21

("where a complaint alleges violations of Rule 10b-5(a) or (c), a plaintiff's allegations under Rule 10b-5(a) or (c) must entail a defendant's undertaking of a deceptive scheme or course of conduct that went beyond misrepresentations.").  In short, this case – as alleged in the Indictment – is a garden-variety fraud scheme where Treacy deceived investors and others and, as such, Treacy is properly charged under prongs (a) and (c) of Rule 10b-5.

The conduct of Treacy and his co-conspirators, most notably, the backdating of option grants without reporting and recording a compensation expense on Monster's books and records, the affirmative misrepresentations in Monster's Forms 10-K that their financial statements were in accordance with APB 25 and that the Company only granted options at fair market value and therefore did not record a compensation expense, and the affirmative misrepresentations in their management representation letters to Monster's outside auditors that their financial statements were presented in accordance with GAAP, constituted both a fraudulent device, scheme and artifice to defraud and an act, practice, or course of business which operated as a fraud or deceit, within the meaning of Rule 10b-5(a) and (c).  Sand, *Modern Federal Jury Instructions*, Instr. 57-22 ("A device, scheme or artifice to defraud is merely a plan for the accomplishment of any objective.  Fraud is a general term which embraces all ingenious efforts and means that individuals devise to take advantage of others.").  *See also Superintendent of Ins. v. Bankers Life & Casualty Co.*, 404 U.S. at 11 n.7 ("We believe that 10(b) and Rule 10b-5 prohibit all fraudulent schemes in connection with the purchase or sale of securities, whether the artifices employed involve a garden type variety of fraud, or present a unique form of deception. Novel or atypical methods should not provide immunity from the securities laws.") (quoting *A.T. Brod & Co. v. Perlow*, 375 F.2d 393, 397 (2d Cir. 1967)); *In re Alstom Sec. Litig.*, 406 F. Supp.

22

2d at 474  ("subsections (a) and (c) of Rule 10b-5 encompass a wide range of activities and are
not limited to the prohibition of market manipulation . . . liability [may be] premised on a course
of deceptive conduct undertaken by the defendant") (citations omitted); *In re Global Crossing*,
322 F. Supp.2d at 336-37 ("But subsections (a) and (c) encompass much more than illegal
trading activity: they encompass the use of *any* device, scheme or artifice, or *any* act, practice, or
course of business used to perpetrate a fraud on investors . . . courts including this country's
highest court have held that a cause of action lies for claims that involve allegations of
manipulative schemes used in connection with securities markets") (emphasis in original and
internal citation omitted).

By intentionally engaging in the backdating of option grants and failing to report
and record a compensation expense with respect to those grants, the defendant and his co-
conspirators deceived shareholders, among others, about the options granting process at Monster,
the books and records of the Company, and provided themselves and other senior executives at
Monster with the opportunity – that Monster's public shareholders were not afforded – to
purchase Monster stock at particularly advantageous exercise prices.  Nothing could be closer to
the fundamental conduct section 10(b) was aimed at protecting against.  *See Affiliated Ute
Citizens v. United States*, 406 U.S. 128, 151 (1972) ("These proscriptions, by statute and rule, are
broad and, by repeated use of the word 'any,' are obviously meant to be inclusive."); *Chiarella v.
United States*, 445 U.S. 222, 226 (1980).  Thus, the Indictment adequately alleges violations of
the securities laws based on defendant's fraudulent and deceitful conduct.

Simply put, Treacy's conduct was deceptive.  As Judge Stein observed in *United
States v. Bongiorno*, 2006 WL 1140864, at *6 (S.D.N.Y. May 1, 2006), "The question is

23

therefore whether a reasonable jury could find that the alleged fraud involved an act or acts of deception.  If the answer is yes, the motion to dismiss as to subsections (a) and (c) must be denied."  Indeed, "[a]ffording the terms its proper- and fully inclusive-meaning, a 'deceptive' act is one which 'tend[s] to deceive' or 'ha[s] power to mislead.'" *Id.* at *7 (quoting Webster's Third New Int'l Dictionary at 585).  *See also United States v. Finnerty*, Nos. 05 Cr. 393, 05 Cr. 397, 2006 WL 2802042, at *5  (S.D.N.Y. Oct. 2, 2006) (Chin, J.) (employing Judge Stein's definition of "deceptive" and noting the Supreme Court's mandate that Section 10(b) and Rule 10b-5 be construed broadly to effectuate its remedial purpose);  *see In re Parmalat*, 376 F. Supp.2d at 502 ("The same dictionary used by the Supreme Court defines 'deceptive' as '[t]ending to deceive; having power to mislead.'").

Here, the Indictment alleges, and a reasonable jury could certainly find, that Treacy's conduct was deceptive.  By participating in a scheme to backdate option grants, by failing to properly account for those option grants, and by making material misrepresentations about the backdating scheme and the Company's financial statements, Treacy and his co-conspirators deceived and misled the public, shareholders, auditors, the SEC and investors, among others.   In other words, the investing public, the auditors, and the SEC were led to believe one thing was true – that Monster only granted options at fair market value and accordingly, did not record a compensation expense for those option grants – and this deception was integral to the scheme to defraud.  Indeed, the whole scheme was about changing the date on option grants (by backdating documents, among other means) to make it look like option grants happened on earlier dates – when the price of the stock was at or near a historical low point –

than the grants actually occurred.  Accordingly, the Indictment is sufficient as a matter of law in

regard to its allegations of subsections (a) and (c) of Rule 10b-5.

**POINT III**

**COUNTS ONE AND TWO ARE NOT MULTIPLICITOUS**

Treacy moves to compel the Government to elect between Count One and Count

Two of the Indictment on the grounds that they are multiplicitous and charge the same crime

based on the same conduct.  Treacy's motion is meritless and must be denied because Counts

One and Two charge different offenses and therefore are not multiplicitous.

**A.    Applicable Law**

The multiplicity doctrine is predicated on the Double Jeopardy Clause of the Fifth

Amendment, which, among other things, assures that the court does not "exceed its legislative

authorization by imposing multiple punishments for the same offense."  *United States v. Fiore,*

821 F.2d 127, 130 (2d Cir. 1987) (quoting *Brown v. Ohio*, 432 U.S. 161, 165 (1977)).  When a

defendant is convicted in a single proceeding of two offenses that are constitutionally the same,

"the Double Jeopardy Clause does no more than prevent the sentencing court from prescribing

greater punishment than the legislature intended."  *Garrett v. United States*, 471 U.S. 773, 793

(1985) (quoting *Missouri v. Hunter*, 459 U.S. 359, 366 (1983)); *see Albernaz v. United States*,

450 U.S. 333, 344 (1981) ("[T]he question of what punishments are constitutionally permissible

[in a single proceeding] is not different from the question of what punishments the Legislative

Branch intended to be imposed.").

As the Second Circuit explained in *United States v. Fiore*, 821 F.2d at 130, a

three-step inquiry is employed to determine whether Congress intended to authorize multiple

25

punishments for conduct that violates two statutory provisions. *First*, if the offenses charged are set forth in different statutes or in distinct sections of a statute, and each section unambiguously authorizes punishment for a violation of its terms, it is ordinarily to be inferred that Congress intended to authorize punishment under each provision. *Id.*

    *Second*, in order to determine whether the two offenses are sufficiently distinguishable from one another that the inference that Congress intended to authorize multiple punishments is a reasonable one, a district court must employ the test established by the Supreme Court in *Blockburger v. United States*, 284 U.S. 299 (1932), which provides:

> where the same act or transaction constitutes a violation of two distinct statutory provisions, the test to be applied to determine whether there are two offenses or only one, is whether each provision requires proof of a fact which the other does not.

*Id.* at 304.  In this regard, it is "not determinative whether the same conduct underlies the counts; rather, it is critical whether the 'offense' — in the legal sense, as defined by Congress — complained of in one count is the same as that charged in another."  *United States v. Chacko*, 169 F.3d 140, 146 (2d Cir. 1999).  Stated another way, "the *Blockburger* test is to be applied to the statute alone, irrespective of the facts alleged in a particular indictment."  *Fiore*, 821 F.2d at 131 n.5; *see also United States v. Dixon*, 509 U.S. 688, 708 (1993) (making clear that the "only . . . test" for double jeopardy purposes when the offenses are alleged to be the "same" is the "same-elements test" from *Blockburger*); *United States v. Bradley,* 812 F.2d 774, 780 (2d Cir. 1987) ("[t]he [*Blockburger*] test is applied to the statutory definition, not to the proof in a particular case"); *United States v. Langella,* 776 F.2d 1078, 1082 (2d Cir. 1985) (Supreme Court authority "requires us to focus on the provisions of the statutes involved, rather than on the

evidence adduced at trial, to determine whether the punishment appellant received was proper

under *Blockburger*"); *United States v. Nakashian*, 820 F.2d 549, 552-53 (2d Cir. 1987) (finding,

in evaluating multiplicity challenge, that it was inappropriate to look behind the statutory

provisions themselves); *United States v. Thomas*, 757 F.2d 1359, 1371 (2d Cir. 1985) (finding

that it is the statutory language, and "not the specific allegations," that controls).

        This strict focus on the statutory elements rather than the underlying facts reflects

the well-settled rule that an identical set of facts, or a single fact, may properly lead to conviction

and punishment under multiple statutes. *See, e.g., United States v. Woodward*, 469 U.S. 105, 107

(1985) (finding that a single factual episode can give rise to distinct offenses under separate

statutes without violating the Double Jeopardy Clause); *Albernaz v. United States*, 450 U.S. at

344 n.3 (same); *Harris v. United States,* 359 U.S. 19 (1959) (finding that consecutive sentences

were permitted where single transaction violated two distinct statutory provisions).  Moreover, as

the Supreme Court reasoned in *Albrecht v. United States*, 273 U.S. 1 (1927), "[t]here is nothing

in the Constitution which prevents Congress from punishing separately each step leading to the

consummation of a transaction which it has the power to prohibit and punishing also the

completed transaction." *Id.* at 11.

        If the *Blockburger* test is satisfied,

> the final step is to test the tentative conclusion that multiple
> punishments are authorized against the legislative history of the
> statutory provisions to discover whether a contrary congressional
> intention is disclosed. If the legislative history either reveals an
> intent to authorize cumulation of punishments or is silent on the
> subject, the court should conclude that Congress intended to
> authorize multiple punishments.

*Fiore*, 821 F.2d at 130 (citing *United States v. Marrale*, 695 F.2d 658, 662 (2d Cir. 1982), and

*Albernaz*, 450 U.S. at 336-42)). The presumption, based on legislative silence, that Congress

intended multiple punishments stems from the recognition that:

> Congress is "predominantly a lawyers body," . . . and it is
> appropriate . . . "to assume that our elected representatives . . .
> know the law." . . . As a result if anything is to be assumed from
> Congressional silence on this point, it is that Congress was aware
> of the *Blockburger* rule and legislated with it in mind.

*Albernaz*, 450 U.S. at 341-42 (internal citations omitted).

It is well-established that a conspiracy and the substantive offense are separate

crimes that may be charged separately in an Indictment. *See United States v. Felix*, 503 U.S. 378,

391 (1992) ( "a conspiracy to commit a crime is a separate offense from the crime itself");

*Iannelli v. United States*, 420 U.S. 770, 777 (1975) ("Traditionally the law has considered

conspiracy and the completed substantive offense to be separate crimes.") (citations omitted);

*United States v. Feola*, 420 U.S. 671, 693 (1975) ("[C]onsecutive sentences may be imposed for

the conspiracy and for the underlying crime.") (citations omitted); *Pereira v. United States*, 347

U.S. 1, 11 (1954) ("[T]he commission of a substantive offense and a conspiracy to commit it are

separate and distinct crimes, and a plea of double jeopardy is no defense to a conviction for

both."); *United States v. Sattar*, 314 F. Supp.2d 279, 306 (S.D.N.Y. 2004) (denying defendant's

motion to dismiss the conspiracy and substantive counts as multiplicitous); *United States v. Bin*

*Laden*, 91 F. Supp.2d 600, 618 (S.D.N.Y. 2000) (denying defendant's motion to dismiss the

conspiracy and substantive counts as multiplicitous even where both offenses were defined

within the same statute).

**B.**    **Discussion**

Treacy claims that the conspiracy charged in Count One of the Indictment and the

substantive securities fraud count charged in Count Two of the Indictment are multiplicitous because the factual allegations underlying both counts are the same.  *See* Defendant's Memorandum in Support of Motion to Compel the Government to Elect Between Counts One and Two Because of Multiplicity ("Treacy's Multiplicity Motion") at 2.  But, as the Second Circuit has made clear, the relevant inquiry is not whether the same conduct underlies the counts but, rather, whether the offenses are distinct legally under the *Blockburger* test.  *See Chacko*, 169 F.3d at 145; *Fiore*, 821 F.2d at 131 n. 5; *Thomas*, 757 F.2d at 1371.  Under the *Blockburger* test and the prevailing law in this Circuit, Treacy's multiplicity challenge to the Indictment must fail.

Notably, Treacy has failed to identify how the two counts fail the well-established *Blockburger* test or cite any authority to support his claim that the conspiracy and substantive offenses charged in the Indictment are multiplicitous.  Count One of the Indictment charges Treacy with conspiring with others to commit securities fraud, file false reports with the SEC, make false statements to auditors, and falsify books and records, in violation of Title 18, United States Code, Section 371.  The elements of conspiracy under this statute are: (1) that the conspiracy charged existed – that is, the existence of an agreement or understanding to commit at least one of the object crimes charged in the Indictment; (2) that the defendant knowingly became a member of the conspiracy; and (3) that any one of the conspirators – not necessarily the defendant, but any one of the parties involved in the conspiracy – knowingly committed at least one overt act in furtherance of the conspiracy during the life of the conspiracy.  Sand, *Modern Federal Jury Instructions*, Instr. 19-3; *see United States v. Maldonado-Rivera*, 922 F.2d 934, 961 (2d Cir. 1990) (quoting district court charge setting forth three elements of conspiracy); *United States v. Ciambrone*, 787 F.2d 799, 810 (2d Cir. 1986) (discussing elements of conspiracy).  A

29

necessary element of this offense is the *agreement* or understanding between Treacy and others to commit *any* one of the objects of the conspiracy.

In contrast, Count Two of the Indictment charges Treacy with substantive securities fraud, in violation of Title 15, United States Code, Sections 78j(b) and 78ff.  To establish that a defendant committed securities fraud in violation of Section 10(b) and Rule 10b-5, the Government must prove:

> First, that in connection with the purchase or sale of [a security] the defendant did any one or more of the following:
>
> > (1) employed a device, scheme, or artifice to defraud, or
> >
> > (2) made an untrue statement of a material fact or omitted to state a material fact which made what was said, under the circumstances, misleading, or
> >
> > (3) engaged in an act, practice, or course of business that operated, or would operate, as a fraud or deceit upon a purchaser or seller.
>
> Second, that the defendant acted willfully, knowingly, and with the intent to defraud.
>
> Third, that the defendant knowingly used, or caused to be used, any means or instruments of transportation or communication in interstate commerce or the use of the mails in furtherance of the fraudulent conduct.

Sand, *Modern Federal Jury Instructions*, Instr. 57-21.

Given the elements of the two offenses, the *Blockburger* test establishes that Counts One and Two are not multiplicitous, because there is an element in each offense that is not contained in the other.  *Blockburger*, 284 U.S. at 304.  Specifically, Count One, the conspiracy count, contains as an element the existence of an agreement, while Count Two, the

30

substantive securities fraud count, does not.  Likewise, Count One contains three other objects in addition to securities fraud: (1) false statements in Annual and Quarterly SEC Reports, in violation of Title 15, United States Code, Sections 78m(a) and 78ff; (2) false statements to auditors, in violation of Title 15, United States Code, Sections 78m(b)(1) and 78ff; and (3) false books and records, in violation of Title 15, United States Code, Sections 78m(b)(2)(A), 78m(b)(5) and 78ff.   Count Two, the substantive securities fraud count, requires as an element proof that the defendant actually did – as opposed to agreed to – employ a device, scheme or artifice to defraud, made an untrue statement of a material fact *or* omitted to state a material fact or omitted to state a material fact which made what was said, under the circumstances, misleading, or engaged in any act, practice, or course of business that operated, or would operate, as a fraud or deceit upon a purchaser or seller.  In addition, Count Two contains as elements proof that the defendant acted willfully and with the intend to defraud and that the defendant used or caused to be used, any means or instruments of transportation or communication in interstate commerce or the use of the mails in furtherance of the fraudulent conduct; neither of these elements is required on Count One.   Accordingly, each offense contains an element that is not contained in the other, and therefore the Counts cannot be considered multiplicitous.

> *United States v. Reed*, 639 F.2d 896 (2d Cir. 1981), relied on by Treacy in support of his motion, does not instruct otherwise.  In *Reed*, the Second Circuit explained that the "typical multiplicity problem involves a statute which either creates a single offense for an act involving several potential victims . . . or describes several means by which a single offense may committed." *Id*. at 904. The Second Circuit was careful to contrast this with the situation presented in *Reed*, where one set of transactions gave rise to violations of two distinct statutes

31

with different elements; in that situation, the Circuit found no "multiplicity problem" because "the same transaction may violate two distinct provisions of the same statute or different statutes and be punishable under both as separate substantive crimes . . . the basic inquiry is whether each offense charged requires proof of a fact that the other does not." *Id.* at 905 (citing *Blockburger*, 284 U.S. at 304).

United States v. Stewart, 420 F.3d 1007 (9th Cir. 2005), which Treacy cites in support of his position, is inapposite.  In *Stewart*, the defendant was convicted of two counts of making material false statements to FBI agents, in violate of the *same* statute, Title 18, United States Code, Section 1001.  The indictment charged the defendant in two separate counts with making identical false statements in response to identical questions posed by the same agent, in violation of the same statute.  In accordance with its prior case law, the Ninth Circuit determined that where a defendant has made multiple, identical false statements in violation of Section 1001(a)(2), the defendant may only be convicted once.  *Stewart* is thus easily distinguishable from this case where Treacy is charged with distinct offenses under separate statutes.

Under prevailing Second Circuit case law, if the *Blockburger* test is satisfied, the final step in the inquiry is to determine whether Congress intended to authorize multiple punishments for conduct that violates two statutory provisions.  *See Fiore*, 821 F.2d at 130 ("If the legislative history either reveals an intent to authorize cumulation of punishments or is silent on the subject, the court should conclude that Congress intended to authorize multiple punishments.").  Significantly, not only does the application of the *Blockburger* test to Counts One and Two defeat Treacy's motion, but Congress made it clear that a conspiracy to commit a substantive crime and the substantive crime are distinct offenses.  *See* Sand, *Modern Federal*

32

*Jury Instructions*, Instr. 19-2 ("Congress has deemed it appropriate to make conspiracy, standing alone, a separate crime, even if the conspiracy is not successful."); *United States v. Labat*, 905 F.2d 18, 21 (2d Cir. 1990) ("Since the essence of conspiracy is the agreement and not the commission of the substantive offense that is its objective, the offense of conspiracy may be established even if the collaborators do not reach their goal.").

In sum, Treacy's motion to compel the Government to elect between Counts and Two of the Indictment on the grounds of multiplicity should be rejected because Counts One and Two satisfy the *Blockburger* test and Congress has plainly stated its intent to make conspiracy a separate crime from its objects.

## POINT IV

### THERE IS NO BASIS TO PRECLUDE THE GOVERNMENT FROM USING THE TERM "BACKDATING" AT TRIAL

Treacy moves to strike the term "backdating" from the Indictment and to preclude the Government from using the term at trial. Treacy's motion is frivolous and, if granted, would unfairly restrict the Government's ability to present its case in a clear and straightforward manner at trial. It therefore should be denied.

A motion to strike surplusage should be granted only where it is clear that "the challenged allegations 'are not relevant to the crime charged and are inflammatory and prejudicial.'" *See United States* v. *Hernandez*, 85 F.3d 1023, 1030 (2d Cir. 1996) (citing *United States* v. *Scarpa*, 913 F.2d 993, 1013 (2d Cir. 1990) (quoting *United States* v. *Napolitano*, 552 F. Supp. 465, 480 (S.D.N.Y. 1982))); *see also United States* v. *Elson*, 968 F. Supp. 900, 909 (S.D.N.Y. 1997). "If the evidence of the allegation is admissible and relevant to the charge, then

33

despite prejudice, the language will not be stricken." *United States* v. *Napolitano*, 552 F. Supp. at 480 (citing *United States* v. *Chas. Pfizer & Co.*, 217 F. Supp. 199, 201 (S.D.N.Y. 1963)).

Treacy is charged with participating in a scheme to grant and receive stock options at historically low exercise prices, while giving the appearance that such grants had been given at fair market value on the date of grant. In furtherance of the scheme, Treacy and his accomplices created documents, including corporate records, to make it look as if the grants had been made on prior dates. In other words, they dated the grants prior to the true date. This is the definition of backdating. *See* Webster's II New College Dictionary 81 (1995) (defining "backdate" as "to date prior to the true date").

Notwithstanding the plain meaning of the word "backdating" and its inherent descriptiveness of the conduct in this case, Treacy moves to strike the term from the indictment and to preclude the Government from using the term at trial. In making this motion, Treacy makes three primary arguments. First, Treacy argues that "'backdating' alone (i.e., selecting dates which are favorable to the grantee in retrospect) is not illegal." *See* Memorandum of Law in Support of Defendant's Motion to Strike the Term "Backdating" from the Indictment ("Treacy's 'Backdating' Motion") at 2. Second, Treacy argues that the term "backdating" is unduly prejudicial. *Id.* at 4-5. Third, Treacy argues that the Government could use other — albeit much more wordy and less descriptive — language to describe the same conduct. Treacy's arguments should be rejected.

First, when Treacy argues that "backdating" alone is not illegal, what he really seems to be talking about is the practice of giving in-the-money option grants. The Government agrees that it is entirely lawful for a company to grant options with a discounted strike price that

is below the fair market value of the stock on the date of grant, provided that the company

properly accounts for it.  The company can achieve this goal by simply selecting any strike price

that it wants.  Arguably, one way to set that strike price would be to look back in time and select

the fair market value of the stock from a prior date.  But it is hard to fathom why the company

would do this, other than to deceive.  Thus, it is the act of backdating — of making it *look* as if

the grant was made on a prior date — that allows the scheme to succeed.  Without that step, the

fact that the company was granting in-the-money options would be obvious to all and the

company would have no ability to avoid the resulting accounting consequences.

Judge Charles R. Breyer addressed this issue in *United States v. Reyes*, an options

backdating case that resulted in a conviction last summer.  In denying the defendant's post-trial

motions, Judge Breyer discussed the nature of the scheme:

> A juror in this case is confronted with a simple question:  why
> backdate? . . .  The most plausible answer is to hide expenses.  The
> only explanation for backdating proffered by [the defendant] in this
> case – because Brocade [the company] wanted to obtain attract and
> retain talent, or, stated another way, because Brocade wanted to
> offer an advantageous strike prices [sic] to its employees – is no
> true explanation at all.  This explains why Brocade might have
> wanted to grant options with low strike prices, that is, at less than
> fair market value.  But a company can give away options without
> backdating them.  *The chief purpose served by the act of*
> *backdating itself is to make the grants look as though they were*
> *granted at fair market value, and thereby to avoid a compensation*
> *charge.*

*United States v. Reyes*, 2007 WL 2462147, at *1 (N.D. Cal. Aug. 29, 2007) (emphasis added).

For similar reasons Treacy's second argument, that the term "backdating" is

unduly prejudicial, must be rejected.  Backdating is the most specific and accurate description of

the conduct at issue in this case.  The Government expects the evidence at trial to show that

35

members of the conspiracy used the term themselves in documents and elsewhere.  The term has

been widely used in connection with this case, as well as in other similar cases across the

country, and Treacy's counsel, in the six pending motions, uses the term repeatedly as the most

accurate description of the charged conduct.  The Government is not aware of any case in which

the defendant succeeded in precluding the Government from using the term. On the contrary, in

*Reyes*, Judge Breyer specifically rejected the defendant's motion to preclude the Government

from using the word, saying that he refused to "sanitiz[e] the speech of the parties."  *See* May 30,

2007 Transcript in *United States v. Reyes*, attached as Exhibit A, at 73-74.  Judge Breyer repeated

the basis for this ruling in his post-trial decision, noting "this *is* a case about backdating."  *Reyes*,

2007 WL 2462147, at *8 (emphasis in original).[3]  While Treacy is certainly free to argue that

there were benign explanations for the backdating, the Government should not be unfairly

hamstrung in its ability to describe Treacy's conduct to the jury.  There is nothing unduly

prejudicial about using the term that best describes what this case is about.

        Finally, Treacy's suggestion that the Government should limit itself to other

euphemisms such as "retrospective pricing" or "selecting grant dates in hindsight," Treacy's

'Backdating' Motion at 4, should be rejected as both overly constricting and misleading.  Treacy

and his accomplices did more than simply select grant dates in hindsight or retrospectively price

option grants; they backdated documents to cover up what they had done.  Precluding the

Government from using the term "backdating" would be no different than requiring the

Government to substitute "systematic plan of action" for "scheme."  The Government is not

---

[3]      In *Reyes*, Judge Breyer addressed defense concerns about whether the jury might erroneously believe that giving in-the-money options through backdating was necessarily illegal by giving an appropriate limiting instruction.  *See Reyes*, 2007 WL 2462147, at *8.

aware of any authority to support such a bizarre result, and none of the cases cited by Treacy —
which overwhelming relate to *civil* litigation — supports Treacy's current motion.

Put simply, it would be awkward and confusing to prohibit the parties and the
witnesses from using the word "backdating" when that word best describes the conduct that
occurred.  There is nothing unduly prejudicial about the term and the Government should not be
unfairly restricted in its ability to accurately describe the charged conduct.  Treacy's motion to
strike the word "backdating" from the indictment and preclude the Government from using the
term at trial therefore should be rejected.

### POINT V

### THE ALLEGATIONS REGARDING THE AMOUNT OF THE ACCOUNTING MISSTATEMENT AND ILLICIT GAIN RESULTING FROM THE BACKDATING SCHEME SHOULD NOT BE STRICKEN FROM THE INDICTMENT

Treacy moves to dismiss paragraph 10, which references Treacy's illegal gain
from the scheme, and paragraph 48,[4] which references the compensation expense that Monster
should have recorded in connection with the backdated in-the-money option grants, from the
Indictment on the grounds that they are speculative and prejudicial.  *See* Defendant's
Memorandum in Support of Defendant's Motion to Strike Speculative Loss and Gain Amounts
from the Indictment ("Treacy's Surplusage Motion") at 1-2.  Because these paragraphs are
relevant and admissible on both the issues of Treacy's motive and the materiality of the
misrepresentations and omissions made during the course of this backdating scheme, Treacy's
motion should be denied.

---

[4]    Paragraph 48 is now paragraph 53 in the superseding indictment.

37

A.    **Applicable Law**

Rule 7 of the Federal Rules of Criminal Procedure provides in pertinent part that "[t]he Court on motion of the defendant may strike surplusage from the indictment . . . ." Fed. R. Crim. P. 7(d).  The Second Circuit has cautioned that "motions to strike surplusage from an indictment will be granted only where the challenged allegations are not relevant to the crime alleged and are inflammatory and prejudicial." *United States v. Mulder*, 273 F.3d 91, 99 (2d Cir. 2001) (quoting *United States v. Scarpa*, 913 F.2d at 1013); *accord United States v. Hernandez*, 85 F.3d at 1030 (quoting *United States v. Napolitano*, 552 F. Supp. at 480).  However, when "'evidence of the allegation is admissible and relevant to the charge, then regardless of how prejudicial the language is, it may not be stricken.'" *United States v. Scarpa*, 913 F.2d at 1013 (quoting *United States v. DePalma*, 461 F. Supp. 778, 797 (S.D.N.Y. 1978)).  "Since 'the standard for surplusage is exacting, only rarely is alleged surplusage stricken from an indictment.'" *United States v. Earls*, No. 03 Cr. 0364 (NRB), 2004 WL 350725, at * 3 (S.D.N.Y. Feb. 25, 2004) (quoting *United States v. Gotti*, 42 F. Supp. 2d 252, 292 (S.D.N.Y. 1999)).

B.    **Discussion**

Treacy claims that the references to a $339 million unreported compensation expense and the $13.5 million illicit gain from backdated option grants should be stricken from the Indictment because they are speculative and carry the risk of unfair prejudice to Treacy.  *See* Treacy's Surplusage Motion at 2.  Treacy's arguments are without merit.

Notably, Treacy completely fails to address the standard in this Circuit for striking surplusage from the Indictment.  Instead, Treacy tries to bootstrap the standard for calculating loss in this Circuit as articulated by the Second Circuit in *United States v. Rutkoske*, 506 F.3d

38

170, 178 (2d Cir. 2007), to a motion to strike surplusage from the Indictment. *See* Treacy's

Surplusage Motion at 7 ("Since Second Circuit precedent makes clear that such a methodology

would be unacceptable for sentencing purposes, it surely does not belong in the Indictment . . ."").

Treacy's argument completely misses the mark because the issue here is not whether the

methodology used in the calculation of loss is too speculative under the applicable Sentencing

Guideline[5] but, rather, whether the challenged allegations are *relevant* to the crime charged.

   The facts alleged in Paragraph 48 relating to the unrecorded compensation

expense by the Company for the backdated option grants are unquestionably relevant and

admissible in this case.  Treacy is charged with a conspiracy to commit securities fraud, file false

reports with the SEC, make false statements to auditors, and falsify books and records (Count

One), and with substantive securities fraud (Count Two).  The securities fraud and false filings

offenses depend, in whole or in part, on Treacy's participation in the falsification of financial

statements disseminated to the public.  These charges, moreover, require proof that the

misstatements were material.  Accordingly, the Government will have to prove that the

misstatements were material to shareholders of Monster Worldwide and, therefore, the amount of

unrecorded compensation expense is highly relevant.   It is well-established that materiality can

be proved by quantitative or qualitative means.  *See, e.g., Ganino v. Citizens Utils. Co.*, 228 F.3d

154, 161 (2d Cir. 2000); *United States v. Ferguson*, – F. Supp. 2d – 2008 WL 2067995, at * 4

(D. Conn. May 15, 2008).  Moreover, the magnitude of the unrecorded compensation expense –

---

   [5]  To the extent that Treacy argues that the methodology used by Navigant
Consulting to calculate the unrecorded compensation expense is imprecise and speculative, the
Government has provided the defense with the underlying data relating to this calculation and the
defense can cross-examine the witnesses at trial about their purported "imprecise estimates."
Treacy's arguments in this regard go to the weight, not the admissibility, of this evidence.

particularly for the years 1999 and 2000 when recording the proper compensation expense would have wiped out Monster's profits for those years – is also relevant and admissible to prove the motive of Treacy and his co-conspirators.

Finally, the allegations in the Indictment (paragraph 10) relating to Treacy's illegal profits from the backdating scheme are similarly relevant and admissible to prove Treacy's motive in committing the charged offenses. *See United States v. Hanna*, 198 F. Supp. 2d at 245 (denying defendant's motion to strike paragraph of the indictment describing the defendant's profits from the fraudulent scheme on the grounds that the evidence was relevant and admissible on the issue of the motive for participating in the scheme to defraud investors).

In sum, for the reasons stated above, the allegations in paragraphs 10 and 53 (formerly 48) are plainly relevant and admissible to the charges in the Indictment and thus should not be stricken.

## POINT VI

## TREACY'S MOTION TO ISSUE RULE 17(c) SUBPOENAS SHOULD BE DENIED

Treacy's final motion seeks a Court order permitting the defense to issue seven Rule 17(c) subpoenas prior to trial. Treacy seeks leave to serve subpoenas on (1) Fulbright & Jaworski, LLP ("Fulbright & Jaworski"), Monster's outside counsel during the relevant period; (2) BDO Seidman, LLP ("BDO"), Monster's outside auditors; (3) Akin Gump Strauss Haeur & Feld, LLP ("Akin Gump"), the law firm that conducted Monster's internal investigation of the backdating scheme after the scheme was discovered on behalf of a Special Committee of Monster's Board of Directors; (4) Navigant Consulting, Inc. ("Navigant"), an outside consulting firm that participated in the post-offense internal investigation of the backdating scheme; and (5)

40

Michael Kaufman, Ronald Kramer and John Gaulding, three members of Monster's

Compensation Committee during the relevant time period.  For each of these parties, Treacy

seeks to subpoena:

> All records (including electronic records) related to TMP
> Worldwide Inc.'s or Monster Worldwide Inc.'s stock option grants
> and option granting practices, for the period December 1, 1996
> through June 30, 2006.

Additionally, for Akin Gump and Navigant, Treacy seeks discovery of:

> All records (including electronic records) with respect to
> determinations about measurement dates for option grants and the
> type of accounting to apply to options grants of TMP Worldwide
> Inc. or Monster Worldwide Inc.

Treacy's motion for permission to issue these subpoenas as currently drafted should be denied,

because Treacy has not met the requirements for issuance of these subpoenas under Rule 17(c),

Federal Rules of Criminal Procedure.

### A.    <u>Applicable Law</u>

Discovery in criminal cases is governed by Rule 16, and is not to be conducted

through the issuance of subpoenas pursuant to Rule 17.  *See Bowman Dairy Co. v. United States*,

341 U.S. 214, 219-20 (1951); *United States v. Fowler*, 932 F.2d 306, 311 (4th Cir. 1991); *United

States v. Cuthbertson*, 630 F.2d 139, 144, 146 (3d Cir. 1980); *United States v. Murray*, 297 F.2d

812, 821 (2d Cir. 1962); *United States v. Cherry*, 876 F. Supp. 547, 552 (S.D.N.Y. 1995); *United

States v. Gel Spice Co.*, 601 F. Supp. 1214, 1224 (E.D.N.Y. 1985).  As the Supreme Court has

explained, "[i]t was not intended by Rule 16 to give a limited right of discovery, and then by

Rule 17 to give a right of discovery in the broadest terms."  *Bowman*, 341 U.S. at 220.  "Courts

must be careful that Rule 17(c) is not turned into a broad discovery device, thereby undercutting

the strict limitation of discovery in criminal cases found in [Rule 16]." *Cherry*, 876 F. Supp. at

552 (quoting *Cuthbertson*, 630 F.2d at 146).

Rather, Rule 17(c) permits a defendant to subpoena "any document or other

materials, *admissible as evidence*, obtained by the Government by solicitation or voluntarily from

third persons . . . ." *Bowman*, 341 U.S. at 221 (emphasis added). The rule's "chief innovation

was to expedite the trial by providing a time and place before trial for the inspection of the

subpoenaed materials." *Id.* at 220. "Thus, rule 17(c) is designed as an aid for obtaining *relevant*

*evidentiary material* that the moving party may use at trial." *Cuthbertson*, 630 F.2d at 144

(emphasis added).

Rule 17(c) does not confer an automatic or absolute right to pretrial production of

evidentiary material. Rather, pretrial production lies within the Court's discretion, which should

be exercised only if the movant can show that: (1) the documents sought are evidentiary and

relevant; (2) the documents are not otherwise procurable in advance of trial by the exercise of

due diligence; (3) the party cannot properly prepare for trial without such production and

inspection in advance of trial and the failure to obtain such inspection may tend unreasonably to

delay the trial; and (4) the application is made in good faith and is not intended as a general

fishing expedition. *United States v. Nixon*, 418 U.S. 683, 699-700 (1974). The "unambiguous"

requirement in Rule 17(c) of court approval for pretrial production of documents is designed to

"ensure that subpoenas are not used for impermissible discovery, which is more likely to be the

case when advance production . . . is sought instead of the usual production at the time of trial."

*United States v. Noriega*, 764 F. Supp. 1480, 1493 (S.D. Fla. 1991) (citing *United States v.*

*Ferguson*, 37 F.R.D. 6, 8 (D.D.C. 1965) (Requirement "is no mere technicality. It is vital

42

protection against misuse or improvident use of such subpoenas *duces tecum*.")).  The overriding

test for permitting the issuance of a Rule 17(c) subpoena is "whether the subpoena constitutes a

good faith effort to obtain identified evidence rather than a generic 'fishing expedition' that

attempts to use the rule as a discovery device."  *Cuthbertson*, 630 F.2d at 144.

To obtain a pretrial subpoena, the movant "must clear three hurdles: (1) relevancy;

(2) admissibility; (3) specificity."  *Nixon*, 418 U.S. at 700.  Under this test the documents sought

"cannot be *potentially* relevant or admissible, they must meet the test of relevancy and

admissibility at the time they are sought."  *United States v. Marchisio*, 344 F.2d 653, 669 (2d Cir.

1965); *see also Cherry*, 876 F. Supp. at 552 (same); *United States v. Burger*, 773 F. Supp. 1419,

1425 (D. Kan. 1991).  Thus, Rule 17(c) is different from the civil rules which permit the issuance

of subpoenas to seek production of documents or materials that, although themselves not

admissible, may lead to admissible evidence.  *See Cherry*, 876 F. Supp. at 552; *see also United

States v. Gross*, 24 F.R.D. 138, 141 (S.D.N.Y. 1959) (Rule 17(c) cannot be used "to obtain leads

as to the existence of additional documentary evidence or to seek information relating to the

defendant's case.  This type of discovery, permissible under the Federal Rules of Civil Procedure,

has not been authorized for criminal trials.").

In addition, courts have repeatedly held that a Rule 17(c) subpoena should not be

used to obtain, in advance of trial, material that is to be used for impeachment purposes.  *See*,

*e.g.*, *Nixon*, 418 U.S. at 701 ("[g]enerally the need for evidence to impeach witnesses is

insufficient to require its production in advance of trial") (citations omitted); *Cherry*, 876 F.

Supp. at 552 (citing *United States v. Hughes*, 895 F.2d 1135, 1145-46 (6th Cir. 1990); *United

States v. Fields*, 663 F.2d 880, 881 (9th Cir. 1981); *Cuthbertson*, 651 F.2d at 195; *United States*

43

*v. Giampa*, Cr. No. 92-437, 1992 WL 296440 at *3 (S.D.N.Y. Oct. 7, 1992); *see also Iozia*, 13

F.R.D. at 340 (Rule 17(c) cannot be used "to require in advance of trial, and in preparation for

trial, a disclosure to the defendant of information which may tend to impeach persons the

Government may or may not call as witnesses").

Finally, "conclusory statements that the documents may be relevant and

admissible are insufficient" to overcome the *Nixon* hurdles.  *Burger*, 773 F. Supp. at 1425 (citing

*United States v. Eden*, 659 F.2d 1376, 1381 (9th Cir. 1981)).  In short, the test for the issuance of

a pretrial subpoena is whether the subpoena represents a good faith effort to obtain relevant,

admissible evidence that is useful only if inspected before trial.  *Bowman*, 341 U.S. at 220-21.[6]

---

[6]      Treacy argues that the standard for permitting the issuance of a Rule 17(c) subpoena may be lower when the subpoena is directed at a third party, as opposed to the Government.  In support of this proposition, Treacy relies in part on a footnote in *Nixon*, which Treacy characterizes as holding that "different, and less burdensome, standard may be appropriate where a Rule 17(c) subpoena seeks discovery from a third party as opposed to the government."  *See* Memorandum of Law in Support of Defendant's Motion for an Order Permitting the Issuance of Rule 17(c) Subpoenas ("Treacy's Rule 17(c) Motion") at 6.  The *Nixon* decision does not, however, stand for this proposition.  In fact, the referenced footnote in *Nixon* expressly states that the Court is *not* making that holding.  *Nixon*, 418 U.S. at 699, n.12 ("We need not decide whether a lower standard exists . . .").  Treacy's reliance on *Nixon*, therefore, is misplaced at best.

Treacy also cites two district court decisions, *United States v. King*, 194 F.R.D. 569 (E.D. Va. 2000), and *United States v. Tucker*, 2008 WL 361127 (S.D.N.Y. Feb. 20, 2008), in support of his argument.  *See* Treacy's Rule 17(c) Motion at 7.  These cases lend some support to Treacy's contention, but they stand as outliers in the face of other authority.  *See United States v. Ferguson*, 2007 WL 2815068, at *3 (D. Conn. Sept. 26, 2007) (concluding that *Nixon* test applies to third-party subpoenas and collecting cases from within Second Circuit).  As Judge Keenan noted when faced with a claim that "subpoenas served on third parties are subject to a diminished standard," the "Court finds no authority to support that proposition."  *United States v. Myerson*, 684 F. Supp. 41, 45 (S.D.N.Y. 1988).

Accordingly, Treacy's argument that the Court should apply a lower standard with regard to the Rule 17(c) subpoenas in this case is dubious.  Here, however, the Court need not decide this issue as the subpoenas fail under either standard, as explained below.

B.    <u>**Discussion**</u>

Here, as the subpoenas are currently drafted, the defense has embarked on a fishing expedition for inadmissible material that is not permitted by Rule 17(c). The at-issue subpoenas are defective not only because the defense cannot possibly make the showing required under Rule 17(c), but also because, to a great extent, the subpoenas seek the sort of production explicitly prohibited either by Rules 16 and 17 and by the case law interpreting those rules.

First, Treacy has failed to satisfy the requirement of specificity with its boilerplate demands on each of the third parties for "[a]ll records related to [Monster's] stock option grants and option granting processes, for the period December 1, 1996 though June 30, 2006." Short of asking for every document related to Monster as a whole, it would be hard to think of a request with a broader scope. *See United States v. Leonard*, 817 F. Supp. 286, 295 (E.D.N.Y. 1992) (subpoena seeking "virtually every DEA document relating to [defendant]" is a "clear[] example" of lack of specificity); *Elife*, 43 F.R.D. at 25 (subpoena improper where not directed at "specific documents"); *cf. Gel Spice*, 601 F. Supp. at 1225 (government subpoena proper where request was "tailored" to records concerning discrete shipments, specified documents to be produced "with reasonable particularity," and sought documents admissible as business records). *Noriega*, 764 F. Supp. at 1493 (if movant "cannot reasonably specify the information contained or believed to be contained in the documents sought but merely hopes that something useful will turn up, this is a sure sign that the subpoena is being misused").

Second, Treacy cannot show that the requested documents — which would undoubtedly include a multitude of irrelevant documents that have nothing to do with the charges

in this case — are either material to his defense or evidentiary and relevant. Treacy's requests are neither addressed to particular grants nor targeted at documents related to Treacy's role in the backdating scheme. Indeed, with regard to the subpoenas to Akin Gump and Navigant, the documents requested could not be admissible because Akin Gump and Navigant first became involved in this matter *after* the at-issue conduct was completed. Neither Akin Gump nor Navigant could authenticate relevant documents. And to the extent they collected documents from Monster as part of their investigation, the compelled production of those documents would be duplicative of documents that have been or will be produced by the company. In this respect, Treacy's subpoenas constitute nothing more than a fishing expedition. *Cuthbertson*, 630 F.2d at 146 ("broad request" for documents "based solely on th[e] 'mere hope' that some exculpatory material might turn up" does not justify enforcement of Rule 17(c) subpoena).

Third, Treacy cannot show — and has not shown — that the documents are not otherwise procurable through other means. Noticeably missing from Treacy's motion is any description of the considerable discovery that he received from the Government. This included approximately 1.7 million pages of documents obtained by the Government from Monster, BDO, Navigant, various witnesses, and other third parties. With regard to Monster, the Government gave Treacy a carbon copy of the database the Government received from Monster in response to a grand jury subpoena. The Government did not edit that material or attempt to limit its production to documents that would be introduced at trial or material to the defense. This was the broadest possible production the Government could have made and effectively the equivalent of open-file discovery. Moreover, it undoubtedly included the vast majority of the materials now sought, including documents that would have been recovered by Akin Gump in the course of its

46

investigation, documents that were created by Navigant in the course of its work on the investigation, and corporate documents that may have been retained by members of the compensation committee.[7]

Fourth, Treacy cannot show that compliance with the subpoenas would not be unduly oppressive and burdensome on the parties subpoenaed. At least one of the subpoenaed parties, Akin Gump, has already notified the Court that it intends to oppose the subpoena on multiple grounds, including privilege and burdensomeness. In this respect, the subpoenas are unduly oppressive not only because they are overly broad, but also because on their face they call for the production of privileged materials from at least three parties: Akin Gump, Navigant, and Fulbright and Jaworski.

Indeed, with regard to Akin Gump, Treacy's only real basis for seeking production of materials is to obtain impeachment materials against Myron Olesnyckyj, a Government witness. *See* Treacy Rule 17(c) Subpoena Motion at 4. Yet the subpoena does not purport to limit the request to these materials. Moreover, to the extent that Treacy hopes to obtain memoranda of prior statements by Olesnyckyj, the Government will provide those materials in connection with satisfying its § 3500 obligations prior to trial. Finally, the law is clear that Rule 17(c) may not be used as a means to obtain pretrial discovery of impeachment materials. *See* *Cuthbertson*, 630 F.2d at 144 (impeachment materials "generally are not subject to production and inspection by the moving party prior to trial").

---

[7]        As the Court is aware, the Government is continuing to cooperate with the defense in obtaining documents from Monster that arguably should have been produced previously by Monster, but were not. The Government expects that this cooperation will result in the review of at least hundreds of thousands of documents by Monster and the production of considerable additional documents by Monster to both the Government and the defense.

In short, Treacy's proposed Rule 17(c) subpoenas are overly broad, not targeted at relevant or admissible evidence, and overly burdensome. They do not seek materials that Treacy could not have gotten from other sources; on the contrary, they largely seek materials that are duplicative of what the Government provided to Treacy in discovery. On their face, the subpoenas represent a fishing expedition. Accordingly, Treacy's motion for leave to serve the seven Rule 17(c) subpoenas should be denied.

## CONCLUSION

For all the reasons stated, Treacy's pretrial motions should be denied in their entirety.

Dated:        New York, New York
              July 14, 2008

                                    Respectfully submitted,

                                    MICHAEL J. GARCIA
                                    United States Attorney for the
                                    Southern District of New York
                                    Attorney for the United States
                                    of America


                        By:      /s/ Deirdre A. McEvoy
                                 Deirdre A. McEvoy
                                 Joshua A. Goldberg
                                 Assistant United States Attorneys
                                 Tel: (212) 637-2309/2439

48

1 Pages 1 - 77

2             UNITED STATES DISTRICT COURT

3             NORTHERN DISTRICT OF CALIFORNIA

4          BEFORE THE HONORABLE CHARLES R. BREYER

5 UNITED STATES OF AMERICA,        )
                                   )
6           Plaintiff,             )
                                   )
7     vs.                          )   No. CR 06-0556 CRB
                                   )
8 GREGORY L. REYES and            )
  STEPHANIE JENSEN,                )
9                                  )
           Defendants.             )
10 _____)

11              San Francisco, California
                Wednesday, May 30, 2007
12

13

14      Reporter's Transcript Of Proceedings

15 Appearances:

16 For Plaintiff:      Scott N. Schools
                  United States Attorney
17                450 Golden Gate Avenue, 11th Floor
                  San Francisco, California  94102
18          By:  Timothy Crudo, AUSA
                  Adam A. Reeves, AUSA
19
   For Defendant      Skadden, Arps, Slate, Meagher & Flom
20 Gregory Reyes:       300 South Grand Avenue, Suite 3400
                  Los Angeles, California  90071
21          By:  Richard Marmaro, Esquire
                  Ronda McKaig, Attorney at Law
22

23 (Appearances continued on next page.)

24 Reported By:      Katherine A. Powell, RPR, CRR, CSR No. 5812
                Official Reporter, U.S. District Court
25

2

1 Appearances Continued:

2 For Defendant         Munger Tolles & Olson LLP
  Gregory Reyes:        355 South Grand Avenue
3                       Thirty-Fifth Floor
                        Los Angeles, CA 90071
4                       By:  Brad D. Brian, Esquire

5 For Defendant         Keker & Van Nest
  Stephanie Jensen:     710 Sansome Street
6                       San Francisco, California  94111-1704
                        By:  Jan Nielsen Little, Attorney at Law
7                       Steven Ragland, Esquire
                        Michael Celio, Esquire
8                       Laurie Mims, Attorney at Law

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

73

1 and dah, dah, dah, and there is this count and that count and

2 so forth and so on.  None of that.

3          I need to say, This is a case in which it is alleged

4 that Mr. Reyes, you know, former chief executive officer of a

5 company called Brocade, which is in the business of blah, blah,

6 blah, you know, is accused.  And then you tell them in two

7 sentences what it's about so they know -- you know, they know.

8          I mean, for example, the motion in limine to

9 eliminate any reference to backdating?  No.  I'm not going to

10 eliminate reference to backdating.  That's how most people

11 heard about the case.

12          MR. MARMARO:  That's just the reason why it should be

13 eliminated, Your Honor.

14          THE COURT:  No, it's not.  I couldn't disagree with

15 you more.  It is especially in the voir dire, especially in the

16 voir dire, it's important that the jurors know what this case

17 is -- how this -- whether they know whether they've heard

18 anything about the case, whether they have any views on the

19 case, and so forth, it's very important for voir dire purposes.

20          You know, I -- whether it would be -- whether it can

21 be and to what extent it can be, quote, argued to the jury or

22 presented to the jury, that may be a different issue.  But I'm

23 not going and, quote, sanitizing the speech of the parties in

24 terms of the reference of how they're dealing with it.

25          Anyway, this is all tentative, okay?  I'm just

74

1 telling you how I think.

2      Okay.  I've got to deal with the jury, so what else?

3      MR. CRUDO:  We have one very quick scheduling and one

4 substantive, Your Honor.

5      I understand that back in October the Court had

6 excluded time, given the nature of the case, the complexity and

7 preparation of trial, and that time remains excluded until we

8 get a jury picked.

9      THE COURT:  Well, I assume so.  I have no problem

10 signing an exclusion of time, if you want me to sign an order.

11      MR. CRUDO:  We will provide that to you, Your Honor.

12 I would expect that would be in connection with both

13 defendants.

14      And, finally, we did raise this in our pretrial

15 statement, the issue of whether counsel would appear as a

16 witness at trial.

17      THE COURT:  Yes, I'm glad you mentioned that.

18      MR. CRUDO:  That is a concern.

19      THE COURT:  Counsel is not going to appear as a

20 witness, right, Mr. Marmaro?

21      MR. MARMARO:  Well, your Honor, the subject matter is

22 the subject of one of the motions.  If the Court precludes the

23 government witness to testify, then it's moot.  So I think we

24 should revisit it when the Court hears argument on that motion.

25 It's a very serious motion, Your Honor, so I think --