UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---------------------------------------------------------x
:
UNITED STATES OF AMERICA :
:
v. :
: Case No. 1:08-CR-00366-RLC
JAMES TREACY, :
:
        Defendant. :
:
---------------------------------------------------------x

**DEFENDANT'S REPLY MEMORANDUM OF LAW
IN SUPPORT OF PRE-TRIAL MOTIONS**

      Defendant James Treacy hereby submits this reply memorandum of law in support of his pre-trial motions to: (1) dismiss the Superseding Indictment as barred by the statute of limitations: (2) dismiss portions of Count Two alleging violations of Rule10b-5(a) and (c); (3) compel the government to elect between Counts One and Two because those counts are multiplicitous; (4) strike the term "backdating" from the Superseding Indictment and preclude the government from using that term at trial; and (5) strike inaccurate and speculative loss and gain amounts contained in the Superseding Indictment.

**I.    COUNT ONE SHOULD BE DISMISSED BASED ON THE STATUTE OF LIMITATIONS**

      On June 30, 2008, the defense moved to dismiss the original Indictment based on the statute of limitations. The motion asserted that, with respect to Count One (conspiracy), the government had failed to allege an overt act committed within the applicable five-year statute of limitations since the most recent overt act alleged – Mr. Treacy's signing of a Form 10-K on or about March 28, 2002 – clearly fell outside the applicable five year period.

On July 10, 2008, the government responded to this fatal defect by obtaining a Superseding Indictment which alleges additional overt acts occurring subsequent to March 28, 2002. Specifically, these additional overt acts include: (1) a "Broad-Based" grant approved by Mr. Treacy in or about June 2002;[1] the filing of several Forms 10-K by Andrew McKelvey (the former CEO of Monster) on and after March 24, 2004;[2] and (3) Mr. Treacy's exercise of certain stock option grants between December 1, 2005 and April 27, 2006.[3]  *See* Govt's Opp. at 8. However, as set forth below, these new overt acts belatedly inserted by the government do not qualify as acts committed "in furtherance" of the conspiracy. Accordingly, Count One must be dismissed as time-barred.

### A. Mr. Treacy's Exercise of Stock Options Does Not Qualify As Acts Committed "In Furtherance" of the Conspiracy Alleged in Count One

The original Indictment contained a general allegation that Mr. Treacy exercised stock options in April of 2006 (Ind. ¶ 33), but did not characterize this (nor any other exercise of stock options) as an overt act committed in furtherance of the conspiracy. The Superseding Indictment now lists, as overt acts, several instances between December 1, 2005 and April 27, 2006 in which Mr. Treacy exercised his stock option grants.[4] However, as argued in our opening brief, the exercise of stock options does not constitute an act "in furtherance" of the alleged conspiracy. *See* Statute of Limitations Motion at 7-8. Accordingly, the government's inclusion of *additional* instances in which Mr. Treacy exercised options does not cure the statute of limitations problem. Indeed, the very fact that the government did not view Mr. Treacy's

---

[1] Superseding Ind. ¶ 62(n)(2).

[2] *Id*. at ¶ 62(p), (q) and (y).

[3] *Id*. at ¶ 62(r)-(x) and (z)-(ad).

[4] Superseding Ind. ¶ 62(r)-(x) and (z)-(ad).

exercise of stock options as acts in furtherance of the conspiracy at the time it drafted the original Indictment underscores the weakness and disingenuousness of the government's current position.

Citing cases which hold that a conspiracy whose purpose is monetary gain continues through the conspirators' receipt of economic benefits, the government contends that the conspiracy charged in this case is also an "economic enrichment" crime because the Indictment alleged that Mr. Treacy and his co-conspirators benefitted financially from receiving "in-the-money" options. *See* Gov's Opp. at 5-6, 10. But the government has mischaracterized the nature of the alleged conspiracy.

Granting or receiving stock options that are "in the money" is not illegal. *See United States v. Shanahan*, 2008 WL 2225731 at * 5 (E.D. Mo., May 28, 2008); *In re Converse Technology, Inc., Securities Litigation*, 543 F.Supp.2d 134, 138 (E.D.N.Y. 2008). It is a perfectly valid form of compensation, provided any associated compensation expense is disclosed and properly accounted for in the Company's public filings. It is the failure to disclose and properly account for the compensation expense associated with backdated options that constitutes the offense alleged in Count One. That is, the purpose of the charged conspiracy was to avoid *the accounting consequences* of granting in-the-money options. That objective was accomplished with the filing of each Form 10-K for a year in which in-the-money options were granted and no compensation expense was recorded. Any subsequent exercise of stock options by an employee or officer is therefore irrelevant and superfluous to the charged scheme.

Stated another way, the government surely would consider the object of the conspiracy to have been achieved even if Mr. Treacy had never exercised his stock options, or even had he never received any stock options at all. Indeed, Andrew McKelvey is listed in the Indictment and the Superseding Indictment as a co-conspirator even though he did not receive any options.

3

It is thus difficult to comprehend how the exercise of options can possibly be considered an overt act that "furthers" the conspiracy.

Because receiving in-the-money options is entirely legal, the "economic conspiracy" cases cited by government are inapplicable. *See* Govt's Opp. at 5-6. Those cases involve crimes that by definition have the goal of generating criminal proceeds. Accordingly, the conspiracies in such cases were properly held to have continued until the anticipated proceeds were received. *See United States v. Salmonese*, 352 F.3d. 608, 612 (2d Cir. 2003) ("pump and dump" scheme whereby persons holding securities fraudulently inflate their price in order to sell at an artificial profit); *United States v. LaSpina*, 299 F.3d 165 (2d Cir. 2002) (conspiracy to engage in monetary transactions of criminally derived property ); *United States v. Ben Zvi*, 242 F.3d 89 (2d Cir. 2001) (staged robbery of jewelry store to obtain insurance proceeds); *United States v. Mennuti*, 679 F.2d 1032 (2d. Cir. 1982) (scheme to destroy private residences in order to obtain insurance proceeds); *United States v. Fletcher*, 928 F.2d 495  (2d Cir. 1991) (tax fraud scheme); *United States v. Rucker*, 586 F.2d 899 (2d Cir. 1978) (narcotics conspiracy). By contrast, the goal of the conspiracy charged in this case was to avoid reporting a compensation expense that would reduce Monster's net earnings, not to generate criminal proceeds. As stated, that goal was accomplished, and the alleged conspiracy was completed, with the filing of a misleading Form 10-K.

Finally, even assuming *arguendo* that the conspiracy in this case qualifies as an economic crime, the alleged profit occurred long before the options were exercised. As the government concedes, any profits from vested options were "attributable to the portion of the grants that were awarded in-the-money *on the date on which the grants were actually made.*" Superseding Ind. ¶ 61(h). That is, any potential profit that is attributable solely to the fact than an option is "in the

4

money" when granted is one that is fixed on the date the option is granted, and thus the economic benefit accrues on that date, not on a later exercise date.

      **B.    The Filing of Forms 10-K for 2003 through 2005 Are Not Overt Acts That Extend the Limitations Period**

In a further effort to salvage a time-barred conspiracy count, the government also added overt acts based on the filing of Monster's Forms 10-K for the years 2003 through 2005, events which occurred after Mr. Treacy had left the Company.

Although the government characterizes these subsequent filings as "new false statements" (Govt's Opp. at 9), the Forms 10-K for 2003-05 merely *repeated* purportedly false earnings figures that had already been reported in the earlier Forms 10-K. The idea that republishing false statements extends the statute of limitations – essentially, an argument that the crime constitutes a "continuing violation" – has been rejected in the stock options backdating context. *See In re Zoran Corp. Derivative Litigation*, 511 F.Supp.2d 986, 1014 (N.D.Cal., 2007) ("Plaintiff's assertion that each new false statement revives all previous ones is tenuous at best. Backdated options were allegedly granted over a period totaling nine years. Although plaintiff does plead that defendants kept making false statements about their past options grants, that simply does not connect nine years worth of option grants."). Indeed, the "weight of authority" in the Second Circuit is "skeptical of the application of the continuing violations doctrine in securities fraud cases" in general. *In re Comverse Tech., Inc. Sec. Litig.*, 543 F. Supp. 2d 134, 155 (E.D.N.Y. 2008) (citing *SEC v. Jones*, 2006 U.S. Dist. LEXIS 22800, at *4-*5 , 2006 WL 1084276 (S.D.N.Y. Apr. 25, 2006); *De la Fuente v. DCI Telecommunications, Inc.*, 206 F.R.D. 369, 385-86 (S.D.N.Y. 2002)).

   Moreover, even in the general conspiracy context, the Supreme Court has held that, since "every conspiracy is by its very nature secret," even "overt acts of concealment" or affirmative

5

"acts of covering up" typically do not constitute overt acts in furtherance of a conspiracy. *Grunewald v. United States*, 353 U.S. 391, 402 (1957). That is because "every conspiracy will inevitably be followed by actions taken to cover the conspirator's traces," and treating every act of concealment as an overt act "would for all practical purposes wipe out the statute of limitations in conspiracy cases." *Id*.

*Grunewald* involved a tax evasion scheme to "fix" tax cases by obtaining "no prosecution" rulings from the Internal Revenue Service. After obtaining the rulings, the conspirators then took several affirmative steps to conceal irregularities in the disposition of their cases – including attempting to doctor a report, covering up traces of illicit cash payments, causing certain records to disappear, and warning witnesses to keep quiet. *Id*. at 395-96. The Court nonetheless held that these acts of concealment were not in furtherance of the conspiracy because the "main objective" of the conspiracy – the obtainment of "no prosecution" rulings – had already been achieved. *Id*. at 405-06.

In this case, the main objective of the charged conspiracy was to avoid recording a compensation expense against earnings. That objective was accomplished with the filing of the Form 10-K for any year in which backdated options were granted but not disclosed and accounted for. The fact that a subsequent Form 10-K merely *repeated* a false financial result for a prior year, but did not contain any *new* false numbers, is at best nothing more than a continuing concealment of the crime after the accomplishment of the conspiracy's main objective. Accordingly, the Forms 10-K submitted after 2002 do not qualify as overt acts.

In addition to arguing that the post-2002 Forms 10-K repeated false financial results that had been previously reported, the government argues that these each of these filings reported false financial results *for the year in question* because most of the backdated options had a four-

year vesting period. Thus, according to the government, "because proper accounting for the in-the-money options required Monster to record a compensation expense over the vesting period of the backdated options," "a backdated option granted in 2002 would continue to require the recording of an expense into 2006." *See* Govt's Opp. at 9. This is merely another version of the "continuing violation" argument that courts have rejected in the securities fraud context and specifically in the context of stock options backdating.

      C.      **Mr. Treacy's Approval of a Purportedly Backdated Broad-Based Grant in June 2002 Falls Outside the Statute of Limitations**

The only remaining new overt act relied on by the government is an allegation that Mr. Treacy approved a backdated Broad-Based option grant "in or about June 2002." Superseding Ind. ¶ 62(n). However, this overt act is outside the statute of limitations.

As set forth in our motion to dismiss, the defense and the government entered into a series of tolling agreements that ultimately extended the five-year limitations period for a period of eleven months. *See* Statute of Limitations Motion at 3. Giving the government the benefit of the doubt, and assuming that the June 2002 grant was approved by Mr. Treacy on June 30, 2002 (the last day of June 2002), the statute of limitations with respect to this overt act expired on May 30, 2008, which is five years and eleven months from June 30, 2002. The Superseding Indictment was filed on July 10, 2008, more than a month after the limitations period had expired. Thus, the overt act based on the June 2002 Broad-Based grant is timely only if the Superseding Indictment "relates back" to the original Indictment filed on April 24, 2008. However, the Superseding Indictment cannot relate back to the original Indictment because the original Indictment was not "validly pending." Accordingly, the overt act based on the June 2002 Broad-Based option grant is time-barred.

The Second Circuit has declared a two-part test for relation back of a superseding indictment: "the original indictment must be validly pending, and the superseding indictment must not materially broaden or substantially amend the charges." *United States v. Rutkoske*, 506 F.3d 170, 175 (2d Cir. 2007) (citing *United States v. Grady*, 544 F.2d 598, 601-02 (2d Cir. 1976)). Unless both requirements are satisfied, a later indictment cannot "piggyback" onto or "relate back" to the filing date of an earlier indictment.

The Second Circuit has not squarely ruled on whether an indictment that has no timely overt acts (and is therefore time-barred) can be considered "validly pending." *See United States v. Ben Zvi*, 242 F. 3d 89, 98 (2d Cir. 2001). However, in each of the cases that declined to decide this issue, the indictments contained facially valid overt acts that fell within the statute of limitations. *See Rutkoske*, 506 F.3d at 175 (overt act alleged in initial indictment was facially timely); *Ben Zvi*, 242 F. 3d at 98 (declining to decide whether subsequent indictments related back to first, untimely indictment since second indictment was independently timely and thus subsequent indictments could relate back to the second indictment); *United States v. Principato*, 2002 U.S. Dist. Lexis 19633 at *5 (S.D.N.Y. October 16, 2002) (original and superseding indictments both contained timely overt acts). Thus, the Second Circuit had never been presented with a case in which there is *no* indictment that is independently timely.[5]

---

[5] This issue is distinct from a situation where the indictment contains a timely overt act but, at trial, the government relies on proof of another timely overt act that was not alleged in the indictment. *See* Government's Opposition to Defendant's Pre-Trial Motions at 8 n. 2. We do not dispute that *if* the government had alleged a timely overt act in either the initial or superseding indictment, it would not have to prove that overt act at trial as long as it proved some other timely overt act and the defendant had fair notice and was not prejudiced. *See United States v. Salmonese*, 352 F. 3d 608 (2d Cir. 2003). In *Salmonese*, which the government cites, the government neglects to mention that the relevant indictment in that case contained a timely overt act. *Id*. at 613 ("Of the ninety overt acts alleged . . . one involved conduct during the limitations period"). The government's argument that it need not plead a timely overt act so long as it proves one at trial would mean that a conspiracy count can never be subject to dismissal

In *Ben Zvi*, *supra*, the Second Circuit agreed with the defendant that the first indictment was time-barred because "none of the alleged overt acts occurred within five years of the indictment's return." 242 F.3d at 97. The Court did not have to decide whether any of the three subsequent indictments related back to the first indictment because the second indictment was *independently* timely. *Id*. at 97-98. Thus, the third and fourth indictments were able to relate back to the second indictment, not the first. *Id*. The Court therefore declined to decide whether, for purposes of relation back, an untimely indictment could be considered "validly pending" under *Grady*.

Were it to squarely face the issue, however, it is highly unlikely that the Second Circuit would consider an indictment that is barred by the statute of limitations to be a "validly pending" indictment. This is because Second Circuit cases applying *Grady* have stated that a superseding indictment can relate back to "a pending *timely* indictment." *See Salmonese*, 353 F.3d at 622; *Ben Zvi*, 242 F.3d at 98; *Rutkoske*, 506 F.3d at 175 (observing that "cases applying *Grady* have stated that a superseding indictment relates back to 'a pending *timely* indictment' so long as the superseding indictment does not 'materially broaden or substantially amend the original charges.'") (emphasis in original).

In *Rutkoske*, the Second Circuit held that the original indictment was validly pending because it contained a facially timely overt act and was thus "not dismissible." *Rutkoske*, 506 F.3d at 175 ("[A]n original indictment remains pending until it is dismissed or until double jeopardy or due process would prohibit prosecution under it.") (citing *United States v. Smith*, 197 F.3d 225, 228-29 (6th Cir. 1999). Here, because the original indictment contained no facially timely overt act, the indictment was dismissible and due process would have prohibited

---

pretrial on statute of limitations grounds. That is not the law, and the government cites no authority so holding.

9

prosecution under the original indictment. Thus, the first indictment was not validly pending and the Superseding Indictment therefore cannot relate back to it. Accordingly, the allegation that Mr. Treacy approved a Broad-Based option grant in June 2002 is untimely in light of the Superseding Indictment's filing date.

## II.   COUNT TWO MUST BE DISMISSED

Count Two of the Indictment charges Mr. Treacy with a substantive violation of Rule 10b-5(a), (b) and (c).  As stated in our opening brief, subsections (a) and (c), regarding schemes and deceptive conduct, do not apply to the allegations at issue here, since this case is predicated exclusively on alleged misrepresentations and omissions regarding stock option expenses made by Monster in its public filings.   Thus, the portions of Count Two charging violations of subsections (a) and (c) must be dismissed.  This leaves subsection (b), relating to misrepresentations and omissions.  However, the last act which could conceivably constitute a violation of subsection (b) occurred outside the statute of limitations.  Accordingly, Count Two must be dismissed in its entirety.

### A.   Subsections (a) and (c) of Rule 10b-5 Do Not Apply to Conduct That Consists Solely of Misrepresentations or Omissions

The case law is crystal clear that subsections (a) and (c) of Rule 10b-5 apply only to "a manipulative or deceptive scheme or conduct *that encompasses acts beyond misrepresentations*." *In re Royal Dutch/Shell Transport Sec. Litig.*, No. 04-374 (JAP), 2006 WL 2355402, at * 9 (D.N.J. Aug. 14, 2006) (emphasis added).  *Accord, In re Alstrom SA*, 406 F.Supp.2d 433, 475 (S.D.N.Y. 2005) (subsections (a) and (c) apply only if it is alleged that the defendant "participated in scheme *that encompassed conduct beyond misrepresentations*")(emphasis added).  See also Schnell v. Conseco, Inc.*, 43 F.Supp.2d 438, 447-48 (S.D.N.Y.1999) (refusing to characterize allegations as subsection (a) or (c) claims where alleged "scheme to defraud"

10

consisted largely of an aggregation of material misrepresentations to inflate stock, such as research reports containing misrepresentations of the underlying facts and use of false names to solicit investors); *Lentell v. Merrill Lynch & Co., Inc.*, 396 F.3d 161, 177 (2d Cir.2005) (preventing plaintiff from attempting to recast misrepresentation claims as claims under Rule 10b-5(a) or (c)); *SEC v. KPMG LLP*, 412 F.Supp.2d 349, 378 (S.D.N.Y. 2006) ("Because the core conduct alleged is in fact a misstatement, it would be improper to . . . designat[e] the alleged fraud a 'manipulative device' [under 10b-5(a) or (c)] rather than a 'misstatement' [under 10b-5(b)]."); *United States v. Bongiorno*, 2006 WL 1140864, at * 8  (S.D.N.Y. May 1, 2006) (noting that subsections (a) and (c) apply to situations where there are no misstatements at issue; *United States v. Finnerty*, 2006 WL 2802042, at * 3  (S.D.N.Y. Oct. 2, 2006) (distinguishing subsections (a) and (b) from "Rule 10b-5 cases [that] involve false or misleading statements").

Although the government attempts to recast this case as a "scheme to defraud" (*see* Govt's Opp. at 21), the Superseding Indictment does not allege *any* illegal conduct beyond misrepresentations, and the government does not point to any in its response.  The government cannot rely on the mere fact that in-the money-options were granted, since granting in-the-money options it is entirely legal.  Thus, the government is left to argue is that Mr. Treacy and others failed to disclose the practice of granting such options in Monster's public filings and that they misrepresented Monster's net earnings by failing to record a compensation expense.  That does not make for a deceptive scheme case.

The government's brief in opposition illustrates that the alleged "scheme" here involved nothing more than misrepresentations or omissions.   For example, the government argues that the Superseding Indictment alleges that Mr. Treacy and others "(1) engaged in accounting fraud *by reporting false earnings and failing to record* a compensation expense associated with

11

backdated option grants and (2) deceived and misled the public, the SEC, and others *by making affirmative misrepresentations about their backdating practices* in the Forms 10-K, proxy statements and other public filings and management representation letters submitted to their outside auditors." Govt's Opp. at 21 (emphasis added). In the same vein, the government claims that the "scheme" consisted of "the backdating of option grants *without reporting and recording a compensation expense* on Monster's books and records, the *affirmative misrepresentations* in Monster's Forms 10-K that their financial statements were in accordance with APB 25 and that the Company only granted options at fair market value and therefore did not record a compensation expense, and the *affirmative misrepresentations* in their management representation letters to Monster's outside auditors that their financial statements were presented in accordance with GAAP." *Id*. at 22 (emphasis added).

Nor does it suffice for the government to simply allege a "scheme to defraud" if the scheme, as alleged, consists of nothing more than misrepresentations or false statements. *See, e.g., Schnell v. Conseco, Inc.*, 43 F.Supp.2d at 447-48 (refusing to characterize allegations as subsection (a) or (c) claims where alleged "scheme to defraud" consisted largely of misrepresentations); *Alstrom*, 406 F.Supp.2d at 475 ("a plaintiff may not seek to hold a defendant liable for misleading statements under subsections (a) and (c) by alleging that the defendant is liable for the misleading statements because he or she was a participant in a scheme through which the statements were made").

Undoubtedly aware that Count Two is flawed, the government devotes six pages of its brief to arguing that the mere fact that the Indictment tracks the language of subsections (a) and (b) is enough to survive a motion to dismiss. Govt's Opp. at 11-17. But as we previously stated, the defense is not claiming that Count Two has not been pled with sufficient specificity; rather,

our argument is that Count Two does not (and cannot) state an offense under (a) and (c) *as a matter of law*. Under this circumstance, it is entirely appropriate to dismiss a count or portions of a count at the pre-trial stage, and courts in this district have not hesitated to do so. *See United States v. Bongiorno*, 2006 WL 1140864, at * 4 (rejecting the government's argument that tracking statutory language was sufficient and dismissing at the pre-trial stage allegations concerning violations of subsection (b) of Rule 10b-5 where the allegations in the indictment failed to make out a violation of subsection (b) and the government "has not averred that it intends to present additional theories of securities fraud at trial."); *United States v. Finnerty*, 2006 WL 2802042, at ** 3, 6-7 (same). As Judge Stein correctly stated in *Bongiorno*: "It would be improper and a waste of resources for everyone involved to conduct a lengthy trial … and submit the case to the jury only to rule on a post-trial motion that the government's theory of criminal liability fails no matter what facts it was able to adduce at trial." 2006 WL 1140864, at * 4.

In sum, because the allegations in the Superseding Indictment do not encompass any conduct that extends beyond misrepresentations or omissions, the portions of Count Two based on subsections (a) and (c) of Rule 10b-5 must be dismissed.

**B.     The Portion of Count Two Relating to Subsection (b) is Time-Barred**

The portion of Count Two based on Subsection (b) of Rule 10b-5 must also be dismissed because the allegations relating to this subsection are certainly barred by the statute of limitations. Count Two is not a conspiracy count, so the actions of alleged co-conspirators in making or using false statements in Monster's public filings cannot be attributed to Mr. Treacy under Count Two. It is undisputed that the *last* public filing signed by Mr. Treacy was the Form 10-K that was signed on March 28, 2002. This date is clearly outside the five-year statute of

limitations for the reasons described in our motion to dismiss based on the statute of limitations. *See* Statute of Limitations Motion at 3, 9.

We understand that Count Two incorporates by reference the allegations in Count One. None of the new overt acts contained in the Superseding Indictment, however, involve any misstatement of any kind *made by Mr. Treacy*. Indeed, the government's response does not even address our argument that subsection (b) is time-barred. It is undoubtedly because any alleged misstatement under subsection (b) would be time-barred that the government is attempting so desperately to manufacture a subsection (a) or (c) case where plainly none exists. In any event, any alleged violation of subsection (b) is time-barred and Count Two must therefore be dismissed in its entirety.

### III. COUNTS ONE AND TWO ARE MULTIPLICITOUS BECAUSE THEY ALLEGE THE SAME SCHEME

If Count Two is not dismissed for the reasons stated above, then the government should be forced to elect as between Count One and Count Two. As we explained in our opening brief, Count Two fails to allege a single specific false statement or omission, and instead alleges a broad, general fraudulent scheme.[6] This broad scheme, however, is for all practical purposes identical to the scheme alleged in the conspiracy charged in Count One.

The government responds by citing *Blockburger* and arguing that the statutory elements of the offenses are different. In addition, the government argues the noncontroversial point that a conspiracy and a substantive offense are separate crimes. Obviously, we do not dispute that the elements of conspiracy and the scheme liability theory of securities fraud differ slightly.

---

[6] The government cannot proceed under a misrepresentation theory under Count Two because, as noted above, the last possible misrepresentation that can be attributed to Mr. Treacy is time-barred.

Moreover, we have acknowledged that the government normally could allege both a conspiracy to commit securities fraud and a corresponding substantive securities fraud count. But that general principle assumes that the substantive securities fraud count alleges at least one specific public filing that would constitute a misrepresentation or omission. In that case, there would be no multiplicity problem because the government would have alleged distinct crimes arising out of the same set of facts. Here, however, because there is no timely misstatement or omission that would allow the government to proceed under a misrepresentation theory, the government is left with a pure "scheme" theory that does not differ in any material respect from the conspiracy charge. Accordingly, the government should be required to elect as between Counts One and Two in the event Count Two is not dismissed for the reasons cited above.

### IV.   THE TERM "BACKDATING" SHOULD BE STRICKEN

The defense has moved to strike the term "backdating" or "backdated" where it is used to refer to the practice of looking back in time to select favorable grant dates. As we have noted, and as the government concedes, this practice is perfectly legal provided that it is properly disclosed and the corresponding compensation expense is accounted for properly. Govt's Opp. at 34-35 ("The Government agrees that it is entirely lawful for a company to grant options with a discounted strike price that is below the fair market value of the stock on the date of the grant, provided that the company properly accounts for it."). However, to the average juror the term "backdate" connotes nefarious and fraudulent conduct (such as forging or altering documents, neither of which is alleged here), and will likely confuse and mislead the jurors into believing that granting options based on historically low dates is per se wrong or illegal, such that the jury may erroneously focus on and convict Mr. Treacy based on this allegation alone.

The government in response argues that it would be unduly "hamstrung" if it were precluded from using the term "backdating."  *See* Govt's Opp. at 36.  In fact, the descriptions of the alleged price selection practices included in the Superseding Indictment make clear that no pejorative shorthand (such as "backdating") is necessary.  For example, if one reads paragraphs 15 through 21 of the Superseding Indictment setting forth the core allegations against Mr. Treacy, the nature of the alleged activity is amply clear and no meaning would be lost had these sections been written without employing the term "backdating" or "backdate."

As for the government's assertion that "the members of the conspiracy used the term themselves in documents and elsewhere (*id*.), based on our review of the discovery to date, the term "backdate" (or a variation thereof) actually appears less than five times in approximately two million pages of materials.  Moreover, the only reason the defense used this term in its pre-trial motions was for the sake of consistency and simplicity in responding to the allegations in the Indictment.

In short, given the serious potential prejudice to the defendant created by the use of such a "loaded" term, and the absence of any harm whatsoever to the government's ability to present its case, the Court should strike the term "backdate" (or any variation of that term) from the Superseding Indictment and preclude the government from using this term at trial.

## V.    THE SPECULATIVE AND PREJUDICIAL ALLEGATIONS REGARDING LOSS AND GAIN AMOUNTS SHOULD BE STRICKEN

In our pretrial motion, we asked the Court to strike the "repricing" claims reflecting an alleged $339 million in unreported compensation expense and a $13.5 million gain to Mr. Treacy from the sale of backdated options, on the grounds that these numbers were based on a "worst case scenario" as opposed to a reasonably accurate methodology.  Specifically, we noted that these figures are derived by using the last possible date that options could have been granted

16

rather than using actual grant dates. As such, we argued, these figures substantially overstate the true amount of unreported compensation and alleged gain to Mr. Treacy, and are thus highly prejudicial.

In its opposition brief, the government does not even attempt to justify the accuracy of the methodology used to calculate these numbers – a significant concession. Instead, the government argues that the Court should not strike these numbers from the Indictment because: (1) the amount of unrecorded compensation is relevant and admissible since the government must prove at trial that the Company's misstatements were material; and (2) the amount of unrecorded compensation and illegal gain is relevant and admissible to prove Mr. Treacy's motive. These arguments have no merit.

First, we do not dispute that the *actual* amount of unrecorded compensation and illicit gain would indeed be relevant and admissible at trial. But concededly *inaccurate* and *speculative* figures are not relevant at all; they are simply misleading. Second, the government completely ignores Fed. R. Evid. 403, which provide that relevant evidence "may be excluded if the probative value is substantially outweighed by the danger of unfair prejudice . . . or misleading the jury."

The Government fails to explain why it would be prejudiced by stating, instead of the speculative figures, that (for instance), Mr. Treacy conspired to "substantially understate" Monster's compensation expenses, or that he allegedly derived "several million dollars" in sales of options that were not properly accounted for. Of course, by contrast, the defense would face an enormous hurdle in trying to overcome the prejudice created when the jury is told of a $339 million loss or a $13.5 million gain. Moreover, even if the Court grants our motion to strike, the government is free to introduce evidence at trial regarding the actual amount of gain and loss. It

17

is these figures, not the "worst case scenario" amounts contained in the Superseding Indictment, that should be presented to the jury. Accordingly, the inaccurate and speculative figures contained in paragraphs 10 and 53 of the Superseding Indictment should be stricken.

## CONCLUSION

For the reasons stated above and in our underlying motions, Mr. Treacy's pretrial motions should be granted.

Respectfully submitted,

/s/ Reid H. Weingarten
Reid H. Weingarten
Evan T. Barr
Sandra E. Cavazos
STEPTOE & JOHNSON LLP
750 Seventh Avenue
Suite 1800
New York, New York 10019
(212) 506-3900

Counsel for James Treacy

Dated: August 4, 2008