UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------X
UNITED STATES OF AMERICA,     :
                                           :
                                         :
                v.                    :
                                         :          OPINION
                                         :
JAMES J. TREACY,               :          S2 08 Cr. 0366 (RLC)
                                         :
            Defendant.        :
------------------------------------------------------------X
APPEARANCES

Deirdre Ann McEvoy, Esq.
United States Attorney's Office
Southern District of New York
1 St. Andrews Plaza
New York, NY 10007
Assistant United States Attorney

Joshua Aaron Goldberg, Esq.
United States Attorney's Office
Southern District of New York
1 St. Andrews Plaza
New York, NY 10007
Assistant United States Attorney

David Matthew Fragale, Esq.
Steptoe & Johnson LLP (DC)
1330 Connecticut Avenue, N.W.
Washington, DC 20036
Attorney for the Defendant

Evan T. Barr, Esq.
Steptoe & Johnson, LLP
750 Seventh Avenue
Suite 1900
New York, NY 10019
Attorney for the Defendant

Sandra Elaine Cavazos, Esq.
Steptoe & Johnson, LLP
750 Seventh Avenue
Suite 1900
New York, NY 10019
Attorney for the Defendant

ROBERT L. CARTER, District Judge

**Introduction**

James J. Treacy was charged in a two-count indictment on April 24, 2008, ("Underlying Indictment").  The Grand Jury returned a superceding indictment on July 11, 2008, ("Superseding Indictment" or "Indictment").  Count One charges Treacy with conspiracy to commit securities fraud, file false reports with the United States Securities and Exchange Commission ("SEC"), make false statements to auditors, and falsify books and records, in violation of Title 18, United States Code, Section 371.  Count Two charges Treacy with committing securities fraud, in violation of Title 15, United States Code, Sections 78j(b) and 78ff, Title 17, Code of Federal Regulations, Section 240.10b-5, and Title 18, United States Code, Section 2.

Treacy has moved to 1) dismiss portions of Count Two of the Indictment alleging violations of Rule 10b-5(a) and (c) on the grounds that the facts alleged do not state an offense under those subsections as a matter of law; 2) dismiss the Indictment based on the statute of limitations; 3) compel the government to elect between Count One and Count Two on the ground that they are multiplicitous; and 4) strike the term "backdating" and the dollar amounts alleged in Paragraphs 10 and 48 of the Indictment as prejudicial surplusage.

**Background**

From 1998 until 2001, Treacy served as Chief Operating Officer ("COO") and Executive Vice-President of Monster Worldwide Inc. ("Monster" or "company"), a company that provided a broad range of online recruitment services.  From 2001 until 2002, Treacy served as Monster's

President and COO, and was a member of if its Board of Directors from 1998 until 2003.

The Indictment alleges that a substantial and important component of Treacy's compensation at Monster was stock option grants.  A stock option typically gives its holder the right to buy a share of stock at a pre-determined price, known as the "exercise" price.  Since stock options are intended to give employees incentive to increase shareholder value, the exercise price is generally determined on the date they are granted at the price at which the underlying stock trades on the market.  If the price of the stock increases, employees are entitled to the difference between their options' exercise price and the market price of the stock on the exercise date.

As a company with shares registered with the SEC, Monster is required to report the financial results of its operations.  Monster claimed in its public filings with the SEC that it followed Accounting Principles Board Opinion No. 25, Accounting for Stock Issued to Employees ("APB 25"), when accounting for the costs associated with granting stock options to its employees.  Under APB 25, a company is required to record and report a compensation expense for any stock option issued "in-the-money" – i.e., with an exercise price lower than the fair market value of the stock on the measurement date.  Issuing stock options in-the-money acts like cash compensation and reduces income.  Under APB 25, generally, no compensation expense is recognized in connection with the awarding of stock option grants to employees provided that, as of the grant date, all terms associated with the award are fixed and the quoted market price of the stock is equal to or less than the amount an employee must pay to acquire the stock as defined.  In Annual Reports for 1997 through 2006 on Forms 10-K filed with the SEC, Monster stated that, since the exercise price of the company's employee stock options equaled

the market price of the underlying stock on the dates of grant, there was no need to recognize any compensation expenses.

The government alleges that Treacy and others engaged in a multi-year scheme to backdate numerous stock option grants at Monster.  Backdating options to set exercise prices based on a lower price from an earlier date confers an automatic benefit onto recipients. Backdating must be properly accounted for as an expense.

According to the Indictment, Treacy and others engaged in an expansive and illegal scheme to deceive by failing to record and report compensation expenses to reflect Monster's systematic backdating of stock options and that Treacy and his co-conspirators backdated numerous stock options granted to Monster employees between 1997 and 2003, a substantial number of which were in-the-money when they were granted.  Since Treacy did not properly disclose the information and did not properly record and report the option grants as expenses, the Indictment alleges, there was no correlating reduction in the company's earnings.  The government contends that, by failing to record and report a compensation expense for the backdated option grants as required, Treacy and accomplices caused Monster to report materially false and misleading financial results over nine years and created false impressions about the Company's option grant practices.  The government alleges that Monster's expenses between 1997 and 2005 were understated by approximately $339 million, and that Treacy illegitimately enriched himself by $13.5 million.

**Discussion**

(1)    *Defendant's motion to dismiss portions of Count Two alleging violations of Rules 10b-5(a) and (c).*

5

Treacy moves pursuant to Federal Rule of Criminal Procedure 12(b)(2) for an order

dismissing portions of Count Two of the Indictment alleging violations of Rules 10b-5(a) and (c)

relating to so called "scheme liability."  Section 10(b) of the Securities Exchange Act of 1934

makes it illegal to

> use or employ, in connection with the purchase or sale of any security registered
> on a national securities exchange or any security not so registered, any
> manipulative or deceptive device or contrivance in contravention of such rules
> and regulations as the Commission may prescribe as necessary or appropriate in
> the public interest or for the protection of investors.

15 U.S.C. § 78j(b).

Rule 10b-5, promulgated pursuant to section 10(b), provides that

> It shall be unlawful for any person, directly or indirectly, by the use of any means
> or instrumentality of interstate commerce, or of the mails or of any facility of any
> national securities exchange,
>
>    (a)     To employ any device, scheme, or artifice to defraud,
>    (b)     To make any untrue statement of a material fact or omit to state a
>          material fact necessary in order to make the statements made, in
>          the light of the circumstances under which they were made, not
>          misleading, or
>    (c)     To engage in any act, practice, or course of business which
>          operates or would operate as a fraud or deceit upon any person, in
>          connection with the purchase or sale of any security.

17 C.F.R. § 240.10b-5.

Treacy moves to dismiss those portions of Count Two alleging violations of Rules 10b-

5(a) and (c) on the grounds that the facts alleged do not state an offense under those subsections

as a matter of law.  Treacy contends that since subsections (a) and (c) apply only to schemes or

conduct that encompass acts beyond misrepresentations, and since the Indictment does not allege

any illegal conduct beyond misrepresentations, Count Two does not state an offense.  The

government responds that the Indictment is legally sufficient because it tracks the language of the

relevant statute.  The government also argues that the fraudulent and deceptive conduct by

Treacy and his co-conspirators, along with their failure to abide by reporting requirements,

violated all three prongs of Rule 10b-5.

Generally, "an indictment need do little more than to track the language of the statute

charged and state the time and place . . . of the alleged crime."  United States v. LaSpina, 299

F.3d 165, 177 (2d Cir. 2002) (quoting United States v. Stavroulakis, 952 F.2d 686, 693 (2d Cir.

1992)) (internal quotation marks and citations omitted).  An indictment suffices if it contains the

elements of the offense charged and fairly informs a defendant of the charge against which he

must defend, and if it enables him to plead an acquittal or conviction in bar of future prosecutions

for the same offense.  Hamling v. United States, 418 U.S. 87, 117 (1974).  The government

asserts that Treacy's motion should be denied without further inquiry since a valid indictment is

enough to call for a trial of the charges on the merits, Costello v. United States, 350 U.S. 359,

364 (1956), and this Indictment meets the minimal requirements for validity.

However, Treacy does not argue that the count should be dismissed because the

Indictment is invalid.  He argues that the facts alleged do not state an offense as a matter of law.

If Treacy is correct, "it would be improper and a waste of resources for everyone involved to

conduct a lengthy trial . . . and submit the case to a jury only to rule on a post-trial motion that

the government's theory of criminal liability fails no matter what facts it was able to adduce at

trail."  United States v. Bongiorno, No. 05 Cr. 390 (SHS), 2006 WL 1140864, at *4 (S.D.N.Y.

May 1, 2006) (Stein, J.).  The government has set forth enough facts in the Indictment to rule on

Treacy's motion, so there is no reason for the court to delay ruling on his arguments.  See id.

(citing Fed. R. Crim. P. 12(b)(3)(B) ("at any time while the case is pending, the court may hear a

claim that the indictment or information fails . . . to state an offense.")) 

"[T]he language of Section 10(b) and subsections (a) and (c) is quite broad . . . [and]
should be construed . . . flexibly to effectuate its remedial purposes."  In re Parmalat Sec. Litig.,
376 F.Supp.2d. 472, 501 (S.D.N.Y. 2005) (Kaplan, J.) (quoting SEC v. Zanford, 535 U.S. 813,
819 (2002)) (internal quotation marks omitted).  "The purpose of section 10(b) was to . . .
achieve a high standard of business ethics in the securities industry."  In re Global Crossing, Ltd.
Sec. Litig., 322 F.Supp.2d 319, 328 (S.D.N.Y. 2004) (Lynch, J.) (quoting Affiliated Ute Citizens
of Utah v. United States, 406 U.S. 128, 151 (1972)) (internal quotation marks omitted).  For
liability to arise under both subsection (b) and subsections (a) and (c) of Rule 10b-5, it must not
only be alleged that Treacy made misrepresentations, but also that he undertook a deceptive
scheme or course of conduct distinct from those misrepresentations.  In re Alstom SA, 406
F.Supp.2d 433, 474 (S.D.N.Y. 2005) (Marrero, J.).  Claims of misrepresentation may not be cast
as claims under Rule 10b-5(a) and (c).  Id.  Thus, the government must allege that the backdating
of stock options amounted to a scheme to defraud that went beyond the misrepresentations
themselves.  Id. at 476.  The government alleges just so.

The government argues that the fraudulent and deceptive practices alleged plainly
constitute a scheme in violation of the first prong of Rule 10b-5, and the conduct was a "practice,
or course of business" which operated as a fraud in violation of the third prong.  "The question is
therefore whether a reasonable jury could find that the alleged fraud involved an act or acts of
deception.  If the answer is yes, the motion to dismiss as to subsections (a) and (c) must be
denied."  Bongiorno, 2006 WL 1140864, at *6.  "The keystone required for a jury to convict a
defendant pursuant to subsections (a) or (c) of Rule 10b-5 is a finding of a fraudulent scheme or

8

course of business." Id. at * 5 (citing Superintendent of Ins. v. Bankers Life & Casualty Co., 404 U.S. 6, 11 n. 7 (1971) ("We believe that 10(b) and Rule 10b-5 prohibit all fraudulent schemes in connection with the purchase or sale of securities, whether the artifices employed involve a garden type variety of fraud, or present a unique form of deception.  Novel or atypical methods should not provide immunity from the securities laws.")); see also Sand, *Modern Federal Jury Instructions,* Instr. 57-22 ("A device, scheme or artifice . . . is merely a plan for the accomplishment of any objective.  Fraud is a general term which embraces all ingenious efforts and means that individuals devise to take advantage of others.").  Treacy's insistence that granting in-the-money options is entirely legal and thus cannot amount to the predicate activity necessary for liability under those subsections is inconsistent with the 10(b)'s text and purpose. If the activity in question amounts to a scheme to deceive, irrespective of its legality, it may be violative.  And while backdating is not necessarily illegal, it is not an inherently innocent act either.  See, e.g., United States v. Reyes, No. C 06-00556-1 CRB, 2007 WL 2462147, at *8 (N.D. Cal. Aug. 29, 2007) ("There are benign explanations for backdating . . . [a]nd there are nefarious explanations for backdating . . . ."); Belova v. Sharp, No. CV 07-299-MO, 2008 WL 700961, at *1 (D.Or. March 13, 2008) ("Backdating is a form of fraud under federal and state law."); In re Zoran Corp. Derivative Litig., 511 F.Supp.2d 986, 996 (N.D.Cal. 2007) (describing the story of stock-options backdating as familiar, the court acknowledged that "[i]n some instances, the grant dates were obviously backdated to maximize returns for the grantees and minimize the compensation expense reported by the company").

       "To deceive means 'to take unawares esp[ecially] by craft or trickery . . . to deprive esp[ecially] by fraud or stealth . . . [or] to cause to believe the false . . . .'" Bongiorno, 2006 WL

9

1140864, at *7 (quoting *Webster's Third New Int'l Dictionary* at 584).  The court finds that a reasonable jury could deem Treacy's alleged conduct deceptive; by allegedly backdating the grants to obtain stock options at historically low prices while giving the appearance that such grants had been given at fair market value on the date of the grant, Treacy may have taken advantage of Monster's shareholders' and the investing public's false belief that the company was in better financial health than it genuinely was.  Put simply, the government alleges that Monster's management engaged in a racket whose ingenuity depended on obscurity and subterfuge to manipulate share prices.  Thus, the allegations against Treacy encompass conduct that extends beyond misrepresentations or ommissions, and the Indictment does not fail.

Since the facts alleged in the Indictment can constitute violations of Rules 10b-5(a) and (c), they are sufficient as a matter of law, therefore Treacy's motion to dismiss those portions of Count Two on this ground is denied.

(2)     *Defendant's motion to dismiss the Indictment for failure to allege an offence within the applicable five-year statute of limitations.*

A.  *Count One*

Treacy argues that Count One of the Indictment, which alleges that he and others acted in furtherance of the charged conspiracy to commit securities fraud, is time-barred because the government has failed to allege the commission of an overt act within the applicable limitations period.  He argues that the most recent alleged overt act took place on or about March 28, 2002, when he signed Monster's Annual Report on Form 10-K for the prior year.  The government alleges that the conspiracy extended through 2006, when Treacy exercised his options from a backdated grant, thereby realizing the benefit of that portion of the scheme.

For purposes of this 12(b)(2) motion to dismiss, the court accepts all factual allegations in the Indictment as true.  See United States v. Clarke, No. 05 Cr. 017 (DAB), 2006 WL 3615111, at *1 (S.D.N.Y. December 7, 2006) (Batts, J.) (citing Costello v. United States, 350 U.S. 359 (1956)).  The applicable statute of limitations is five years.  United States v. Rutkoske, 506 F.3d 170, 174 (2d Cir. 2007) (citing 18 U.S.C. § 3282a).   The filing of the Underlying Indictment tolled the limitations period, see United States v. Grady, 544 F.2d 598, 601 (2d Cir. 1976), and the Superceding Indictment related back to the date of the Underlying Indictment, United States v. Gengo, 808 F.2d 1, 3 (2d Cir. 1986).  "When a conspiracy requires proof of an overt act, the government satisfies the statute of limitations . . . if it establishes that the conspiracy operated within the five-year period preceding the indictment, and a conspirator knowingly committed at least one overt act in furtherance of the scheme within that period."  United States v. Salmonese, 352 F.3d 608, 614 (2d Cir. 2003).  "Once a conspiracy is shown to exist . . . it continues to exist until consummated, abandoned or otherwise terminated . . . ."   United States v. Rucker, 586 F.2d 899, 906 (2d Cir. 1978).  The scope of the conspiratorial agreement is crucial, "for it is that which determines both the duration of the conspiracy, and whether the act relied on as an overt act may properly be regarded as in furtherance of the conspiracy."  Grunewald v. United States, 353 U.S. 391, 397 (1957).  "Where the object of a conspiracy is economic, the conspiracy generally 'continues until the conspirators receive their anticipated economic benefits.'"  LaSpina, 299 F.3d at 175 (quoting United States v. Mennuti, 679 F.2d 1032, 1035 (2d Cir. 1982)).

Treacy argues that his exercise of stock options does not qualify as an act committed in furtherance of the conspiracy because the conspiracy as alleged in Count One did not have the

goal of generating criminal proceeds.  Treacy construes the Indictment to charge that the alleged conspirators acted with the narrow aim of avoiding reporting a compensation expense that would have reduced the company's net earnings.  He contends that the failure to account for the compensation expense associated with the backdated options constitutes the offense alleged in Count One, and that since the purpose of the conspiracy was to avoid the accounting consequences of granting in-the-money options, its objective was accomplished with the filing of each Form 10-K for the years in which in-the-money options were granted and no compensation expense was recorded.  According to Treacy, any subsequent exercise of stock options is irrelevant to the charged scheme.

Treacy's argument fails.  The Indictment specifically alleges that as part of the scheme, Treacy created an opportunity for himself and others at the company to reap substantial benefits by awarding backdated stock option grants with particularly advantageous exercise prices. Indeed, the Indictment charges that Treacy conspired to commit fraud for the express purpose of personal profit, that the conspiracy was economically motivated, and that profiting from backdated stock options was its object.  Accordingly, the court finds that the statute of limitations is satisfied by the allegation that Treacy exercised a majority of his options in 2006.

Treacy also argues that any putative economic benefit accrued on the date the options were granted, not the exercise date, because the options were in-the-money from the outset. "Profit" is defined as "[t]he advance in the price of goods *sold* beyond the cost of purchase." *Blacks Law Dictionary* (italics inserted).  Therefore, by definition, Treacy only profited from the grants when he exercised his options for pecuniary gain.

For the foregoing reasons, Treacy's motion to dismiss Count One based on the statute of

limitations is denied.

B.      *Count Two*

Treacy argues that Count Two of the Indictment fails to allege any facts in support of a securities fraud claim occurring within the applicable limitations period, and therefore should be dismissed.   The court finds that Count Two must be dismissed in its entirety because the allegations surrounding the practice of backdating and the filing of statements or disclosures containing false and misleading information about the allegedly backdated options grants are barred by the five-year statute of limitations.

"[T]o the extent that [the government's] claims are based directly on a backdated grant of options, the 5-year period begins to run on the date the options were granted." In re Comverse Tech., Inc. Sec. Litig., 543 F.Supp.2d 134, 155 (E.D.N.Y. 2008) (citing In re Amtel Corp. Derivatives Litig., No. C 06-4592 JF (HRL), 2007 WL 2070299, at *7 (N.D.Cal. July 16, 2007)). The Underlying Indictment was filed on April 24, 2008, so any option grant which occurred prior to April 24, 2003, is beyond its reach.   None of the alleged backdated option grants, the last of which the government says took place in June 2002, falls within this period.   The claim against Treacy based upon the backdating itself is time barred.

The portion of Count Two based on 10b-5(b) misrepresentations is also time barred.   "A claim . . . based on dissemination of false financial statements accrues when the allegedly false or misleading statement was made."   In re Affiliated Computer Servs. Derivatives Litig., 540 F.Supp.2d 695, 701 (N.D.Tex., 2007) (citing Del Sontro v. Cendant Corp., Inc., 223 F.Supp.2d 563, 573 (D.N.J. 2002)).   According to the Indictment, the last public filing signed by Treacy was

the Form 10-K dated March 28, 2002, well without the five-year period.  Since the government's claim cannot be based on any allegedly false statements made prior to April 24, 2003, the federal securities fraud claims are untimely.

> (3)    *Defendant's motion to compel the government to elect between count one and count two because of multiplicity.*

Treacy moves to compel the government to elect between counts One and Two of the Indictment because, he contends, they are multiplicitous.  Since Count Two of the Indictment is time barred, the Court will not reach this issue.

> (4)    *Defendant's motion to strike all reference in the Indictment to the term "backdating" on the grounds that the term carries a connotation of illegal or unethical conduct that could unfairly prejudice the jury; and defendant's motion to strike speculative loss and gain amounts from the Indictment.*

Treacy moves to strike all reference in the Indictment to "backdating" for fear that it connotes illegal or unethical conduct and could unfairly prejudice the jury.  He argues that the term increases the likelihood that the jury will focus on that conduct while remaining insensitive to the requirement that there be proof beyond a reasonable doubt of a corresponding violation of accounting rules before such conduct can be deemed illegal or unethical.

Treacy also moves for an order striking all references to certain dollar amount calculations in the Indictment that purport to reflect the magnitude of an alleged accounting misstatement and an alleged illicit gain resulting from the conspiracy charged.  He contends that the numbers should be stricken because they represent imprecise extrapolations that cannot be supported by evidence at trial, and which could unfairly prejudice him.

14

Federal Rule of Criminal Procedure 7(d) empowers the court "to strike surplusage from an indictment . . . where the challenged allegations are not relevant to the crime charged and are inflammatory and prejudicial." United States v. Hernandez, 85 F.3d 1023, 1030 (2d Cir. 1996) (quoting United States v. Scarpa, 913 F.2d 993, 1013 (2d Cir. 1990)) (quotation marks omitted). "[I]f evidence of the allegation is admissible and relevant to the charge, then regardless of how prejudicial the language is, it may not be stricken." Scarpa, 913 F.2d at 1013 (quoting United States v. DePalma, 461 F.Supp. 778, 797 (S.D.N.Y. 1978) (Sweet, J.)). "[T]he standard for surplusage is exacting, [so] only rarely is alleged surplusage stricken from an indictment[,]" United States v. Gotti, 42 F.Supp.2d 252, 292 (S.D.N.Y. 1999) (Parker, J.), and "[i]t has long been the policy of courts within the Southern District to refrain from tampering with indictments," United States v. Bin Laden, 91 F.Supp.2d 600, 621(S.D.N.Y. 2000) (Sand, J.) (quoting United States v. Claytor, 52 F.R.D. 360, 361 (S.D.N.Y. 1971) (Croake, J.)) (internal quotation marks omitted).

Treacy is not entitled to have the term "backdating" stricken from the Indictment because the allegations that he participated in a scheme to backdate stock options – i.e., to grant and receive stock options at historically low prices while giving the appearance that such grants had been made at fair market value on the date of the grant – are integral to the charges.  The term is neither irrelevant nor surplusage; it is perfectly descriptive of the device allegedly used to perfect the charged conspiracy.  Treacy's motion is denied.

Treacy's motion to strike the dollar amounts alleged in the Indictment is also denied. Paragraph 10 of the Indictment alleges that Treacy exercised approximately 745,000 Monster stock options for a total gain of $23 million, approximately $13.5 million of which was derived

from the "in-the-money" portion of backdated option grants.  The Indictment also alleges in

Paragraph 53 that, because of their failure to account for these options, Monster's cumulative

compensation expense was understated by approximately $339 million pre-tax during the period

1997 through 2005.  These figures are taken from a 2006 accounting restatement ("restatement")

filed by the company following an internal investigation by a Special Committee of the Board

into the stock option backdating practices at issue in this controversy.

Treacy argues that these figures should be stricken because they are unduly speculative,

highly prejudicial, and irrelevant.

Treacy argues that the figures are unduly speculative because they are based on arbitrary

suppositions bearing no relationship to the expected evidence at trial.  He contends that the

restatement adopted a "worst case scenario methodology" – since the investigators were unable

to determine the actual dates on which the grants were made, the restatement assumed that the

grant was made on the date that the information about its recipient was entered into the

company's electronic database program, and for options granted before the database's

implementation, the restatement averaged the lag time separating the execution of the grants

from the time they were recorded in the database.  Treacy contends that, since the restatement

itself acknowledged that the volatility of the company's common stock made it so that the use of

another measurement date could have resulted in a substantially higher or lower figure, the

numbers in the Indictment are unreliable.

Treacy argues that the figures are prejudicial because the jury may be so distracted by

these spectacular sums that they will become incapable of minding the exculpatory evidence that

he intends to present at trial.  Citing Rutkoske, 506 F.3d at 178, he contends that a court

16

considering the validity of loss and gain allegations in an indictment should be as circumspect as a court calculating the amount of loss caused by wrongful conduct for purposes of determining a sentence in a securities fraud conviction.  Treacy reads <u>Rutkoske</u> to preclude the latter from relying on speculative methodologies that cannot bear precise descriptions of the amount of loss attributable to the allegedly fraudulent conduct.  Treacy would have the court apply that heightened standard to the Indictment, lest, he fears, an inflamed jury be overwhelmed by the amount of money at issue.

Finally, Treacy argues that the figures are irrelevant because neither the magnitude of his purported gain nor the magnitude of the company's underreported compensation expenses is an element of the conspiracy charge.  The government argues that the information is relevant and admissible because it elucidates Treacy's motive.

The government has successfully demonstrated that Paragraph 10's reference to Treacy's alleged illegal profits from the backdating scheme is relevant and admissible on the issue of motive for entering into the allegedly illegal agreement.  <u>See, e.g.</u>, <u>United States v. Hanna</u>, 198 F.Supp.2d 236, 245 (E.D.N.Y. 2002) (denying motion to strike paragraph of an indictment describing the profits from a fraudulent scheme because the evidence was relevant and admissible on the issue of the motive for participating in the scheme to defraud investors). Accordingly, Treacy's motion to strike that language is denied.

The government has not demonstrated, however, that the allegations contained in Paragraph 53 are squarely relevant to the surviving, conspiracy charge.  Nevertheless, Treacy for his part has inadequately explained why its inclusion carries the risk of unfair prejudice, and he has not shown the estimated $339 million in underreported compensation expenses to be so

afield from the genuine number that it is without probative value.  Any methodology used to calculate the actual loss caused by a securities fraud scheme is necessarily speculative.  See, e.g., Rutkoske, 506 F.3d at 179 ("[d]etermining the extent to which a defendant's fraud, as distinguished from market or other forces, caused shareholders' losses inevitably cannot be an exact science.").  In this instance, the court is satisfied that the figures approximate the extent of loss caused by the alleged fraud because they seem to reflect "expert opinion and some consideration of the market in general and relevant segments in particular."  Id. at 180.  There is no reason to doubt that the restatement was compiled by competent persons suited to negotiate whatever information gaps retarded their efforts.  Therefore, although the controversial figures may turn out to be imprecise, so long as Treacy does not demonstrate that they are specious, they may remain.  The court finds that the Indictment's reference to $339 million in underreported compensation expense does not carry enough risk of unfair prejudice to require its excision from the Indictment.

### Conclusion

For these reasons, Treacy's motion to dismiss Count Two of the Indictment alleging violations of Rules 10b-5(a) and (c) on the grounds that the facts alleged do not state an offense under those subsections as a matter of law is denied; Treacy's motion to dismiss the Indictment based on the statute of limitations is granted in part and denied in part; Treacy's motion to compel the government to elect between Count One and Count Two because of multiplicity is not reached; and Treacy's motion to strike certain terms and information from the Indictment as surplusage is denied.

**IT IS SO ORDERED**

DATED:      New York, New York
              November 19, 2008

Robert L. Carter
United States District Judge