**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

UNITED STATES OF AMERICA      :

                                    S2 08 Cr. 366 (RLC)

   - v. -                               :

JAMES J. TREACY,                  :

                Defendant.      :

- - - - - - - - - - - - - - - - - - - - - - - - - - -- - - - - -x

## MEMORANDUM OF LAW IN OPPOSITION TO MOTION BY NON-PARTY CHARLES FORELLE TO QUASH A SUBPOENA *AD TESTIFICANDUM*

LEV L. DASSIN
Acting United States Attorney for the
Southern District of New York
Attorney for the United States
      of America

DEIRDRE A. McEVOY
JOSHUA A. GOLDBERG
Assistant United States Attorneys,
    Of Counsel.

# TABLE OF CONTENTS

Preliminary Statement . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

Background . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

    A.    Nature of the Charges . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

    B.    The At-Issue Evidence . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

Argument . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

    A.    Applicable Law . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

    B.    Discussion . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

        1.    The Evidence is Highly Relevant . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

        2.    The Evidence is Not Obtainable from Other Sources . . . . . . . . . . 14

        3.    The Evidence is Not Cumulative . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

        4.    Requiring Mr. Forelle To Testify is Not Unduly Burdensome . . . . 17

Conclusion . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

## TABLE OF AUTHORITIES

### FEDERAL CASES

*Branzburg v. Hayes*, 408 U.S. 665 (1972) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

*von Bulow v. von Bulow*, 811 F.2d 136 (2d Cir. 1987) . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

*Gonzales v. NBC*, 194 F.3d 29 (2d Cir. 1999) . . . . . . . . . . . . . . . . . . . . . . . 7, 10, 14-16, 20

*In re Grand Jury*, 99 F. Supp. 2d 496 (D.N.J. 2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

*In re Maykuth*, 2006 WL 724241 (E.D. Pa. Mar. 17, 2006) . . . . . . . . . . . . . . . . . . . . . . . 9

*In re Waldholz*, 1996 WL 389261 (S.D.N.Y. July 11, 1996) . . . . . . . . . . . . . . . . . . . . . . 8

*Maughan v. NL Industries*, 524 F. Supp. 93 (D.D.C. 1981) . . . . . . . . . . . . . . . . . . . . . . . 7

*N.L.R.B. v. Mortensen*, 701 F. Supp. 244 (D.D.C. 1988) . . . . . . . . . . . . . . . . . . . . . . . 7, 8

*New York Times Co. v. Gonzales*, 459 F.3d 160 (2d Cir. 2006) . . . . . . . . . . . . . . . . . . 6, 7

*S.E.C. v. Seahawk Deep Ocean Technology*, 166 F.R.D. 268 (D. Conn. 1996) . . . . . . . . 9

*United States v. Burke*, 700 F.2d 70 (2d Cir. 1983) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

*United States v. Cassese*, 428 F.3d 92 (2d Cir. 2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

*United States v. Foote*, 2002 WL 1822407 (D. Kan. Aug. 8, 2002) . . . . . . . . . . . . . . . . . 9

*United States v. Gordon*, 987 F.2d 902 (2d Cir. 1993) . . . . . . . . . . . . . . . . . . . . . . . . . . 13

*United States v. Tone N. Grant*, S4 05 Cr. 1192 (NLB) (S.D.N.Y.) . . . . . . . . . . . . . . . . . 9

*United States v. Johnson*, 513 F.2d 819 (2d Cir. 1975) . . . . . . . . . . . . . . . . . . . . . . . . . . 13

*United States v. Fredric Blair Layne, et al.*, 05-20419-CR (S.D. Fl.) . . . . . . . . . . . . . . . 9

*United States v. Marcos*, 1990 WL 74521 (S.D.N.Y. June 1, 1990) . . . . . . . . . . . . . 16, 17

*United States v. Markiewicz*, 732 F. Supp. 316 (N.D.N.Y. 1990) . . . . . . . . . . . 7, 8, 14, 18

*United States v. Perez*, 387 F.3d 201 (2d Cir. 2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

*United States v. Sanusi*, 813 F. Supp. 149 (E.D.N.Y. 1992) . . . . . . . . . . . . . . . . . . . . . . . 8

*United States v. Ahmed Abdel Sattar, et al.*, S1 02 Cr. 395 (JGK) (S.D.N.Y.) . . . . . . . . 10

## FEDERAL RULES

Fed. R. Evid. 611(b) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

**UNITED STATES OF AMERICA**  :

                                            **S2 08 Cr. 366 (RLC)**

   - v. -  :

**JAMES J. TREACY,**  :

          **Defendant.**  :

- - - - - - - - - - - - - - - - - - - - - - - - - - - - -- - - - - - x

## MEMORANDUM OF LAW IN OPPOSITION TO MOTION BY NON-PARTY CHARLES FORELLE TO QUASH A SUBPOENA *AD TESTIFICANDUM*

The Government respectfully submits this memorandum of law in opposition to the motion by non-party Charles Forelle to quash a subpoena *ad testificandum*, which requires Mr. Forelle to appear and give testimony in the trial of *United States v. James J. Treacy*, S2 08 Cr. 366 (RLC). By that subpoena, the Government seeks limited testimony by Mr. Forelle to verify statements made by defendant James J. Treacy to Mr. Forelle and reported in *The Wall Street Journal* (the "*WSJ*"). Mr. Forelle's testimony is the only available avenue for presenting the admissions and false exculpatory statements made by Treacy that are contained in Mr. Forelle's article, and is therefore essential to the Government's proof. As such, the law requires Mr. Forelle's compliance with the Government's trial subpoena, and Mr. Forelle's motion to quash the subpoena should be denied.

## Preliminary Statement

The purpose of the subpoena is to compel Mr. Forelle, a reporter for the *WSJ*, to testify regarding the accuracy of statements attributed to Treacy in a June 12, 2006 *WSJ* article, entitled "Monster Worldwide Gave Officials Options Ahead of Share Run Ups." Mr. Forelle moves to quash the subpoena, claiming that his qualified privilege as a journalist immunizes him from giving testimony, because his testimony would be irrelevant, unduly cumulative, and available from other sources.[1] Mr. Forelle is incorrect.

Mr. Forelle's motion rests on a fundamental misconception of why his testimony is sought in this matter. While Mr. Forelle argues that Treacy's publicly-reported statements would be admissible only as false exculpatory statements, aspects of his statements also are admissible as party admissions. They also are admissible as statements in furtherance of the charged conspiracy, insofar as they were part of Treacy's continuing efforts to avoid disclosure of the backdating scheme. Moreover, contrary to Mr. Forelle's claims, evidence of the statements is not cumulative of other evidence or relevant only to peripheral matters; it is direct proof of Treacy's knowledge of the backdating scheme and his intent (the key issues in this case), and it is the only evidence

---

[1]     Mr. Forelle notes in his brief that he was served with the subpoena while visiting his family over Thanksgiving weekend. Br. at 4. Service was done in this manner because counsel for the *WSJ* declined to accept service on Mr. Forelle's behalf and told the Government that the Government should serve Mr. Forelle directly. Since Mr. Forelle is currently assigned to the Brussels office of the *WSJ*, Mr. Forelle's recent trip to the United States provided the Government with its best opportunity to serve him.

2

of Treacy's statements after the backdating scheme was disclosed.  As such, this evidence is highly relevant and in no way cumulative.  It also is not available from any other sources since Mr. Forelle was the only witness to Treacy's statements.

Mr. Forelle's motion also rests on a gross overstatement of his interest in avoiding compliance with the subpoena.  This is not a case where the Government seeks to elicit testimony regarding any confidential information or unpublished materials.  Nor does the Government seek to delve into Mr. Forelle's reportorial or editorial processes, or to use him as an investigative agent.  Rather, the Government merely seeks to confirm the accuracy of statements attributed to a named-individual in a widely-published article.  If these statements are, in fact, accurate, Mr. Forelle's testimony will do little more than reiterate what he has already written in a public article.  If, for some reason, the statements are not accurate, the only consequence to Mr. Forelle would be a correction of the public record.  Under these circumstances, Mr. Forelle does not have a compelling interest that would overcome the Government's interest in presenting this evidence, Treacy's interest in cross-examining Mr. Forelle, and the public's interest in the fair administration of justice.

## Background

### A.   Nature of the Charges

The charges in this case relate to allegations that the defendant and others engaged in a multi-year scheme to backdate numerous stock option grants at Monster

3

Worldwide, Inc. ("Monster"), formerly known as TMP Worldwide, Inc. By backdating

the grants, the defendant and others were able to obtain stock option grants at historically

low exercise prices, while giving the appearance that such grants had been given at fair

market value on the date of grant. As part of the scheme, the defendant and others failed

to properly account for the option grants, thereby materially misstating Monster's

financial results in numerous public filings.

Indeed, between in or about 1997 and in or about April 2003, Treacy and

his co-conspirators granted numerous in-the-money options by looking back in time to

select favorable strike prices. They did so both in annual "broad-based grants" that went

to large numbers of employees and in periodic "one-off grants" that were made to new

employees and current employees in connection with promotions, retention or

productivity goals. To avoid detection of the scheme — and to avoid the resulting

accounting charges that would have both revealed the scheme and materially impacted

Monster's financial reports — Treacy and others working in concert with him and at his

direction backdated numerous documents to make it look as if the option grants had in

fact been made on the day that they had retroactively selected.

In connection with the scheme, Treacy and his accomplices caused Monster

to report materially false and misleading financial results in public filings for the period

from at least in or about 1997 through in or about mid-2006. As a result, Monster's

cumulative compensation expense between 1997 and 2005 was understated by

4

approximately $339 million pre-tax.

## B.     The At-Issue Evidence

Monster's backdating scheme continued until June 2006, when it was

disclosed in connection with Mr. Forelle's June 12, 2006 article in the *WSJ*. In that

article, Mr. Forelle quoted Treacy as follows:

- "Mr. Treacy, who has since left Monster, said that, like any other employee, he had no involvement in the options-granting process, which he said was 'all in the purview' of the board's compensation committee and Andrew McKelvey, Monster's founder and chief executive."

- "He said he believes the dates were 'the days that the comp committee and Andy granted' the options."

- "Mr. Treacy said he didn't notice the favorable strike prices at the time. 'I was busy working, and there was a lot to do and a lot of moving parts and a family to get home to,' he said."

The at-issue subpoena seeks to compel Mr. Forelle to give testimony limited

to confirming the accuracy of these statements.

## Argument

Mr. Forelle's motion to quash should be denied, because the narrowly-

tailored subpoena calls for nonconfidential and extremely limited — albeit extremely

important — testimony verifying statements made by Treacy contained in a published

article. Those statements are relevant to a material aspect of this case, they are not

cumulative of any other evidence, and Mr. Forelle — as the sole witness to Treacy's

statements — is the only source of this evidence.

5

## A.    Applicable Law

Although the Supreme Court has never squarely recognized a journalist's

privilege, *see Branzburg v. Hayes*, 408 U.S. 665, 682-83 (1972)[2], the Second Circuit has

concluded that "the process of newsgathering is a protected right under the First

Amendment, albeit a qualified one," *von Bulow v. von Bulow*, 811 F.2d 136, 142 (2d Cir.

1987). "This qualified right, which results in the journalist's privilege, emanates from the

strong public policy supporting the unfettered communication of information by the

journalist to the public." *Id.*

The journalist's privilege is not, however, absolute, and even those courts,

such as the Second Circuit, that have recognized a journalist's privilege have concluded

that such a privilege is qualified and may be overcome where, as here, there is a

countervailing interest in compelling the journalist to comply with a valid subpoena. *See*

*New York Times Co. v. Gonzales*, 459 F.3d 160, 169 (2d Cir. 2006). In considering

whether to override a journalist's claim of privilege, courts have applied various

formulations, depending on the circumstances of the case and the court's understanding

of controlling precedent. *Id.* (describing various formulations). Under each formulation,

the courts generally look to factors such as the relevance and importance of the sought

---

[2]        Generally, the Supreme Court has noted that testimonial exclusionary rules
and privileges are not favored because "they contravene a fundamental principle of our
jurisprudence that 'the public . . . has a right to every man's evidence.' " *von Bulow*, 811
F.2d at 141 (quoting *United States v. Bryan*, 339 U.S. 323, 331 (1950)).

6

information to the case, and the ability of the subpoenaing party to obtain the information from another source. *Id.* The courts also consider the journalist's interest in enforcing the privilege, and the practical impact on the journalist's First Amendment rights if the privilege is overcome. *United States v. Markiewicz*, 732 F. Supp. 316, 319-20 (N.D.N.Y. 1990).

As the caselaw regarding the journalist's qualified privilege has developed, certain principles have emerged. First, "where nonconfidential information is at stake, the showing needed to overcome the journalists' privilege is less demanding than for material acquired in confidence." *Gonzales v. NBC*, 194 F.3d 29, 30 (2d Cir. 1999). Second, information is considered "nonconfidential," even if it was unpublished, unless it was received from a "confidential source." *Id.* at 32. Third, the privilege does not carry as much weight when the reporter himself is subpoenaed, as opposed to when a party seeks to compel the reporter to produce unpublished documents. *Id.* (citing *Maughan v. NL Industries*, 524 F. Supp. 93, 95 (D.D.C. 1981)). Finally, "if the questions put to a reporter are narrowly limited, then subpoenaing a reporter is more acceptable." *Id.* (citing *N.L.R.B. v. Mortensen*, 701 F. Supp. 244, 250 (D.D.C. 1988)). Thus, for example, the reporter's interest in asserting the privilege may be lower when the purpose of the subpoena is simply to elicit testimony that an article was written, that a defendant was interviewed in connection with the article, and that the defendant's statements, as published in the article, were faithfully transcribed. *See id.* at 319-20.

7

In sum, combining these principles — regardless of the formulation of the test for overcoming the journalist's qualified privilege — the journalist's interest in asserting a privilege is lowest when the information sought is nonconfidential (meaning not from a confidential source), the Government does not seek disclosure of unpublished documents, and the purpose of the subpoena is merely to elicit testimony about the accuracy of statements attributed to a defendant in a published article.[3]

For this reason, courts have routinely required compliance with subpoenas in cases such as this one. *See, e.g., Mortensen*, 701 F. Supp. at 246 (subpoenas enforced where journalists called "to appear and verify the fact that they had conducted and reported correctly the three interviews"); *Markiewicz*, 732 F. Supp. at 317 (refusing to quash subpoena in criminal case where Government made clear "that it merely seeks to have the reporters testify that the defendants made the statements reported in the newspapers"); *In re Waldholz*, 1996 WL 389261, at *1 (S.D.N.Y. July 11, 1996)

---

[3]     There is authority for the proposition that the privilege may be "diminished when the trial before which the reporter is to testify is criminal," at least where nonconfidential material is sought. *Markiewicz*, 732 F. Supp. at 319 (citing *Baker v. F & F Investment*, 470 F.2d 778, 784 (2d Cir. 1972)). This proposition is not, however, clear in light of *United States v. Burke*, 700 F.2d 70, 77 (2d Cir. 1983) (in case involving confidential materials, finding that standard for overcoming qualified privilege is same in criminal and civil matters); *see also United States v. Sanusi*, 813 F. Supp. 149, 153, 159 (E.D.N.Y. 1992) (citing *Burke* for proposition that same test applies in "both civil and criminal proceedings, and to nonconfidential materials as well as confidential sources," but then applying test in less stringent manner because of different interests in criminal trials). In light of this uncertainty, in opposing Mr. Forelle's motion, the Government is not relying on an argument that the standards are lower because this is a criminal case.

8

(subpoena enforced where journalist asked to testify that, although he could not remember interview, he typically reported interviews accurately); *S.E.C. v. Seahawk Deep Ocean Technology*, 166 F.R.D. 268, 269 (D. Conn. 1996) (refusing to quash subpoena that had been issued "for only one purpose: to ask [the reporter] to verify that one of the defendants in this case in fact made statements [the reporter] attributed to him in a published newspaper article [the reporter] wrote"); *In re Grand Jury*, 99 F. Supp. 2d 496 (D.N.J. 2000) (subpoena enforced to compel production of complete audiotape for interview previously edited for broadcast); *United States v. Foote*, 2002 WL 1822407 at *3 (D. Kan. Aug. 8, 2002) (refusing to quash subpoena issued by Government in criminal case seeking to have reporter confirm at trial that "statements and/or quotes attributed to the Defendant that appeared in the newspaper articles" written by journalist were, in fact, statements made by defendant); *In re Maykuth*, 2006 WL 724241, at * 3 (E.D. Pa. Mar. 17, 2006) (subpoena enforced where reporter called to "verify whether plaintiffs made the statements that [were] quoted in [the] article"). Indeed, reporters have testified pursuant to a subpoena to verify the accuracy of a defendant's statements in at least three recent prosecutions arising out of this district. *See United States v. Tone N. Grant*, S4 05 Cr. 1192 (NRB) (during April 2008 trial arising from securities fraud at Refco Inc., permitting reporter from *Chicago Tribune* to testify about defendant's published statements); *United States v. Fredric Blair Layne, et al.*, 05-20419-CR (tried in S.D. Fl.) (in fall 2006 trial charging wire fraud, denying motion to quash subpoena of reporter from

9

*St. Petersburg Times* regarding defendant's published statements); *United States v. Ahmed Abdel Sattar, et al.*, S1 02 Cr. 395 (JGK) (denying motion to quash subpoena of reporter from *Reuters* regarding defendant's published statements and allowing reporter to testify in September 2004).

### B.   Discussion

In this case, the Government seeks to compel Mr. Forelle to testify concerning the accuracy of statements attributed to Treacy in Mr. Forelle's June 12, 2006 article in the *WSJ*. These statements are "of likely relevance to a significant issue in the case, and are not reasonably obtainable from other available sources." *See Gonzales*, 194 F.3d at 36. Moreover, contrary to Mr. Forelle's assertion, this evidence is not cumulative to any other evidence in this case. Finally, the burden on Mr. Forelle will be minimal at most, and there is no realistic possibility that compelling Mr. Forelle to testify will either harm his career or hinder his ability to perform as a journalist going forward.

### 1.   The Evidence is Highly Relevant

Treacy's statements to Mr. Mr. Forelle easily satisfy *Gonzales*'s "likely relevance" standard. Indeed, the statements directly relate to Treacy's knowledge and intent, which are *the* significant issues in the case.

As detailed above, the charges in this case relate to a long-running scheme to backdate stock options without recording the resulting compensation expense. To prove these charges, the Government will have to prove not only the existence of the

10

backdating scheme, but also Treacy's knowing and intentional participation in the scheme. This, in turn, will require proof that Treacy participated in the backdating of options, knew that the backdating of options had accounting consequences, and intended to defraud the public by failing to properly account for the backdated options. Given the overwhelming evidence of the backdating of stock options at Monster, the Government does not expect that the existence of the scheme itself will be seriously contested at trial. As a result, the key issues at trial will boil down to Treacy's knowledge and intent with regard to the backdating scheme. The at-issue statements — as witnessed by Mr. Forelle — go directly to these issues.

First, Treacy's admission that he understood that options were within the "purview" of the compensation committee shows his understanding of the options process, and helps to prove that he knew grants were backdated. The Government expects that Treacy may claim at trial that he believed that Andrew J. McKelvey, Monster's former CEO, had authority to grant options and that Treacy was unaware that the compensation committee had to approve all grants. Based on that purported belief, Treacy may argue that he believed that the date of a grant corresponded to when McKelvey decided to grant it (*i.e.* without the benefit of hindsight). In fact, only the compensation committee could grant options. Treacy's admission that he understood this fact is affirmative evidence of his knowledge and intent, and negates one of his expected defenses.

11

Second, Treacy's statements are admissible as statements in furtherance of the charged conspiracy, insofar as those statements were part of a continuing effort to prevent full disclosure of the backdating scheme.

Third, Treacy's statements contain false exculpatory statements that are directly at odds with his anticipated trial defense. In this respect, the Government expects the evidence at trial to show that (1) Treacy had extensive involvement in the options-granting process (and in the selection of strike prices for grants), (2) he knew that grant dates listed on the stock-option grants did not correlate to days in which either the compensation committee granted the options or McKelvey proposed the options, and (3) he was aware of Monster's stock prices and the resulting strike prices that he and others selected for the backdated grants. All of these facts are contrary to Treacy's statements to the *WSJ*, constituting false exculpatory statements that tend to show his knowledge and intent. "The law admits consciousness-of-guilt evidence precisely because a jury may properly infer therefrom that the defendant believes himself to be guilty of the charged crime, which constitutes some evidence that he is, in fact, guilty." *United States v. Cassese*, 428 F.3d 92, 107 (2d Cir. 2005) (citing Sand, *Modern Federal Jury Instructions*, Instructions 6-9 (flight), 6-11 (false exculpatory statements) (2002)); *see also United States v. Perez*, 387 F.3d 201, 209 (2d Cir. 2004) (attempt to persuade witness to make false exculpatory statements is probative of guilty knowledge and intent).

Indeed, at trial Treacy may argue that even if he participated in the options

12

process and even if knew about the backdating, he was unaware of the accounting rules

and therefore had no intent to defraud. His false exculpatory statements strongly belie

that defense. If Treacy had believed that there was nothing wrong with backdating option

grants and that he had done nothing wrong, he presumably would have been forthright

with the *WSJ* and owned up to his involvement in the process. Instead, he made several

false statements, in a clear attempt to distance himself from the options-granting process

and thereby absolve himself of responsibility. The jury could infer from this fact that

Treacy lied to the *WSJ* because he hoped to avoid culpability for conduct that he knew

was wrong and illegal.

        In moving to quash the subpoena, Mr. Forelle ignores Treacy's admission

about the role of the compensation committee and then dismisses the value of the false

exculpatory statements, asserting that such statements have only "minimal probative

value." Br. at 12. This is incorrect. While false exculpatory statements generally are not

admissible as direct evidence of guilt, they "are circumstantial evidence of a

consciousness of guilt and have independent probative force." *United States v. Johnson*,

513 F.2d 819, 824 (2d Cir. 1975). It is for this reason that such statements are admissible,

and it is for this reason that the jury may consider such statements, along with all the other

evidence in the case, to conclude that a defendant knowingly and intentionally

participated in a crime. *See United States v. Gordon*, 987 F.2d 902, 906-07 (2d Cir. 1993)

(knowledge and intent may be established through circumstantial evidence, "includ[ing]

13

acts that exhibit a consciousness of guilt"). Far from being of minimal probative value, such evidence can play an important role in establishing the defendant's guilt. Such proof should not be lightly dismissed, particularly given the high burden of proof that the Government must meet at a criminal trial. *See Markiewicz*, 732 F. Supp. at 322.

In a related argument, Mr. Forelle argues that because false exculpatory statements purportedly "have minimal probative value," they "cannot be considered a 'significant' issue in this case." Br. at 13. This argument confuses the probative value of false exculpatory statements with the reason why false exculpatory statements are admitted. As explained above, the false exculpatory statements are admissible as circumstantial evidence of Treacy's knowledge and intent. These are not only "significant" issues in this case, they are the most important issues in the case.

For all of these reasons, the at-issue statements easily satisfy the *Gonzales* standard of "likely relevance to a significant issue in this case." 194 F.3d at 36.

## 2. The Evidence is Not Obtainable from Other Sources

Prior to issuing the subpoena, the Government attempted to obtain the information from alternative sources. First, the Government asked Treacy's counsel if Treacy would stipulate to the authenticity of his reported statements; Treacy declined. Second, the Government conferred with the general counsel for the *WSJ* to determine the *WSJ*'s position regarding the proposed testimony. He confirmed that the *WSJ* would not consent to allow Mr. Forelle to testify voluntarily. Third, the Government explored

14

whether there were any other witnesses who could testify about Treacy's statements.
Counsel for the *WSJ* confirmed that Mr. Forelle was the only witness to the statements.[4]
Given that the Government obviously cannot compel Treacy to testify about the
statements and that there are no witnesses to the statements other than Mr. Forelle, this
evidence is "not reasonably obtainable from other available sources." *Gonzales*, 194 F.3d
at 36.

### 3.     The Evidence Is Not Cumulative

In moving to quash the subpoena, Mr. Forelle argues that the testimony
sought is cumulative of other evidence that the Government intends to present at trial. Br.
at 13. Specifically, Mr. Forelle points to other evidence that tends to show that Treacy
was involved in the backdating scheme, including various e-mails. Br. at 13-14.

Mr. Forelle is correct that the Government intends to present evidence to
prove that Treacy participated in the backdating scheme. But that does not mean that Mr.
Forelle's testimony would be cumulative. The at-issue evidence constitutes the
Government's only proof of Treacy's statements after the backdating scheme had been
disclosed publicly. Such evidence falls into a different category than the Government's
other evidence, in that it constitutes important admissions and false exculpatory
statements from Treacy himself. This is powerful circumstantial evidence of Treacy's

---

[4]      Given this fact, it is surprising that Mr. Forelle's current counsel asserts in
his brief that "there is no evidence to suggest that the government made any efforts to
obtain the requested information from anyone other than Forelle." Br. at 15.

consciousness of guilt, which goes directly to his knowledge and intent, as well as direct evidence of Treacy's continuing efforts to cover up the backdating scheme. In all of these respects, the at-issue evidence is not cumulative in any way.

Mr. Forelle's reliance on *United States v. Marcos*, 1990 WL 74521 (S.D.N.Y. June 1, 1990), is misplaced for at least two reasons. First, the Court in *Marcos* applied the wrong standard for disclosure because it erroneously assumed that "unpublished material" should be treated as "confidential."[5] That assumption was incorrect in light of the Second Circuit's subsequent decision in *Gonzales v. NBC*, 194 F.3d 29 (2d Cir 1999). In *Gonzales*, the Second Circuit treated unpublished materials — in that case, "unedited camera footage" including "outtakes" and "raw footage" — as nonconfidential. *Id.* at 31-32. Such materials were subject to disclosure based on a "less demanding showing" that they were "of likely relevance to a significant issue in the case, and . . . not reasonably obtainable from other available sources." *Id.* at 36. Because the *Marcos* Court applied the wrong standard, its analysis of the relevance of the at-issue evidence was also necessarily flawed.

Second, the nature of the false exculpatory statements in *Marcos* is distinct from this case. In *Marcos*, the false exculpatory statements related to Imelda Marcos's denial that she knew about a bank contract dated four years before the commencement of the charged conduct. *Marcos*, 1990 WL 74521, at *3. While the false exculpatory

---

[5]     Mr. Forelle repeats the same mistake throughout his brief.

16

statements were relevant to Marcos's consciousness of guilt, they were merely consistent

with her defense at trial, namely, that she was unaware of her husband's financial

dealings. *Id.* at *4.  The Government had presented considerable evidence to refute this

defense, and the fact that Marcos previously had made similar incredible disavowals was

not critical evidence in the Court's opinion. *Id.*  In contrast, here Treacy's statements to

Mr. Forelle go beyond general denials about his involvement in the backdating scheme.

Indeed, they include a specific admission about the role of the compensation committee in

granting options, which statement provides direct proof as to Treacy's knowledge of the

options granting process at Monster.  The statements also include specific denials about

key underlying facts, including whether Treacy was involved in the options-granting

process, whether he was aware that grant dates often did not correlate to any action by the

compensation committee or McKelvey, and whether Treacy was aware that the strike

prices on the grants were particularly fortuitous.  Each of these facts is independently

relevant to the allegations in this case, and the fact that Treacy made false statements

about each of these facts at a time when the backdating scheme had just been disclosed

provides key evidence of his state of mind that is not available from any other source.

Accordingly, the evidence is not cumulative.

### 4.    **Requiring Mr. Forelle To Testify Is Not Unduly Burdensome**

Finally, in moving to quash the subpoena, Mr. Forelle asserts a series of

hardships that will supposedly befall him if he is required to testify.  None of these

17

withstands scrutiny.

For example, Mr. Forelle claims that his "ability to obtain interviews and elicit information is dependent upon assurance that he will not be compelled to testify." Br. at 5. But there is no evidence to suggest that Mr. Forelle gave such an assurance to Treacy in this case. Nor would such an assurance have been appropriate, since the law is clear that Mr. Forelle can be compelled to testify, especially where, as here, his testimony relates to published statements by a nonconfidential source.

Nor is there any reason to believe that Mr. Forelle's ability to gather information in the future will be hindered by his compelled testimony in this case. As the Court found in *Markiewicz*, such a speculative concern is not sufficient to require the quashing of a subpoena. *See Markiewicz*, 732 F. Supp. at 321 (rejecting reporter's assertion that he would be "shunned in the future by other sources with information" if forced to testify). After all, there is no realistic possibility that Mr. Forelle will be seen as an agent of the Government since he will have been compelled to testify, rather than testifying of his own volition. *See id.*

Similarly, there is no evidence to support Mr. Forelle's claims that, if he were compelled to testify, he would be unable to fulfill his duties as a reporter because he might be required to testify in numerous other cases across the country. Br. at 5. This appears to be the first case in which Mr. Forelle has ever been asked to testify, and it is unlikely that the facts of this case — a situation where a defendant proceeding to trial

18

previously made admissions and false exculpatory statements — are likely to repeat themselves again. The fact that Mr. Forelle apparently has not been subpoenaed in any of the other numerous backdating cases about which he reported by itself shows that this concern is grossly exaggerated.

Equally unpersuasive is Mr. Forelle's suggestion that being compelled to testify might discourage him and other reporters from "investigat[ing] and expos[ing], free from unnecessary government intrusion, evidence of criminal wrongdoing." Br. at 6. Mr. Forelle has not articulated why compliance with the subpoena in this case would discourage vigorous reporting in the future, and a look at the facts of this case shows that such a risk is unrealistic. After all, the Government merely seeks to call the named author of a published article to testify and confirm statements attributed to a named witness. It strains credulity to believe that Mr. Forelle would have foregone publishing a series of articles that culminated in a Pulitzer Prize if he had known that he might have to give limited testimony someday to authenticate published statements by an identified figure.

The Government acknowledges that compelling Mr. Forelle to testify will cause him some inconvenience, and that time spent testifying will mean a modest loss of time reporting. But this could be said about the impact on the employment or profession of any witness who is compelled to testify. The Government will take steps to minimize Mr. Forelle's inconvenience by attempting to accommodate his schedule, arranging and paying for his travel, and keeping his examination short. To that end, the Government

19

remains amenable to a stipulation with the defense that would obviate the need for Mr.

Forelle to testify.  This would include a stipulation regarding any information that would

otherwise *properly* be elicited during cross-examination — *i.e.*, material that is within the

scope of the direct examination — so as to avoid any hardship professional or personal to

Mr. Forelle.  The Government also joins in Mr. Forelle's request that any cross-

examination be limited to issues related to the accuracy of Treacy's published statements.

There is no reason why either party should have to delve into confidential matters or

question Mr. Forelle about any subjects other than Treacy's statements.  *See* Fed. R. Evid.

611(b) (limiting cross-examination to subject matter of direct).

*          *          *

In sum, the Government has established that the testimony sought is "of

likely relevance to a significant issue in the case, and [is] not reasonably obtainable from

other available sources."  *See Gonzales*, 194 F.3d at 36.  The Government also has shown

that such testimony is not cumulative, and that the burden on Mr. Forelle will be minimal

at most.  Under these circumstances, Mr. Forelle's qualified journalistic privilege must

give way to the public interest in compelling his testimony.  Accordingly, his motion to

quash the subpoena should be denied.

## Conclusion

For all the reasons stated, the Court should deny non-party Charles Forelle's motion to quash the subpoena *ad testificandum* and compel Mr. Forelle to appear and give testimony in the trial of *United States v. James J. Treacy*, S2 08 Cr. 366 (RLC), regarding the accuracy of statements made by defendant James J. Treacy to Mr. Forelle and reported in *The Wall Street Journal* (the "*WSJ*") on June 12, 2006.

Dated:      New York, New York
            January 7, 2009

                              Respectfully submitted,

                              LEV L. DASSIN
                              Acting United States Attorney for the
                              Southern District of New York
                              Attorney for the United States
                              of America

            By:     _____
                    Deirdre A. McEvoy
                    Joshua A. Goldberg
                    Assistant United States Attorneys
                    Tel: (212) 637-2309/2439