UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
_________________________________________X

UNITED STATES OF AMERICA 08 Cr. 366(RLC)

v.

JAMES J. TREACY,

Defendant.
_________________________________________X

**REPLY MEMORANDUM OF LAW OF NON-PARTY CHARLES FORELLE IN FURTHER SUPPORT OF HIS MOTION TO QUASH SUBPOENA *AD TESTIFICANDUM***

Slade R. Metcalf
Rachel F. Strom
HOGAN & HARTSON LLP
875 Third Avenue
New York, New York 10022
Tel: (212) 918-3000
Fac.: (212) 918-3100

*Attorneys for Non-Party Charles Forelle*

**TABLE OF CONTENTS**

TABLE OF AUTHORITIES ........ ii

PRELIMINARY STATEMENT ........ 1

ARGUMENT ........ 2

THIS COURT SHOULD QUASH THE SUBPOENA BECAUSE IT SEEKS INFORMATION WITH LIMITED RELEVANCE AND IS PROTECTED BY THE JOURNALIST'S PRIVILEGE ........ 2

A. The Government Mischaracterizes The Scope Of Forelle's Testimony And The Burden Forelle Would Face If He Is Called To Testify ........ 2

B. The District Attorney Has Completely Failed To Satisfy The Three-Prong Test Necessary To Overcome The Shield Law ........ 6

1. Forelle's Testimony Is Not Relevant To A Significant Issue Of The Case ........ 7

2. The District Attorney Has Not Shown That The Requested Information Is Not Available From Other Sources ........ 11

C. Should Forelle Be Forced To Testify, Such Testimony Should Be Strictly Limited To Published Information ........ 12

CONCLUSION ........ 14

# TABLE OF AUTHORITIES

## Federal Cases

*Church of Scientology Celebrity Ctr. Int'l v. Internal Revenue Serv.*, 779 F. Supp. 273 (S.D.N.Y. 1991)........ 11, 12

*Gonzales v. Nat'l Broad. Co.*, 194 F.3d 29 (2d Cir. 1999)........ 2, 5, 6

*In re: Consumers Union of United States, Inc.*, 495 F. Supp. 582 (S.D.N.Y. 1980)........ 4, 5

*Lonegan v. Hasty*, No. CV-04-2743 (NG)(VVP), 2008 WL 41445 (E.D.N.Y. Jan. 1, 2008)........ 5, 6, 8

*S.E.C. v. Seahawk Deep Ocean Tech., Inc.*, 166 F.R.D 268 (D. Conn. 1996)........ 12

*States v. Nusraty*, 867 F.2d 759 (2d Cir. 1989)........ 10

*United States v. Lorenzo*, 534 F.3d 153 (2d Cir. 2008)........ 10

*United States v. Marcos*, No. 87 CR 598(JFK), 1990 WL 74521 (S.D.N.Y. June 1, 1990)........ 10

*von Bulow v. von Bulow*, 811 F.2d 136 (2d Cir. 1987)........ 5

## State Cases

*In re Grand Jury Subpoena to Moore*, 269 A.D.2d 475, 703 N.Y.S.2d 230 (2d Dep't 2000)........ 13

*People v. Nasser*, 15 Misc. 3d 499, 830 N.Y.S.2d 892 (Sup. Ct. Westchester Co. 2007)........ 13

## Federal Rules

Rule 17 of the Federal Rules of Criminal Procedure........ 1, 2

Non-party witness Charles Forelle ("Forelle"), a reporter for *The Wall Street Journal* (the "*Journal*"), by his undersigned attorneys, respectfully submits this reply memorandum of law in further support of his motion pursuant to Rule 17 of the Federal Rules of Criminal Procedure ("Fed. R. Crim. P.") to quash the subpoena *ad testificandum* served on him by the United States Attorney for the Southern District of New York (the "Subpoena").[1]

## Preliminary Statement

In response to Forelle's motion to quash, the government seems to focus on the question of whether Forelle's testimony will materially assist it in proving that the defendant here was aware of the procedures of the option granting system, but not whether he was aware of the false and misleading entries on the company's filings that were filed with the SEC — which, according to the indictment, is the primary accusation against the defendant. Accordingly, even under normal evidentiary standards, this Court should quash the Subpoena because the requested testimony has limited evidentiary value.

Furthermore, the government strains to persuade this Court that whatever is the scope of the journalist's privilege in this Circuit, the questions to be posed to Forelle could not possibly invade such a privilege because Forelle is only being asked to affirm the accuracy of the quoted statements made by the defendant to Forelle. But the precise wording in Forelle's article that the government is interested in here is mostly paraphrasing by Forelle of the defendant's statements. Thus, it is inevitable that the government (much less the defendant's counsel on cross-examination) will delve into unpublished information and Forelle's newsgathering methods.

---

1 The facts relevant to this motion are set forth in the in the declarations of Slade R. Metcalf (the "Metcalf Decl."), sworn to on the 17th day of December, 2008 and of Charles Forelle (the "Forelle Decl."), sworn to the 15th day of December, 2008, and the exhibits annexed thereto, which were submitted with the Memorandum of Law of Non-Party Charles Forelle In Support of His Motion to Quash Subpoena *Ad Testificandum* (the "Opening Memorandum").

This clear, unwarranted invasion of the journalist's privilege, with the extremely minimal relevance of Forelle's testimony, mandates that this Court grant the motion to quash.

## ARGUMENT

### THIS COURT SHOULD QUASH THE SUBPOENA BECAUSE IT SEEKS INFORMATION WITH LIMITED RELEVANCE AND IS PROTECTED BY THE JOURNALIST'S PRIVILEGE

This Court should quash the Subpoena because it seeks information with very limited probative value and is protected by the journalist's privilege. In the Memorandum of Law in Opposition to Motion By Non-Party Charles Forelle To Quash Subpoena *Ad Testificandum* ("Opposition"), the government concedes, as it must, that there is some form of a journalist's privilege in this Circuit that is applicable to this case. *See* Opposition at 6, 10. The government further acknowledges that in order to overcome Forelle's journalist's privilege and compel Forelle to testify here it must establish that the requested information is "[1] of likely relevance [2] to a significant issue in the case, and [3] [is] not reasonably obtainable from other available sources." *Gonzales v. Nat'l Broad. Co.*, 194 F.3d 29, 36 (2d Cir. 1999). Opposition at 10. Yet, in the Opposition, the government has not satisfied this burden and therefore cannot overcome Forelle's journalist's privilege. As a result, this Court should quash the Subpoena pursuant to Fed. R. Crim. P. 17.

### A. The Government Mischaracterizes The Scope Of Forelle's Testimony And The Burden Forelle Would Face If He Is Called To Testify

As a preliminary matter, before turning to the *Gonzales* test, it is important to correct two misconceptions in the government's Opposition. The government both attempts to downplay the potential scope of Forelle's testimony in this action on direct and cross-examination and diminish the burden Forelle — a professional journalist — would face if he is compelled to testify in this action.

First, contrary to the assurances of the U.S. Attorneys' Office and the statements in the Opposition that the government "does not seek to delve into Mr. Forelle's reportorial or editorial processes," the government is clearly requesting Forelle to divulge *unpublished* information that he gathered in preparing the article at issue here (the "Article"). Opposition at 3; Metcalf Decl. ¶ 7. The government deceptively states that it merely "seeks limited testimony by Mr. Forelle to verify statements made by defendant James J. Treacy ["Treacy"] to Mr. Forelle and reported in *The Wall Street Journal*."[2] Opposition at 1, 2. Yet, a careful read of the Opposition makes it clear that the government does not intend to limit Forelle's testimony to published information, as it once promised. *See, e.g.*, Opposition at 8 (the government seeks "testimony *about* the accuracy of statements attributed to the a defendant in a published article") (emphasis added).

In the Opposition, the government states that it seeks Forelle's testimony so that Forelle will "confirm[] the accuracy" of the following three statements (collectively, the "Statements") in the Article:

- "Mr. Treacy, who has since left Monster, said that, like any other employee, he had no involvement in the options-granting process, which he said was 'all in the purview' of the board's compensation committee and Andrew McKelvey, Monster's founder and chief executive."

- "He said he believes the dates were 'the days that the comp committee and Andy granted' the options."

- "Mr. Treacy said he didn't notice the favorable strike prices at the time. 'I was busy working, and there was a lot to do and a lot of moving parts and a family to get home to,' he said."

Opposition at 5. But, while the Statements include some quotations of Treacy's statements to Forelle, they are primarily Forelle's own paraphrasing of a conversation he had with Treacy. As such, in order "to elicit testimony *about* the accuracy of" the Statements, as the government

---

2 In the Opposition, the government incorrectly states that the Subpoena is "narrowly tailored." Opposition at 5. In actuality, the Subpoena does not define or limit the scope of the required testimony in any manner. *See* Forelle Decl., Exhibit ("Ex.") C.

desires, it will likely ask Forelle to divulge information about Treacy's exact statements to Forelle, statements that were *not* published in the Article, and how and why Forelle characterized his conversation with Treacy the way he did. Opposition at 8 (emphasis added). In response to those questions, Forelle may be obliged to disclose other statements by Treacy which were never used in the Article. Clearly then, the government will — contrary to its assurances — delve into Forelle's reportorial and editorial processes.

Moreover, in the Opposition, while acknowledging that if Forelle is required to take the stand in this action Treacy will be entitled to cross-examine Forelle (Opposition at 20), the government completely skirts the issue of the potential breadth of this cross-examination. Understandably, in attempting to overcome Forelle's journalist's privilege, the government does not want to discuss the potential cross-examination, but this Court, with respect, cannot avoid this issue. Indeed, Treacy's counsel has made clear that if Forelle is required to testify in this action about Treacy's Statements in the Article, Treacy's counsel intends to cross-examine Forelle so that Forelle would give some "context" to the Statements and apparently show that the Statements did not really mean what the prosecutors intend to show. Metcalf Decl. ¶ 8. As such, if Forelle is compelled to take the stand here, he will undoubtedly be required to testify about unpublished information — including "contextual" information — about Treacy's conversation with Forelle.

Therefore, despite all of the government's protestations about the "extremely limited" nature of the Subpoena, the government and Treacy's counsel will unquestionably delve into unpublished information that Forelle gathered in preparing to write the Article and into Forelle's editorial and reportorial processes — information that is at the heart of the journalist's privilege. *See In re: the Application of Consumers Union of United States, Inc.*, 495 F. Supp. 582, 586

(S.D.N.Y. 1980) (information is protected by the journalist's privilege because "[r]egardless [of] whether they seek confidential sources, they seek to examine the reportorial and editorial processes. . . . Such discovery would represent a substantial intrusion on fact gathering and editorial privacy which are significant aspects of a free press"); *see also von Bulow v. von Bulow*, 811 F.2d 136, 143 (2d Cir. 1987) ("like the compelled disclosure of confidential sources, the compelled production of a reporter's [nonconfidential information] may substantially undercut the public policy favoring the free flow of information to the public that is the foundation of the privilege"); *Lonegan v. Hasty*, No. CV-04-2743 (NG)(VVP), 2008 WL 41445, at *2 (E.D.N.Y. Jan. 1, 2008) ("ready access by litigants to reporters and their resource materials intrudes on newsgathering and editorial processes, and thus interferes with the free flow of information to the public.").

Second, the government wholly underestimates the burden Forelle — and professional journalists in general — would face if Forelle is compelled to testify. Unlike the government here, the Second Circuit takes seriously the burdens members of the press face when a journalist is compelled to divulge information about his or her newsgathering activities. Indeed, in affirming that the journalist's privilege applies to non-confidential information, the Second Circuit specifically held that the "broader concerns" of "the pivotal function of reporters to collect information for public dissemination, and the paramount public interest in the maintenance of a vigorous, aggressive and independent press capable of participating in robust, unfettered debate over controversial matters . . . are relevant regardless whether the information sought from the press is confidential." *Gonzales*, 194 F.3d at 35 (internal citations and quotations omitted). In so holding, the Second Circuit noted that if parties

> were free to subpoena the press at will, it would likely become standard operating procedure for those litigating against an entity that had been the subject of press



\\\NY - 031767/000018 - 1126749 v2

> attention to sift through press files in search of information supporting their claims. The resulting wholesale exposure [to the press] … would burden the press with heavy costs of subpoena compliance, and could otherwise impair its ability to perform its duties — particularly if potential sources were deterred from speaking to the press, or insisted on remaining anonymous, because of the likelihood that they would be sucked into litigation.

*Id.* The Second Circuit went on to note that "permitting litigants unrestricted, court-enforced access to journalistic resources would risk the symbolic harm of making journalists appear to be an *investigative arm of the judicial system, the government*, or private parties." *Id.* (emphasis added). *See also Lonegan*, 2008 WL 41445, at *2 ("Requiring journalists and press organizations to respond to subpoenas on a regular basis, even when the requested documents and testimony concern non-confidential matters, imposes costs in time and money that would unnecessarily burden reporters and their employers. Moreover, ready access by litigants to reporters and their resource materials intrudes on newsgathering and editorial processes, and thus interferes with the free low of information to the public.").

Accordingly, while the government insists that Forelle's fear that his career as a reporter for the *Journal* would be negatively impacted if he were required to testify is "grossly exaggerated" (Opposition at 19), the Second Circuit has recognized the real "concerns" that arise when a reporter is called to testify about his newsgathering activities. As such, based upon the broad potential scope of Forelle's testimony, which will undoubtedly include unpublished information, and the judicially recognized burden Forelle would face if he is required to testify here, the *Gonzales* test weighs heavily in favor of quashing the Subpoena.

### B. The District Attorney Has Completely Failed To Satisfy The Three-Prong Test Necessary To Overcome The Shield Law

The government has failed to overcome Forelle's qualified journalist's privilege here because Forelle's testimony is not relevant to a significant issue in the case. Further, any potential relevance Forelle's testimony may have is obtainable from other sources.

1. **Forelle's Testimony Is Not Relevant To A Significant Issue Of The Case**

In the Opposition, the government makes three equally baseless arguments as to how Forelle's testimony is relevant to "Treacy's knowledge and intent with regard to the backdating scheme," which, it claims, is a significant issue of its case. Opposition at 11. But its arguments are not persuasive.

Before reaching any of the government's specific arguments it must be noted that, on the whole, the government merely seeks to use Forelle's testimony to establish that Treacy knew about the options granting process at Monster Worldwide, Inc. ("Monster") so that one could infer that Treacy knew that stock option grants at Monster were backdated. But, according to the second superseding indictment against Treacy (the "Indictment"), the main issue of this case is not whether Treacy knew about the stock option granting process at Monster, or even that certain stock options were backdated, but whether Treacy allegedly committed securities fraud by causing improper securities filings to be made. Metcalf Decl., Ex. A ¶¶ 12, 16, 21. Here, Treacy's Statements in the Article do not show — and the government certainly does not allege that they do — that Treacy knew that he filed false securities filings. As such, even if Forelle's testimony were relevant to establishing that Treacy knew about Monster's stock options granting process, the testimony is still not relevant to the most significant issue of the case.

The government attempts to compensate for this fatal shortcoming by listing three arguments that are designed to establish the relevance of Forelle's testimony here. First, the government argues that Treacy's "admission" that he understood that "options were within the 'purview' of the compensation committee shows his understanding of the options process, and helps prove that he knew grants were backdated." Opposition at 11. This is mystifying.[3] In the

[3] The weakness of the government's argument is underscored by the fact that it argues in contradictory fashion that Treacy's Statements in the Article are relevant *both* as an

Article, Treacy is paraphrased as saying "that, like any other employee, *he had no involvement* in the options-granting process, which he said was 'all in the purview' of the board's compensation committee and Andrew McKelvey ["McKelvey"], Monster's founder and chief executive." Forelle Decl., Ex. A (emphasis added). Far from establishing that Treacy admitted that he knew how the "options process" worked and that grants were backdated, Treacy clearly denies any knowledge of the options granting process.

The government confusingly argues that at trial Treacy may claim that he believed that McKelvey "had authority to grant options" and that "[b]ased on that purported belief, Treacy may argue that he believed that the date of a grant corresponded to when McKelvey decided to grant it." Opposition at 11. As such, the government claims that Treacy's knowledge that there was a compensation committee "negates one [of Treacy's] expected defenses." *Id*. But, in the Article, Treacy explicitly states that "[h]e said he believes the dates were 'the days that the comp committee and Andy granted' the options." Forelle Decl., Ex. A. Accordingly, far from removing Treacy's potential "defense" that he thought McKelvey "had authority to grant options," the Article reaffirms Treacy's purported belief that McKelvey had that precise authority. As such, contrary to the government's convoluted theories, the Statements — which deny any knowledge about the backdating scheme — are not relevant to showing that Treacy was involved in the backdating of stock option grants at Monster. As such, Forelle's testimony is not relevant for the purposes of an admission.[4]

---

"admission" that Treacy knew about the options granting scheme at Monster *and* as a false exculpatory statement because Treacy denied knowing about the options granting scheme at Monster. *Cf.* Opposition at 10, 12.

4 In the Opposition the government incorrectly claims that in the Opening Memorandum Forelle "ignores Treacy's admission about the role of the compensation committee." Opposition at 13. This is untrue. Forelle acknowledged that the government seeks to use the Statements as an admission, but argued that because "Treacy is quoted as saying that

Second, the government argues, almost in passing, that "Treacy's statements are admissible as statements in furtherance of the charged conspiracy" because the Statements "prevented full disclosure of the backdating scheme." Opposition at 12. But Treacy's Statements denying his involvement in a "backdating scheme" cannot honestly be considered an action in furtherance of the charged conspiracy. Tellingly, in the Indictment, in listing all of the "overt acts" Treacy took in furtherance of the alleged conspiracy, the government does not so much as mention the Statements Treacy made in the Article. *See* Metcalf Decl., Ex. A. As such, the government clearly does not consider the Statements to be significant evidence of Forelle's participation in the charged conspiracy. Moreover, it is worth noting that contrary to the government's argument that Treacy's Statements in the Article failed to "prevent full disclosure of the backdating scheme," the Article — as well as Forelle's other articles on Monster — fully exposed the backdating scheme at Monster. Forelle Decl., Exs. A and B. As such, Forelle's testimony will not support any statement from Treacy in furtherance of the alleged conspiracy.

Finally, the government unconvincingly argues that the Statements are relevant as false exculpatory statements. The government claims that false exculpatory statements are probative to establishing that a defendant knowingly and intentionally participated in a crime and here, it argues, "Treacy's knowledge and intent" are "the most important issues in the case." Opposition at 13. Forelle does not contest that Treacy's intent to backdate stock options at Monster and failure to report them may be an important issue in the government's case. Forelle simply argues that false exculpatory statements have minimum probative value to establishing this requisite

---

he was *not involved* in the options granting process at Monster and that he did not notice the favorable prices of the stock option grants he received" the Statements "cannot possibly be relevant to showing that Treacy *was* involved in the backdating of stock option grants at Monster." Opening Memorandum at 11.

knowledge and intent. And, the government's interest in presenting evidence with minimal probative value is vastly outweighed by Forelle's journalist's privilege.[5]

As discussed in the Opening Memorandum, in *United States v. Marcos*, No. 87 CR 598(JFK), 1990 WL 74521 (S.D.N.Y. June 1, 1990), the Southern District of New York faced the competing interests of the government's desire to confirm a defendant's false exculpatory statement and CBS Inc.'s ("CBS") journalist's privilege to protect its non-confidential newsgathering activities.[6] The government in *Marcos* argued, as the government does here, that it was entitled to non-confidential information from the press for the purpose of establishing a defendant's false exculpatory statement. *Id.* at *3. But, in quashing the subpoena to CBS the court specifically noted that false exculpatory statements have limited value to a government's "proof of a crime." *Id.* at *4. The court thus held that the government's interest in presenting a defendant's false exculpatory statement could not defeat CBS' qualified journalist's

---

5 Further, as noted in the Opening Memorandum, unless the government has other evidence establishing Treacy's guilt, Treacy's alleged false exculpatory statement may not be used to establish that Treacy knowingly joined a conspiracy. *See United States v. Lorenzo*, 534 F.3d 153, 161 (2d Cir. 2008); *see also States v. Nusraty*, 867 F.2d 759, 765 (2d Cir. 1989) (false exculpatory statement could not support conviction because "other evidence of guilt is weak ….").  Unless and until the government presents other evidence establishing Treacy's guilt, the Subpoena is premature.

6 The government attempts to distinguish *Marcos* by arguing that the court in that case erroneously applied the higher standard for disclosure of confidential newsgathering material. Opposition at 16. In the Opening Memorandum, Forelle did not argue that this Court should apply the stricter journalist's privilege articulated in *Marcos.* As such, contrary to the government's accusation, Forelle did not "repeat[] the same mistake throughout his brief." *Id.* Instead, Forelle correctly argued that *Marcos* stands for the proposition that false exculpatory statements have minimum probative value. Opening Memorandum at 14-15. As such, in balancing a government's desire to confirm a false exculpatory statement with a journalist's privilege to protect newsgathering information, even under the *Gonzales* standard, Forelle argued, a court should weigh in favor of the journalist's privilege. *Id.*

privilege. Similarly here, Forelle's testimony, which would have minimal if any probative value, should not defeat Forelle's qualified journalist's privilege.

As such, because the government has not established that Forelle's testimony is relevant to a significant issue of the case, this Court should quash the Subpoena to Forelle.

**2. The District Attorney Has Not Shown That The Requested Information Is Not Available From Other Sources**

Further, even if Forelle's testimony were relevant to establishing "Treacy's knowledge and intent with regard to the backdating scheme" (Opposition at 11), which it is not, the government has failed to establish that it is unable to obtain this information from other sources. In the Opposition, the government argues that because Forelle was the "only witness" to the Statements, it is unable to obtain the requested information from any other source.[7] But the question here is not whether the government is able to obtain confirmation of the specific Statements from other sources. Instead, the correct focus is whether the information the government is requesting — Treacy's statements that he was not aware of the backdating of stock options at Monster — is available from other sources. For example, in *Church of Scientology Celebrity Ctr. Int'l v. Internal Revenue Serv.*, 779 F. Supp. 273, 276 (S.D.N.Y. 1991), this court quashed a subpoena to a journalist pursuant to the journalist's privilege because — among other reasons — the requested information was available from other sources. In that case the Church of Scientology (the "Church") sought to depose a *Time* magazine reporter who had recently reported on the harassment that he personally faced by the Church as well as the harassment the government and others faced by the Church. In holding that this information was

[7] The government incorrectly states that counsel for the *Journal* "confirmed that Mr. Forelle was the only witness to the statements." That is not so and could not be so. Forelle and counsel for the *Journal* have no idea if Treacy was alone when Treacy talked to Forelle. As such, Treacy's attorney, family or some other unknown witness could have been a witness to these Statements.

available from other sources, the court held "as to allegations regarding alleged harassment . . . the Church is free to depose any and all persons who claim to have been harassed. . . . [Further], the Church has not shown that it has exhausted the avenues open to it to investigate the events recounted by [the reporter] regarding the Church's claimed harassment of himself, through interviewing its own agents, or seeking to depose all of the persons identified in [the article at issue]. The Church must exhaust these alternative sources before any deposition of [the reporter] would be warranted." *Id.* at 275-76. Similarly here, the government must attempt to obtain evidence that Treacy denied knowing about the alleged "backdating scheme" — the information it seeks to elicit from Forelle — from other potential witnesses before requesting Forelle to testify. As discussed in the Opening Memorandum, before the government attempts, and fails, to elicit this evidence from other sources, the Subpoena to Forelle is wholly improper.

As such, because Forelle's testimony would not be relevant to a significant issue of the case and because the government has not established that the requested information is not available from other sources, this Court should quash the Subpoena.

### C. Should Forelle Be Forced To Testify, Such Testimony Should Be Strictly Limited To Published Information

Finally, as stated in the Opening Memorandum, to the extent Forelle is forced to testify at all despite the journalist's privilege that clearly applies here, that testimony should be strictly limited to *published* information.

Because it is clear that the government has completely failed to carry the burden of demonstrating why the journalist's privilege must yield to require Forelle to testify as to his unpublished newsgathering activities, the *only* testimony that could possibly be required should be strictly limited to published information — in accordance with past cases addressing this issue. *See S.E.C. v. Seahawk Deep Ocean Tech., Inc.*, 166 F.R.D 268, 272 (D. Conn. 1996)

(limiting subpoena at issue to "the verification [of published statements] discussed herein"); *In re Grand Jury Subpoena to Moore*, 269 A.D.2d 475, 476-77, 703 N.Y.S.2d 230, 231 (2d Dep't 2000) (requiring reporters to testify only "'in response to questions aimed solely to authenticate for admission as evidence before the Grand Jury the videotape broadcast . . . and the newspaper article'") (internal citation omitted); *People v. Nasser*, 15 Misc. 3d 499, 502, n.3, 830 N.Y.S.2d 892, 895, n.3 (Sup. Ct. Westchester Co. 2007) (court required reporter to testify in criminal action regarding only "contents of [witness's] statement as contained in the newspaper article," and specifically stated that "nothing in this Court's decision prohibits the witness from claiming the privilege with respect to any testimony sought to be elicited by defense counsel that arguably constitutes unpublished information which falls outside the parameters of the testimony discussed during oral argument.").[8]

As a result, as proposed in the Opening Memorandum, if required to testify, Forelle should only take the stand in order to verify the following: (1) whether Forelle conducted an interview of Treacy for the Article; and (2) whether Forelle believes that the Article accurately sets forth the information Forelle obtained from Treacy – without any additional probing. In addition, this Court should specifically determine that Forelle will not be required to testify on direct or cross-examination as to any other topics related to the Article, including any unpublished materials or newsgathering related to the Article. This limitation is consistent with the government's concession that Forelle's testimony should "be limited to issues related to the accuracy of Treacy's published statements." Opposition at 20.

---

8 In the Opposition, the government cites cases in which courts enforced subpoenas to journalists that were similarly limited to these cases. *See* Opposition at 8-9. Forelle agrees with the government, to the extent he is compelled to testify at all, his testimony should be limited in the same manner as the cases cited in the Opposition.

**CONCLUSION**

For all of the foregoing reasons, non-party Charles Forelle respectfully requests that this Court issue an order quashing the Subpoena and awarding Forelle costs and reasonable attorney's fees for making the present motion, and granting such other and further relief as this Court deems appropriate.

Dated: January 16, 2009

Respectfully submitted,

HOGAN & HARTSON LLP

By: s/ Slade R. Metcalf
Slade R. Metcalf
Rachel F. Strom
HOGAN & HARTSON LLP
875 Third Avenue
New York, New York 10022
Tel. (212) 918-3000
Fac. (212) 918-3100

*Attorneys for Non-Party Charles Forelle*