UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - -x
                            :

UNITED STATES OF AMERICA
                            :          08 Cr. 366 (JSR)

     - v. -
                            :

JAMES J. TREACY,
                            :

          Defendant.
                            :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - -x

## SENTENCING MEMORANDUM

PREET BHARARA
United States Attorney for the
Southern District of New York
Attorney for the United States
of America

DEIRDRE A. McEVOY
Assistant United States Attorney,
     Of Counsel.

## **TABLE OF CONTENTS**

Facts . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

    A. The Offense Conduct . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

Discussion . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

    A. Treacy's Objections to the PSR Should Be Rejected . . . . . . . . . . . . . . . . . . . . . . . . 11

        1.    The Guidelines Manual . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

        2.    Use of Gain as an Alternative to Loss . . . . . . . . . . . . . . . . . . . . . . . . 21

        3.    Number of Victims . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

        4.    Role in the Offense . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

    B. Treacy's Motion For a Downward Departure Should Be Denied . . . . . . . . . . . . . . 30

    C. Restitution Should Be Imposed . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31

    D. Section 3553(a) Factors Militate Against Leniency . . . . . . . . . . . . . . . . . . . . . . . . . 34

        1.    The Nature and Circumstances of the Offense and Characteristics of the
            Defendant . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35

        2.    The Need to Reflect the Seriousness of the Offense, Promote Respect for
            the Law and Provide Just Punishment for the Offense/The Need to Afford
            Adequate Deterrence to Criminal Conduct . . . . . . . . . . . . . . . . . . . . . . 36

        3.    The Need to Avoid Unwarranted Sentence Disparities . . . . . . . . . . . . . 37

Conclusion . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 40

## <u>TABLE OF AUTHORITIES</u>

*Barna v. Travis*, 239 F.3d 169 (2d Cir. 2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

*DiNapoli v. Northeast Regional Parole Comm'n*, 764 F.2d 143 (2d Cir. 1985) . . . . . . . . . . . . 14

*Gall v. United States*, 128 S. Ct. 586 (Dec. 10, 2007) . . . . . . . . . . . . . . . . . . . . . . . . . 13, 18, 38-39

*Irizarry v. United States*, 128 S. Ct. 2198 (2008) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13, 18, 19

*Johnson v. United States*, 529 U.S. 694 (2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

*Kimbrough v. United States*, 128 S. Ct. 558 (Dec. 10, 2007) . . . . . . . . . . . . . . . . . . . . . . . . 13, 18

*Miller v. Florida*, 482 U.S. 423 (1987) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13-15

*Rita v. United States*, 551 U.S. 338 (2007) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

*United States v. Abiodun*, 536 F.3d 162 (2d Cir. 2008) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

*United States v. Amato*, 540 F.3d 153 (2d Cir. 2008) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32-34

*United States v. Anati*, 457 F.3d 233 (2d Cir. 2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

*United States v. Battista*, ___F.3d____, 2009 WL 2392886 (2d Cir. Aug. 6, 2009) . . . . . . . . . 33

*United States v. Beaulieu*, 959 F.2d 375 (2d Cir. 1992) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

*United States v. Carter*, 490 F.3d 641 (8th Cir. 2007) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

*United States v. Cummings*, 189 F. Supp.2d 67 (S.D.N.Y. 2002) . . . . . . . . . . . . . . . . . . 25, 32, 34

*United States v. Demaree*, 459 F.3d 791 (7th Cir. 2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . 15-16

*United States v. DeRiggi*, 72 F.3d 7 (2d Cir. 1995) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

*United States v. Duane*, 533 f.3d 441 (6th Cir. 2008) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

*United States v. Duncan*, 42 F.3d 97 (2d Cir. 1994) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

*United States v. Dupes*, 513 F.3d 338 (2d Cir. 2008) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32

*United States v. Ebbers*, 458 F.3d 110 (2d Cir. 2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23, 38

*United States v. Fernandez*, 443 F.3d 19 (2d Cir. 2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18, 38

*United States v. Gilman*, 478 F.3d 441 (1st Cir. 2007) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

*United States v. Gilmore*, 460 F. Supp.2d 233 (E.D.N.Y. 2007) . . . . . . . . . . . . . . . . . . . . . . . . 16

*United States v. Gonzalez*, 281 F.3d 38 (2d Cir. 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12, 14

*United States v. Jackson*, 346 F.3d 22 (2d Cir. 2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

*United States v. Johnson*, 558 F.3d 193 (2d Cir 2009) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12, 19

*United States v. Joyner*, 924 F.2d 454 (2d Cir. 1991) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 38

*United States v. Kilkenny*, 493 F.3d 122 (2d Cir. 2007) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17, 19

*United States v. Kinlock*, 174 F.3d 297 (2d Cir. 1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32

*United States v. Laursen*, 348 F.3d 329 (2d Cir. 2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

*United States v. Laursen*, 362 F.3d 160 (2d Cir. 2004),
*judgment vacated by Laursen* v. *United States*, 543 U.S. 1097 (2005) . . . . . . . . . . . . . . . 30-31

*United States v. McGuire*, 957 F.2d 310 (7th Cir. 1992) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

*United States v. Nolan*, 136 F.3d 265 (2d Cir. 1998) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

*United States v. Payne*, 63 F.3d 1200 (2d Cir. 1995) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

*United States v. Reifler*, 446 F.3d 65 (2d Cir. 2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32

*United States v. Rising Sun*, 522 F.3d 989 (9th Cir. 2008) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

*United States v. Schneiderhan*, 404 F.3d 73 (1st Cir. 2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 38

*United States v. Singh*, 390 F.3d 168 (2d Cir. 2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

*United States v. Spencer*, 129 F.3d 246 (2d Cir. 1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

*United States v. Thompson*, 518 F.3d 832 (10th Cir. 2008) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

*United States v. Turner*, 548 F.3d 1094 (D.C. Cir. 2008) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

*United States v. Wisniewski*, 121 F.3d 54 (2d Cir. 1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

*United States v. Wood*, 486 F.3d 781 (3d Cir. 2007) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

*United States v. Zafar*, 291 Fed. Appx. 425 (2d Cir. 2008) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

*United States v. Zichettello*, 208 F.3d 72 (2d Cir. 2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

*Wojchowski v. Daines*, 498 F.3d 99 (2d Cir. 2007) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - -x
                               :

UNITED STATES OF AMERICA
                               :         08 Cr. 366 (JSR)

      - v. -
                               :

JAMES J. TREACY,
                               :

          Defendant.
                               :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - -x

## SENTENCING MEMORANDUM

       The Government respectfully submits this Memorandum for the Court's consideration in connection with the sentencing of defendant James J. Treacy, currently scheduled for September 2, 2009, at 2:00 p.m., and in response to the defendant's objections to the Presentence Report ("PSR") and sentencing memorandum dated August 24, 2009 (cited herein as "Br."). As set forth below, the trial evidence revealed that Treacy was an organizer and leader of a scheme to backdate option grants at Monster Worldwide Inc. ("Monster" or "the Company") that resulted in the understatement of cumulative compensation expense between 1997 and 2005 by approximately $339 million pre-tax. Treacy's objections to the factual recitation set forth in the PSR, which largely ignore or mischaracterize the trial evidence, are without merit. Likewise, Treacy's legal objections to the PSR's offense level calculations should be rejected. Finally, Treacy's motion for a downward departure should be denied.

## FACTS

The following facts are from the evidence introduced at trial and the PSR:

### A.     The Offense Conduct

The evidence at trial proved beyond a reasonable doubt that between at least in or about 1996 and in or about June 2006, the defendant and others engaged in a multi-year scheme to backdate numerous stock option grants at Monster Worldwide, Inc. ("Monster"), formerly known as TMP Worldwide, Inc.  By backdating the grants, the defendant and others were able to obtain stock options at historically low exercise prices, while giving the appearance that such grants had been given at fair market value on the date of grant.  As part of the scheme, the defendant and others failed to properly account for the option grants, thereby materially misstating Monster's financial results in numerous public filings.

A stock option gives its holder the right to buy a share of stock on a future date at a set price, known as the "exercise" or "strike" price.  During the relevant time period, Monster used stock options as an important recruitment and retention tool.  (Tr. 87, 90).[1]  In addition, top executives, including Treacy, received massive stock option grants as a major component of their compensation.  (Tr. 2052).

The exercise price of an option is typically the price at which the underlying stock trades in the market (*i.e.*, the fair market value) on the date of the option grant.  Options issued with an exercise price equal to the current market price of the underlying stock on the date of the grant are commonly referred to as being "at the money"; options issued with an exercise price below the current market value of the stock are considered "in the money."  During the relevant time

---

[1]      "Tr." refers to the trial transcript and "GX" refers to a Government exhibit at trial.

2

period, controlling accounting rules set forth in Accounting Principles Board Opinion No. 25, Accounting for Stock Issued to Employees ("APB 25"), which Monster purported to follow, allowed companies to avoid recording a compensation expense — a charge against, or reduction of, its earnings — for any options that were issued at-the-money. If, however, Monster granted options in-the-money, the company was required to record a compensation expense. Like cash compensation, option-related compensation expense — which is apportioned over the vesting period of the options — reduces net income in each such period. (Tr. 1591-98).

In numerous public filings with the SEC, including several that were signed by Treacy, Monster represented, in substance, that it followed these accounting rules and that no compensation was recorded because Monster did not grant in-the-money options. (Tr. 5002-5007). This was false. Monster also filed materially false financial statements that failed to properly record and report compensation expenses that it should have incurred as a result of its granting process.

Indeed, between in or about 1996 and in or about 2002, Treacy and his co-conspirators granted numerous in-the-money options by looking back in time to select favorable strike prices. They did so both in annual "broad-based grants" that went to large numbers of employees and in periodic "one-off grants" that were made to new employees and current employees in connection with promotions, retention or productivity goals. The purpose of the scheme was to give Treacy and others valuable compensation, without recording a compensation expense that would have impacted Monster's financial reports. (Tr. 316, 319). As part of the scheme, on numerous occasions, members of the scheme granted in-the-money stock options with immediate compensatory value as a way to avoid the payment of bonuses or other cash compensation. By

3

backdating the stock options and at times shortening the vesting period of these options, Treacy and other members of the conspiracy were able to induce employees to forego cash bonuses that they were owed, while wiping the resulting compensation charge off of Monster's books and records. (Tr. 461-64, 762-64, 770-72). This practice became particularly pervasive beginning in Fall 2001, when Monster's financial performance took a substantial downturn as a result of a nationwide recession. Treacy, who was overseeing the stock option program at the time, used backdated stock options as an illegal means of inflating the Company's reported earnings and meeting financial targets that Treacy and others had communicated to investors and stock analysts. (Tr. 762-64, 770-810; GX 916, 922, 926, 927, 928, 930, 931, 932, 947, 948, 1002, 1013, 1014, 1015, 1038, 1310, 1311, 1316, 1413).

To avoid detection of the scheme — and to avoid the resulting accounting charges that would have both revealed the scheme and materially impacted Monster's financial reports — Treacy and others working in concert with him and at his direction backdated numerous documents to make it look as if the option grants had in fact been made on the day that they had retroactively selected. They also misled the SEC, the Company's outside auditors, its board of directors, and the public at large. As part of this deception, members of the scheme destroyed documents, such as fax pages, that would have revealed the backdating, changed the terms of stock option grants after the Company's Compensation Committee had already approved them, and maintained false books and records at the Company. (Tr. 312-13, 442-45).

In connection with the scheme, Treacy and his accomplices caused Monster to report materially false and misleading financial results in public filings for the period from at least in or about 1997 through in or about mid-2006. As a result, Monster's cumulative compensation

4

expense between 1997 and 2005 was understated by approximately $339 million pre-tax. (GX

5054R).  To put that in perspective, in two years — 1999 and 2000 — Monster reported net

profits when, in fact, proper accounting would have resulted in Monster reporting substantial net

losses.  In addition, for the year 2001, Monster overstated its net income by over $65 million, or

1,907%.  The following chart shows the extent of the financial overstatement post-tax during the

relevant time period:

**Impact on reported net income as a result of Monster's failure to
record a compensation expense for backdated options (post-tax)**

| Year | Reported Income | Restated Income | Overstatement | % Over/Under-Statement |
|------|-----------------|-----------------|---------------|------------------------|
| 1997 | $61,302,000 | $54,121,000 | $7,181,000 | 13.3 % |
| 1998 | $46,218,000 | $40,899,000 | $5,319,000 | 13 % |
| 1999 | $8,158,000 | ($25,895,000) | $34,053,000 | 131.5 % |
| 2000 | $50,863,000 | ($13,424,000) | $64,287,000 | 478 % |
| 2001 | $69,020,000 | $3,439,000 | $65,581,000 | 1,907 % |
| 2002 | ($534,896,000) | ($579,839,000) | $44,943,000 | 7.8 % |
| 2003 | ($81,864,000) | ($108,824,000) | $26,960,000 | 24.8 % |
| 2004 | $73,104,000 | $58,736,000 | $14,368,000 | 24.5 % |
| 2005 | $107,432,000 | $98,194,000 | $9,238,000 | 9.4 % |
| **TOTAL** | **($200,663,000)** | **($472,593,000)** | **$271,930,000** | **57.5 %** |

(GX 3040).[2]

_____

[2]     Treacy's claim that Monster's analysts and investors did not "care" about "non-cash" options-related expenses is simply belied by the trial evidence.  James Kang, from Capital Guardian Trust, and Danton Goei, from Davis Advisors both testified to the contrary.  Kang testified that he would have wanted to know if the company was granting in the money options because that would have changed his earnings estimate with respect to the company because the

(continued...)

5

Treacy was involved in the scheme from its inception and his role in that scheme was multifaceted. He approved backdated stock option grants and participated in the process of selecting dates and prices with the benefit of hindsight. (Tr. 355-56, 455, 1867-70, 1887, 1891-93, 1898-1920, 2315-16, 2329-31; GX 33, 913A, 918, 920, 921, 937, 939A, 1004, 1008, 1018, 1021, 1042).[3] He oversaw the accounting, finance, legal and human resources departments, which were responsible for administering Monster's stock option program and accounting for stock option grants. (Tr. 317-18, 354; GX 5101, 5107A-D, 5108, 5111). Treacy signed documents, including SEC filings and management representation letters to Monster's outside auditors, that contained materially false statements and false financial information. (GX 1646-47, 1653-55, 1657, 5002-05). He oversaw the granting process during some of the most egregious backdating. And he personally benefitted from the scheme– indeed, he profited from the scheme more than anyone else at the Company. (Tr. 356; GX 1450B).[4] Indeed, Treacy had

---

[2](...continued)

company would have incurred higher options-related expenses. He said that he would have lowered the price target of Monster and that would have impacted his recommendation and Capital Guardian's decision whether to invest in Monster. (Tr. 270-71). Goie testified that Monster's revenues, expenses and profitability were significant factors in his company's investment decision and that the company's underreporting of compensation expenses to the tune of approximately $80 million pre-tax in 2000 and 2001 would have been important information he would have wanted to know in making his investment decision. (Tr. 2283-84).

[3]      Treacy's argument that he did not participate in selecting grant dates and prices (and that Olesnyckyj "backed" away from his claim that Treacy did) (Br. 22-24), is simply wrong and contrary to the evidence adduced at trial.

[4]      Treacy claims that Camara was the largest beneficiary of backdated options at Monster. (Treacy Objections to PSR, ¶¶ 21-23). Although the Restatement expense taken by the Company for Camara's options was approximately $22.2. million (based on the in-the-money value of exercised plus unexercised options) compared to a Restatement expense of $14.4 million for Treacy, Treacy exercised substantially more of his backdated options than did
(continued...)

6

primary responsibility and oversight over the backdating scheme from late 2001 through 2002, the period in which the backdating was most egregious. (Tr. 355). During that time, the evidence established that Treacy participated in selecting and approving backdated strike prices for two broad-based grants — dated as of April 4, 2001 and May 6, 2002 — as well as numerous one-off grants. (Tr. 1826-56, 1870-1933, 2316-35).

The evidence further established that on at least two occasions, in Spring 2000 and late 2001, Treacy had an opportunity to end the scheme. (Tr. 355-56, 697-717, 794; GX 33). On both occasions, Treacy chose to continue the criminal conduct, and, in fact, in each case, as Treacy's involvement became more substantial, the backdating became more egregious.

In his capacity as COO and then president of Monster, Treacy played a leadership role in the backdating scheme, directing and supervising others, including the Company's chief financial officers, its controller, its general counsel, and individuals in the Company's human resources department. (Tr. 317-18, 320, 332-47, 54-56; GX 5101, 5107A-D, 5108, 5111).

During the course of the scheme, Treacy received in excess of one million options (adjusted for a stock split and a spin-off of a Monster division) on eight different grant dates. (GX 3050). Six of these were backdated. This included large stock option grants dated as of January 6, 1997, December 12, 1997, December 9, 1998, August 5, 1999, April 4, 2001, and November 1, 2001.

Treacy also participated in granting stock options to others. The following chart shows some of the more significant stock option grants that were backdated by Treacy and his co-

---

[4](...continued)
Camara. Accordingly, the in-the-money portion of the backdated options that Treacy exercised was $13.4 million compared to Camara's $693,608.

conspirators during the course of the scheme:

## Significant Backdated Stock Option Grants

| Reported "Grant Date" | Original Grant Price | Options Granted to Treacy | Type | Pricing Detail |
|---|---|---|---|---|
| January 6, 1997 | $12.875 | 66,666 | Broad-Based | Lowest price in 1997 |
| December 12, 1997 | $15.00 | 5,000 | Broad-Based | Lowest price in 1997 after Feb. 12 |
| December 9, 1998 | $26.875 | 75,000 | Broad-Based | Lowest price after Nov. 24, 1998 |
| May 25, 1999 | $43.00 | NA | One-Off | Lowest price in 1999 after Jan. 20 |
| August 5, 1999 | $44.125 | 200,000 | One-Off | Lowest price in 1999 after May 25 |
| October 18, 1999 | $50.00 | NA | One-Off | Lowest price in 1999 after Aug. 20 |
| December 1, 1999 | $95.00 | NA | Broad-Based | Lowest price between Dec. 1999 and March 2000 |
| April 4, 2001 | $30.625 | 5,000 | Broad-Based | Lowest price to date for 2001 and lowest until Sept. 26, 2001 |
| October 2, 2001 | $27.24 | NA | One-Off | Lowest price in 2001 |
| November 1, 2001 | $27.50 | 100,000 | One-Off | Lowest price between Oct. 2, 2001 and Feb. 22, 2002 |
| February 22, 2002 | $27.18 | NA | One-Off | Lowest price to date for 2002 and lowest until May 3, 2002 |
| May 6, 2002 | $22.88 | NA | Broad-Based | Lowest price to date for 2002 and lowest until June 27, 2002 |

In addition, towards the beginning of the scheme, Treacy participated in backdating a substantial "gift" of Monster stock to him from Andrew McKelvey, a co-conspirator who was Monster's founder and CEO. By backdating this particular grant of stock, the Company avoided recording a proper compensation expense and Treacy avoided certain tax consequences. Treacy sold a substantial amount of this stock at a huge profit shortly after the Company made its initial public offering. (Tr. 386-409, 427-35; GX 1919, 1936, 1950, 1952A).

Between December 2005 and April 2006 — just before the scheme was uncovered — Treacy exercised approximately 745,000 of his backdated stock options for a total gain of

8

$24,001,231.79 million. (GX 1450A). At least $13,448,352.62 million of Treacy's gross

proceeds was derived from the in-the-money portion of backdated option grants, as determined

by Navigant in connection with the Company's Restatement. (GX 1450B). That is, the

$13,448,352.62 million represents Treacy's illicit profits from the backdating scheme.

In addition, during his tenure at the Company, Treacy made approximately $2.9 million in

salary, as well as $1,088,750 million in bonuses during the years 1997-2001, for total cash

compensation of close to $4 million. The following chart shows Treacy's salary and bonus

compensation during his tenure at the Company:

**Treacy's Salary and Bonus Compensation**

| Year | Salary | Bonus | Total |
|------|--------|-------|-------|
| 1994 | $165,000[5] | NA | $165,000 |
| 1995 | $180,000 | $197,500 | $377,500 |
| 1996 | $199,231 | $154,954 | $354,185 |
| 1997 | $211,531 | $50,000 | $261,531 |
| 1998 | $231,100 | $35,000 | $266,100 |
| 1999 | $329,576 | $35,000 | $364,576 |
| 2000 | $475,000 | $118,750 | $593,750 |
| 2001 | $508,365 | $850,000 | $1,358,365 |
| 2002 | $675,000 | NA | $675,000 |
| Totals | $2,974,803 | $1,441,204 | $4,416,007 |

(GX 7010). Monster's proxy statements provided that cash incentive payments to Treacy were

---

[5]     This amount represents the defendant's annual reported salary for 1994.
However, the defendant was first employed by the Company beginning on June 3, 1994, and
therefore received only a prorated portion of his annual salary.

9

"based on obtaining operational efficiencies and spearheading the Company's investor relations." (GX 5043, 5050, 5051). Moreover, Ronald Kramer, a member of Monster's Board of Directors and Compensation Committee, testified that Treacy's bonus was "determined by a preset goal that would be done through the recommendation of the CEO, and then the review of those goals would lead to a year-end bonus evaluation." (Tr. 2052). Kramer testified that these goals included Treacy achieving earnings and profitability goals, accomplishing growth through acquisition and implementing cost-cutting measures. (Tr. 2052-53). Were it not for the scheme, Treacy would not have received the bulk of his bonuses because these were based on Treacy meeting certain performance goals — and the Company meeting earnings targets — none of which would have been met if the Company had not falsified its financial statements.

Treacy left Monster at the end of 2002, following a falling out with Andrew J. McKelvey. Treacy remained on Monster's Board of Directors until Spring 2003. (Tr. 347; GX 1424).

In June 2006, Treacy was interviewed by a reporter for *The Wall Street Journal* in connection with a report on possible backdating of stock options at Monster. In connection with that interview, Treacy made numerous false statements, which were subsequently published in a June 12, 2006 article. For example, Treacy claimed that "like any other employee, he had no involvement in the options-granting process." He also claimed that stock options were "all in the purview of the board's compensation committee and Andrew McKelvey." He further stated that he believed the grant dates were "the days the comp committee and Andy granted" the options. Finally, Treacy denied knowledge of the backdating, claiming that he "didn't notice the favorable strike prices at the time" because he "was busy working, and there was a lot to do and a lot of moving parts and a family to get home to." (Tr. 2236-52). All of these statements were false.

10

Monster's backdating scheme continued until June 2006, when it was disclosed in connection with the Wall Street Journal's June 12, 2006 article entitled, "Monster Worldwide Gave Officials Options Ahead of Share Run Ups." The closing price of Monster's stock on Friday, June 9, 2009, was $42.00. On June 12, 2006, after Monster announced an investigation into their stock option practices at approximately 8:56 a.m., shares of Monster fell $3.40, or 8 percent, on heavy trading (a volume of 7,710,430 shares) to close at $38.60. (*See* Exhibit A attached).

## DISCUSSION

### A.    Treacy's Objections to the PSR Should Be Rejected

Under the 2008 Guidelines Manual, Treacy's's Guidelines range is properly calculated under Section 2B1.1.   Pursuant to U.S.S.G. § 2B1.1(a)(1), the base offense level is 7.  As discussed further below, because the loss (gain) amount was more than $7,000,000, an additional 20 levels are added pursuant to U.S.S.G § 2B1.1(b)(1)(K). An additional 6 levels are added because the offense involved 250 or more victims. *See* U.S.S.G § 2B1.1(b)(2)(C).  An additional 4 levels are added because the defendant committed a violation of securities law and, at the time of the offense, the defendant was an officer and director of a publicly traded company.  *See* U.S.S.G § 2B1.1(b)(16)(A).  In addition, because the defendant was an organizer or leader of a criminal activity that involved five or more participants or was otherwise extensive, an additional 4 levels are added.  *See* U.S.S.G § 3B1.1(a).

Based on the foregoing, the applicable offense level is 41.  Given the defendant's Criminal History Category of I, the applicable Guidelines range is 324 to 405 months' imprisonment.  (PSR ¶ 108).

11

### 1.    The Guidelines Manual

Treacy contends that use of the November 1, 2008 edition of the Guidelines Manual would violate the Ex Post Facto Clause and, therefore, the November 1, 2001 version should be used. (Treacy Objections to PSR ¶ 41). The Probation Department employed the November 1, 1998 edition of the Guidelines Manual. (PSR ¶ 41). For the reasons set forth below, it is the Government's view that the Court should use the current manual to determine the applicable Sentencing Guidelines range.

Congress has directed that a defendant's sentencing range should be calculated under the Guidelines that "are in effect on the date the defendant is sentenced." 18 U.S.C. § 3553(a)(4)(ii). Notwithstanding that statutory directive, the Second Circuit had held under the now-defunct mandatory Guidelines regime that the Ex Post Facto Clause of the Constitution applies to amendments to the Sentencing Guidelines that provide for a more severe sentence than was generated by the Guidelines in effect at the time the crime was committed. *E.g., United States* v. *Gonzalez*, 281 F.3d 38, 45 (2d Cir. 2002). That body of case law clearly turned on the mandatory nature of the Guidelines.

It is the position of the Department of Justice that under the advisory Guidelines regime, the former *ex post facto* analysis is no longer good law and the manual in effect at the time of sentencing should always be used. This is an open question in the Second Circuit and one that, in this case, will have to be resolved by Your Honor. *See United States* v. *Johnson*, 558 F.3d 193, 194 n.1 (2d Cir. 2009) ("we note that other courts have determined that, in light of their advisory status, the Sentencing Guidelines cannot ever run afoul of the Ex Post Facto Clause" and that "remains an open question to be decided in the appropriate case" in this Circuit). We

respectfully submit, however, that a consideration of the case law that governed this issue under

the mandatory Guidelines regime compels the conclusion that the current manual should be used

for all sentencings, in light of the Supreme Court's most recent decisions confirming the advisory

nature of the Sentencing Guidelines – such as *Gall*, *Kimbrough*, and *Irizarry*.[6]    Accordingly, it

is the position of the Department of Justice that application of the Guidelines Manual in effect at

the time of a defendant's sentencing no longer violates the Ex Post Facto Clause, even if the

sentencing range applicable to that defendant is increased after the offense was committed.

The starting point for analysis is 18 U.S.C. § 3553(a)(4)(ii), which requires a district court

to consider the sentencing range calculated under the Guidelines that "*are in effect on the date*

*the defendant is sentenced . . . .*" (Emphasis added.)  The Guidelines Manual echoes this

statutory command, providing that a sentencing court must generally apply the Guidelines in

effect at the time of sentencing, *see* U.S.S.G. § 1B1.11(a), unless such application would violate

the Ex Post Facto Clause of the U.S. Constitution. *See* U.S.S.G. § 1B1.11(b)(1).  The Ex Post

Facto Clause, U.S. Const., Art. I, § 9, Cl. 3, provides: "No Bill of Attainder or ex post facto Law

shall be passed."  The Supreme Court has explained that this provision "bars application of a law

'that changes the punishment, and inflicts a greater punishment, than the law annexed to the

crime, when committed.'" *Johnson* v. *United States*, 529 U.S. 694, 699 (2000) (quoting *Calder*

v. *Bull*, 3 Dall. 386, 390 (1798)).

In concluding, before *Booker*, 543 U.S. 220 (2005), that the Ex Post Facto Clause applied

to Guidelines amendments, the Second Circuit relied on the leading case of *Miller* v. *Florida*,

---

[6] *Gall* v. *United States*, 128 S. Ct. 586, 591 (Dec. 10, 2007); *Kimbrough* v. *United States*, 128 S. Ct. 558, 563 (Dec. 10, 2007); *Irizarry* v. *United States*, 128 S. Ct. 2198, 2202 (2008).

482 U.S. 423 (1987), in which the Supreme Court held that changes in the method of scoring

offenses under Florida's sentencing guidelines that increased the defendant's presumptive

sentencing range violated the *ex post facto* restriction applicable to the states, U.S. Const., Art. I,

§ 10, Cl. 1. *See, e.g., United States v. Gonzalez*, 281 F.3d 38, 45 (2d Cir. 2002) (applying

*Miller*'s reasoning to amendments to Federal Sentencing Guidelines). In *Miller*, the Court noted

that an *ex post facto* law must both operate retrospectively and "disadvantage the offender," 482

U.S. at 430 (internal quotation marks omitted), and concluded that the revisions to Florida's

guidelines passed both prongs of the test. The Court explained that increases in Florida's

guidelines had the "purpose and effect" of increasing the length of the sentences, 482 U.S. at 431,

because departures from the presumptive sentencing range would require the judge to provide

"clear and convincing reasons" based on "facts proved beyond a reasonable doubt," and the

decision would be subject to appellate review. 482 U.S. at 432. In contrast, a sentence within

the range did not require supporting reasons and was not reviewable on appeal. 482 U.S. at

432-33. Those features of the Florida system meant that a defendant was "substantially

disadvantaged" by a severity-enhancing change in the Florida sentencing laws. 482 U.S. at 432-

33.

The Supreme Court rejected the state's effort to analogize the Florida guidelines to the

United States Parole Commission's guidelines, which had been found by the courts of appeals

not to be subject to the Ex Post Facto Clause. 482 U.S. at 434; *see, e.g., DiNapoli* v. *Northeast

Regional Parole Comm'n*, 764 F.2d 143 (2d Cir. 1985); *cf. also Barna* v. *Travis*, 239 F.3d 169,

171-72 (2d Cir. 2001) (per curiam) (holding that New York state parole commission guidelines

are not "laws" covered by the Ex Post Facto Clause). The Court noted that the Parole

14

Commission's guidelines may have provided only "flexible guideposts for use in the exercise of discretion," 482 U.S. at 435 (internal quotation marks omitted), but that the Florida guidelines "create a high hurdle" before discretion can be exercised at all, 482 U.S. at 435. The hurdle existed, the Court reiterated, because of the requirement that an outside-the-range sentence must be justified by credible reasons based on facts not weighed in the presumptive sentence. 482 U.S. at 435. The Court also cited legislative history indicating that the Parole Commission had "unfettered discretion" under its guidelines system, which a Florida sentencing court clearly did not. 482 U.S. at 435 (quoting S. Rep. No. 225, 98th Cong., 2d. Sess. 38 (1983)).

The Second Circuit's pre-*Booker* case law applying *Miller* to the Sentencing Guidelines has now been completely undermined by a series of Supreme Court decisions including *Booker*, *Rita*, *Gall*, *Irizarry*, and *Kimbrough*. Put in the terms used by the Supreme Court in *Miller*, the Federal Guidelines are no longer a "high hurdle" that must be surmounted by district courts, with variances permitted only by facts not already incorporated into the presumptive sentence. *Cf. Miller*, 482 U.S. at 434. Instead, they have become like the New York parole guidelines, which are only "flexible guideposts for use in the exercise of discretion," 482 U.S. at 435, and if that is so, then the Ex Post Facto Clause does not apply to the Sentencing Guidelines.

This is precisely the conclusion adopted by the Seventh Circuit, one of the first courts of appeals to have fully considered the continued applicability of the Ex Post Facto Clause to the Guidelines in the wake of *Booker*. In *United States* v. *Demaree*, 459 F.3d 791 (7th Cir.) (Posner, J.), *cert. denied*, 127 S. Ct. 3055 (2007), the Seventh Circuit held that the district court did not violate the Ex Post Facto Clause by applying the version of the Sentencing Guidelines in effect when the defendant was sentenced, rather than the less severe version of the Guidelines that was

15

in effect when she committed the offense. The court noted that the government had confessed

error, 459 F.3d at 793, but rejected that confession, reasoning that "*Booker* demoted the

Guidelines from rules to advice," and that "the ex post facto clause should apply only to laws and

regulations that bind rather than advise." 459 F.3d at 794-95 (quoting *United States* v. *Roche*,

415 F.3d 614, 619 (7th Cir. 2005)). As the court observed, a district judge's "choice of sentence,

whether inside or outside the guideline range, is discretionary and subject therefore to only light

appellate review. The applicable guideline nudges him toward the sentencing range, but his

freedom to impose a reasonable sentence outside the range is unfettered." 459 F.3d at 795

(citations omitted). Moreover, the court pointed out that there would only be a "semantic effect"

in adhering to the rule that application of revised Guidelines trigger *ex post facto* concerns. 459

F.3d at 795. That is because "[i]nstead of purporting to apply the new guideline, the judge who

wanted to give a sentence based on it would say that in picking a sentence consistent with section

3553(a) he had used the information embodied in the new guideline." 459 F.3d at 795.

At least one trial court in this Circuit has apparently adopted the holding in *Demaree*. In

*United States* v. *Gilmore*, 460 F. Supp.2d 233, 238-39 (E.D.N.Y. 2007), Judge Glasser, citing

*Demaree* and *Barton*, held that the Ex Post Facto Clause did not prohibit retroactive application

of a change in the advisory Sentencing Guidelines. In *Gilmore*, the Government conceded that it

should have applied the Guidelines manual in effect at the time of the offense, given an

intervening amendment before sentencing. Judge Glasser held that the Government's

"concessions were misguided," because the advisory nature of the Guidelines made the Ex Post

Facto Clause inapplicable. 460 F. Supp.2d at 238-39.

On the other hand, the Court of Appeals for the District of Columbia Circuit has rejected

16

the reasoning of *Demaree*, *United States* v. *Turner*, 548 F.3d 1094, 1098-1100 (D.C. Cir. 2008),

and held that even in the post-*Booker* world, the relevant *ex post facto* analysis remains the same.

Furthermore, in cases arising in a number of other circuits, including the Second Circuit, the

issue does not appear to have been contested by the parties, and with little discussion the courts

have simply followed the pre-*Booker* practice of applying an earlier Guideline Manual to avoid

*ex post facto* concerns. Thus, in *United States* v. *Kilkenny*, 493 F.3d 122, 127-30 (2d Cir. 2007),

the Second Circuit remanded a case for resentencing where it was "not disputed that defendant

was disadvantaged by the application of the 2002 Guidelines" in sentencing him for a bank fraud

scheme executed in 2000. The court did not cite *Demaree* or even acknowledge the question of

whether *Booker* impacted the *ex post facto* analysis.[7]

    The Government's confession of error in cases like *Kilkenny* — which was decided on

July 5, 2007 — was gradually undermined, however, by the Supreme Court's decisions that were

---

[7] *See also, e.g., United States v. Wood*, 486 F.3d 781, 790-91 (3d Cir. 2007) (agreeing with government's concession that application of Guidelines amendment in sentencing defendant for robbery that took place before effective date of amendment constituted plain error that affected defendant's substantial rights); *United States v. Carter*, 490 F.3d 641, 643 (8th Cir. 2007) (noting that following *Booker*, the Eight Circuit has still "recognized that retrospective application of the Guidelines implicates the *ex post facto* clause") (citation, quotation marks, and alteration omitted). Likewise, even where other courts have suggested some disagreement with *Demaree*, their discussions have come in *dicta*. *Cf. United States v. Duane*, 533 F.3d 441, 446 & n.1 (6th Cir. 2008) (assuming *arguendo* in extended *dicta* that "a retroactive change to the Guidelines could implicate the *Ex Post Facto* Clause"); *United States v. Gilman*, 478 F.3d 440, 449 (1st Cir. 2007) (stating that the *ex post facto* issue raised by *Demaree* "is doubtful" in the First Circuit); *United States v. Thompson*, 518 F.3d 832, 870 (10th Cir. 2008) (affirming application of 2001 Guidelines where offense was committed in 2001, but stating in *dicta* that "the *ex post facto* clause bars the sentencing court from retroactively applying an amended guideline provision when that amendment disadvantages the defendant"). *See also United States v. Rising Sun*, 522 F.3d 989, 992 n.1 (9th Cir. 2008) (district court "was correct" in using 2003 edition of Guidelines in sentencing defendant for murder committed in 2003, where Guidelines range was subsequently increased).

issued days beforehand and in the months that followed. In *Rita v. United States*, for example, the Court declined to adopt an enforceable presumption of reasonableness for within-Guidelines-range sentences, and instead merely allowed circuit courts to choose for themselves whether to adopt a loose presumption in that regard. 551 U.S. 338, 345-50 (2007). The Second Circuit, notably, chose not to adopt such a presumption. *See United States v. Fernandez*, 443 F.3d 19, 26-28 (2d Cir. 2006). Likewise, in *Gall v. United States*, 128 S. Ct. 586, 591 (Dec. 10, 2007), the Court declined to adopt the Government's proposed proportionality principle for reviewing non-Guidelines sentences, which would have required judges to provide stronger justifications the further they deviated from the Guidelines range. Then came *Kimbrough v. United States*, 128 S. Ct. 558, 563 (Dec. 10, 2007), which overturned decisions like *Castillo* and held that judges are, indeed, permitted to vary from the advisory Guidelines ranges based on policy disagreements with the Sentencing Commission.

This line of cases culminated with *Irizarry v. United States*, where the Supreme Court held that a district judge need not give advance notice of an intent to deviate from the Guidelines range under Fed. R. Crim. P. 32. 128 S. Ct. 2198, 2202 (2008). After *Booker,* a defendant no longer has "[a]ny expectation subject to due process protection . . . that a criminal defendant would receive a sentence within the presumptively applicable guideline range." 128 S. Ct. at 2202.[8] This holding — that a defendant has no constitutionally protected "expectation" of

---

[8] In reaching that conclusion, the Supreme Court overruled the Second Circuit's contrary decision in *United States v. Anati*, 457 F.3d 233 (2d Cir. 2006). In *Anati*, the Second Circuit had suggested that there it was "doubtful" that a judge could impose a sentence outside a guideline range based on a "personal view" that one category of offenses was more serious than another, contrary to the advice provided by the Sentencing Commission. As noted, *Kimbrough* rejected this view, and confirmed the broad discretion of a district judge to choose a sentence that differs
(continued...)

18

receiving a sentence within a given guideline range — fatally undermined the premise of earlier

circuit precedents that the Ex Post Facto Clause bars the application of revised Guidelines

Manuals that call for more severe sentences than were provided at the time of the offense. *See*

*Kilkenny*, 493 F.3d at 126 (citing *Miller*, 482 U.S. at 430, for the proposition that the Ex Post

Facto Clause is designed to give citizens "fair warning" of a law's effect). Decisions such as

*Kilkenny*, which predate *Gall*, *Kimbrough*, and *Irizarry*, are accordingly no longer good law.

*See, e.g., Wojchowski v. Daines*, 498 F.3d 99, 106 (2d Cir. 2007) (holding that although decision

of circuit panel is generally binding, one exception is when "there has been an intervening

Supreme Court decision that casts doubt on our controlling precedent") (internal quotation marks

omitted). The Second Circuit made that explicit in *United States* v. *Johnson*, 558 F.3d 193, 194

n.1 ("we note that other courts have determined that, in light of their advisory status, the

Sentencing Guidelines cannot ever run afoul of the Ex Post Facto Clause" and that "remains an

open question to be decided in the appropriate case" in this Circuit).

     In sum, the Supreme Court's most recent decisions have fatally undermined the validity

of Second Circuit precedents applying the Ex Post Facto Clause to the Sentencing Guidelines.

We also submit that the reasoned opinion by Judge Posner in *Demaree* sets forth the better of the

argument and we accordingly request that the Court adopt the holding in that case, which was

subsequently followed by Judge Glasser in *Gilmore*. Accordingly, the Government respectfully

submits that in the absence of an *ex post facto* violation, the Court is required to comply with the

statutory mandate of 18 U.S.C. § 3553(a)(4)(ii) and apply the Guidelines Manual in effect at the

---

[8](...continued)
from the range suggested by the Guidelines.

time of sentencing.

Even if the Court were to find that *ex post facto* arguments regarding which version of the Sentencing Guidelines to use were still applicable, the appropriate version of the Guidelines would still be the 2008 Manual because Treacy (and his co-conspirators) took affirmative steps with respect to the counts of conviction after November 1, 2002.[9] "Under subsection (b)(1) [of Section 1B1.11], the last date of the offense of conviction is the controlling date for *ex post facto* purposes."  U.S.S.G. § 1B1.11(b)(1), Application Note 2.  In addition, "[s]ubsection (b)(3) provides that where the defendant is convicted of two offenses, the first committed before, and the second after, a revised edition of the Guidelines Manual became effective, the revised edition of the Guidelines Manual is to be applied to both offenses, even if the revised edition results in an increased penalty for the first offense." U.S.S.G. § 1B1.11(b)(1), Background.  Accordingly, because Treacy was convicted of a conspiracy to commit securities fraud, file false reports with the SEC, make false statements to auditors, and falsify books and records from 1996 through June 2006, it is clear that the conspiracy count is controlling for *ex post facto* purposes and that Treacy and his co-conspirators committed affirmative acts in furtherance of the conspiracy well after November 1, 2002, when the applicable Guidelines were amended.

Here, the Indictment plainly alleges that Treacy and his co-conspirators caused Monster to file publicly with the SEC annual reports and quarterly reports that failed to report Monster's true compensation expenses and therefore materially misstated, among other things, Monster's

---

[9] Section 2B1.1 of the Guidelines was amended effective November 1, 2002 and raised the base offense level from 6 to 7 for offenses with a statutory maximum of 20 years or more, added a 2-level enhancement for more than 250 victims and a 4-level enhancement for defendants who were officers or directors of publicly traded companies.

net income during the period 1997 through 2005.  (Indictment ¶ 61(g)).  As specifically alleged

in the Indictment, the false public filings included not only the Annual Reports on Forms 10-K

and Quarterly Reports on Forms 10-Q filed with the SEC, but also proxy filings with the SEC

that were authorized by members of Monster's Board of Directors, including Treacy.  (Ind. ¶

13).[10]   Moreover, the Indictment alleges that after option grants had vested, Treacy and his

conspirators exercised certain options (including in 2006), and thereby obtained additional profits

that were attributable to the portion of the grants that were awarded in-the-money on the date on

which the grants were actually made.  (Indictment ¶¶ 61(h), 62(r)-(ad)).    Thus, the Ex Post

Facto Clause does not preclude application of the 2008 Guidelines Manual in this case because

the trial evidence demonstrates that overt acts in furtherance of the conspiracy were committed

through June 2006.

### 2.    Use of Gain as an Alternative to Loss

Treacy further challenges the PSR's application of a 20-level enhancement under §

2B1.1(b)(1)(K) because the defendant's gain from the offense was more than $7 million but less

than $20 million.  (PSR ¶ 45).   Specifically, Treacy argues that because shareholders suffered

no loss, neither the loss nor gain enhancements should be applied.  (Br. 15-20).  Treacy's

argument is belied by the record.

Section 2B1.1 of the Guidelines provides for enhancements of the offense level based on

---

[10]     For example, GX 5044, the proxy statement distributed on or about May 14, 2003,
falsely represented that: (1) "[o]ptions are granted at the prevailing market value of the
Company's common stock and will only have value if the Company's stock price increases"
(Proxy Statement at 13); and (2) that the December 1998 option grants to certain of its executive
officers (which proof at trial will establish were backdated) were granted at "the fair market
value of the Company's common stock on the date of grant." (Proxy Statement at 19).  The
proxy statement was authorized by the Board of Directors, of which Treacy was a member.

the amount of loss resulting from the offense conduct. U.S.S.G. § 2B1.1(b). The commentary to

that section defines loss as "the greater of actual loss or intended loss" and, in turn, defines

"actual loss" as "the reasonably foreseeable pecuniary harm that resulted from the offense."

U.S.S.G. § 2B1.1, comment. (n. 3(A)). A district court need not calculate loss with absolute

precision, but, rather, "need only make a reasonable estimate of the loss." U.S.S.G. § 2B1.1,

comment. (n. 3(C))); *see also United States* v. *Singh*, 390 F.3d 168, 192 (2d Cir. 2004) ("[a]

reasonable estimate of the loss is all that is necessary."). Where there is a loss, but that loss

cannot reasonably be estimated, a district court may "use the gain that resulted from the offense

as an alternative measure of loss." U.S.S.G. § 2B1.1, comment. (n. 3(B)). *See, e.g., United

States* v. *Zafar*, 291 Fed. Appx. 425, 429 (2d Cir. 2008) (affirming, in "pump and dump"

securities fraud scheme, the calculation of loss based on gains realized by the defendant);[11]

*United States* v. *Kaiser*, S1 04 Cr. 733 (TPG) (S.D.N.Y. May 17, 2007) (using, in an accounting

fraud securities fraud case, the defendant's gain from the fraudulent scheme, specifically the

bonuses he received during the course of the scheme that were tied to meeting earnings' targets

that would not have been achieved but for the scheme).

    Here, as the attached chart from Bloomberg makes clear, Monster's stock fell $3.40 on

heavy trading the day the article was published in the Wall Street Journal disclosing the

backdating. (*See* Exhibit A attached). Treacy's reliance on Professor Hubbard's analysis is

misplaced because his analysis focused on the issue of materiality in connection with the

summary judgment motion filed in the civil class action suit, not the issue of whether there was

---

[11]     Although this summary order is not binding precedent in the Second Circuit, the
reasoning contained therein is instructive.

an actual loss that could not be determined. Even Professor Hubbard acknowledged that

Monster's share price experienced a "statistically significant drop" on June 12, 2006. (Br. 16).

Accordingly, the Government submits that where, as here, the price of the Company's stock fell

substantially upon disclosure of allegations regarding the fraud, shareholders suffered an actual

loss even if that loss is not reasonably ascertainable. There is no question that Monster's public

shareholders were directly harmed by, and their loss directly resulted from, the conduct of Treacy

and his co-conspirators. In fact, as Your Honor knows, the shareholders were compensated for

their losses in the amount of $25.1 million in the class action settlement. In addition, as Your

Honor observed at the sentencing of Carole Argo, a defendant who was also convicted of

securities fraud in connection with the backdating of option grants:

> There have been many cases where I have been able to calculate
> loss even in cases involving securities fraud, but this is different
> for reasons that the defense submissions make plain. . . I think in
> the end, not that there was necessarily no loss, but that the
> calculation of the loss on this record is impossible.

(1/28/08 Sentencing Transcript at 16). Thus, in this case like in Argo, the Court should

use Treacy's gain that resulted from his offense as an alternative measure of loss for the purpose

of the Guidelines calculation.[12] Using gain as an alternative measure of loss in this case

precludes "perpetrators of fraud [from getting] a windfall." *United States* v. *Ebbers*, 458 F.3d

110, 127 (2d Cir. 2006).

Treacy also asserts that even assuming *arguendo* that his gain should be used as an

---

[12]    Treacy's claim that his gain bears no logical connection to any loss in this case is
baseless. As the Company argued in its victim impact statement, Treacy's profits from his
exercise of backdated options (calculated by Navigant to be $13,448,352) represent additional
paid-in capital the Company would have received upon exercise had Treacy's options not been
fraudulently backdated. (7/17/07 Monster Victim Impact Statement at 1).

23

alternative measure of loss, the $14.5 million number applied by the PSR is inaccurate. (Br. 19-20). As set forth in the Government's forfeiture brief, Treacy's gain was $14,537,102.62: $13,448,352.62 of which represents the illegal profits received by Treacy in connection with his exercise of backdated options and $1,088,750 of which represents bonus payments received by Treacy during the period of the backdating scheme based on his achievement of certain financial targets. Between December 2005 and April 2006, Treacy exercised approximately 745,000 of his backdated stock options for a total gain of $24,001,231.79. (GX 1450A). In connection with the Company's Restatement, Navigant Consulting determined that at least $13,448,352.62 of Treacy's gross proceeds was derived from the in-the-money portion of backdated option grants. (*See* GX 1450B attached as Exhibit B).[13] In addition to Treacy's proceeds from his exercise of backdated options, Treacy received $1,088,750 in bonus for the years 1997-2001 which he would not have received but for the backdating scheme. (GX 7010).

Even if the Court were to reject Navigant's analysis and calculate new measurement dates for Treacy's option grants based on the trial evidence, an approach urged by Treacy in his sentencing memorandum and in his response to the Government's forfeiture memorandum, Treacy's profits from his exercise of backdated options would still exceed $6 million. (*See* Exhibit C attached). As the attached chart makes clear, even if the measurement dates for the five subject option grants were modified based on the trial evidence, Treacy's actual profits from backdating were, at a minimum, $6,332,995. Thus, even using this conservative approach, Treacy's profit from his exercise of backdated option grants, $6,332,995, plus the $1,088,750

---

[13]      Although this exhibit was marked for identification, it was not admitted into evidence at trial.

24

that Treacy received in bonuses during the scheme, totals $7,421,745.[14]   Adopting either

approach, therefore, results in a 20-level enhancement under § 2B1.1(b)(1)(K) because Treacy's

gain from the offense was more than $7 million but less than $20 million.

### 3.    Number of Victims

Treacy argues that an enhancement for more than 250 victims under U.S.S.G. §

2B1.1(b)(2)(C) should not be applied because there is no actual shareholder loss. (Br. 20-21)

The application notes to section 2B1.1 define the "victims" of a fraud offense to include "any

person who sustained any part of the actual loss determined under subsection (b)(1)."  U.S.S.G.

§ 2B1.1 cmt n. 1.  In this case, Monster and its shareholders are the victims of Treacy's fraud.

As set forth above, there is an actual loss suffered by shareholders but it reasonably cannot be

determined.  On June 12, 2006, after Monster announced an investigation into their stock option

practices at approximately 8:56 a.m., shares of Monster fell $3.40, or 8 percent, on heavy trading

(a volume of 7,710,430 shares) to close at $38.60.   Monster's public shareholders who number

in the thousands and who were compensated for their losses as part of the settlement of the class

action litigation, *see In re Monster Worldwide, Inc. Sec. Litig.*, 07 Civ. 2237 (JSR),[15] were

"directly harmed by, and their loss directly resulted from, the conduct of Treacy and his co-

conspirators."  *See United States* v. *Cummings*, 189 F. Supp.2d 67 (S.D.N.Y. 2002).  Based on

------

[14]      If the Court were to adopt this methodology for calculating new measurement
dates for Treacy's option grants, this amount would also represent the amount Treacy is liable to
the Government in forfeiture.

[15]      Monster paid $25.1 million to shareholders in settlement of the class action suit.
According to Monster, as of August 13, 2009, the claims administrator of the class had sent out
118,642 notices of claim and had received 10,804 proofs of claim, 9,473 of which were properly
documented claims eligible for payment.

the size of the shareholder class, the drop in the stock (8 %) and the heavy trading volume (7.7 million shares[16]) following the announcement on June 12, 2006, the Government submits that there are more than 250 victims who sustained part of the actual loss in this case. *United States v. Abiodun*, 536 F.3d 162 (2d Cir. 2008), an identity theft and credit card fraud case upon which Treacy relies, is factually distinguishable because in that case an actual loss determination was calculated and some individuals who were categorized as victims had not sustained part of the actual loss. *Id.* at 169. Here, by contrast, although there was an actual loss sustained by Monster's public shareholders, that loss has not been calculated. Accordingly, *Abiodun* poses no bar to the application of an enhancement for more than 250 victims under § 2B1.1(b)(2)(C) in this case.

### 4.    Role in the Offense

The PSR recommends a four level enhancement based on the fact that the defendant "was an organizer and leader of the criminal activity for which he was convicted, which was extensive and involved more than five participants." (PSR ¶ 49). Treacy not only objects to the application of this enhancement but boldly asserts that he should receive a two-level reduction for a minor role because he was a passive participant in the scheme. (Br. 23-24). Treacy's claim should be swiftly rejected because it is completely at odds with the evidence adduced at trial.

Section 3B1.1(a) of the Sentencing Guidelines requires a four-level increase in a defendant's offense level "[i]f the defendant was an organizer or leader of criminal activity that involved five or more participants or was otherwise extensive." The applicability of this

---

[16]    The volume of trading on June 12, 2006 was almost seven times greater than the volume on the day prior to the announcement.

enhancement "depends upon the degree of discretion exercised by [the defendant], the nature and degree of his participation in planning or organizing the offense, and the degree of control and authority exercised over the other members of the conspiracy." *United States* v. *Beaulieau*, 959 F.2d 375, 379-80 (2d Cir. 1992); *see also* U.S.S.G. §3B1.1, Application Note 4.  "There can, of course, be more than one person who qualifies as a leader or organizer of a criminal association or conspiracy." U.S.S.G. § 3B1.1(a), Application Note 4.

"A 'participant' is a person who is criminally responsible for the commission of the offense, but need not have been convicted." U.S.S.G. § 3B1.1, Application Note 1.  The adjustment applies so long as the defendant "managed only one other participant" in criminal activity that involved five or more participants. *United States* v. *Zichettello*, 208 F.3d 72, 107 (2d Cir. 2000) (affirming four-level organizer/leader enhancement); *see United States* v. *Payne*, 63 F.3d 1200, 1212 (2d Cir. 1995) (rejecting defendant's argument that the district court was required to find that he supervised five participants); *United States* v. *McGuire*, 957 F.2d 310, 316 (7th Cir. 1992) (same).

Here, the fraudulent backdating scheme involved more than five participants (i.e., Treacy, McKelvey, Olesnyckyj, Previty, Catalane, O'Connell, Sileck, and Bonica) and the evidence plainly demonstrated that Treacy supervised, at a minimum, Olesnyckyj and Catalane. (Tr. 317-18).[17]

---

[17]     The offenses of which Treacy were convicted were also "otherwise extensive." *See, e.g., United States* v. *Spencer*, 129 F.3d 246, 253 (2d Cir. 1997) ("a fraud that involved only three participants but used the unknowing services of many outsiders could be considered extensive.");  *United States* v. *Nolan*, 136 F.3d 265, 273 (2d Cir. 1998) (involvement of at least eight unknowing participants whose services were peculiar and necessary to the scheme, including accountant, bank officers, and attorneys rendered scheme "otherwise extensive.").

Treacy claims that his "corporate titles do not translate into criminal leadership." (Br.

23). This claim, however, is unavailing under controlling Second Circuit precedent. The

Second Circuit has held that when a defendant's criminal conduct occurs in a corporate setting, a

leadership enhancement is generally appropriate where the defendant is a top corporate official

who countenances and participates in that criminal conduct. *United States* v. *DeRiggi*, 72 F.3d 7,

8-9 (2d Cir. 1995) ("when a business's top officer knows of corruption in the business and

implicitly approves it by participating in the corruption, a four-level enhancement under

§ 3B1.1(a) is proper."); *see also United States* v. *Wisniewski*, 121 F.3d 54, 58 (2d Cir. 1997);

*United States* v. *Duncan*, 42 F.3d 97, 106 (2d Cir. 1994).

In *DeRiggi*, defendant DeRiggi was the supervising inspector of the Taxi and Limousine

Commission's inspection station in Queens, New York. Bribes were paid to line inspectors and

their supervisors to rig inspection outcomes and to ignore inspection failures. *United States* v.

*DeRiggi*, 72 F.3d at 7. The Second Circuit found that, for purposes of § 3B1.1(a), DeRiggi's

"place in the inspection station hierarchy together with his participation in the conspiracy

necessarily made him a leader in the scheme." *Id.* at 8. The Court reasoned that:

> DeRiggi's participation in the scheme allowed his subordinates to understand that
> bribe-taking was an institutional practice, and that they had high-ranking
> institutional protection for their jobs and careers notwithstanding their corruption.
> DeRiggi's influence would tend in this way to erode the inhibitions and scruples
> of participating subordinates and to facilitate recruitment of others.

*Id.* The Second Circuit further opined that by failing to "put a stop" to the activity, DeRiggi put

his imprimatur on it.

*DeRiggi* applies squarely to the facts of this case. Like defendant DeRiggi, Treacy was

one of Monster's top officers. Like DeRiggi, Treacy could have "put a stop" to the criminal

28

activity by virtue of his position as the COO and President and leader of the Company.  And like DeRiggi, by participating in the criminal activity, Treacy "eroded the inhibitions and scruples of his subordinates," like Olesnyckyj, and "facilitated recruitment of others," like Catalane.

Moreover, even if the law did not mandate application of the role enhancement by virtue of Treacy's leadership role in Monster, the evidence at trial supported the additional finding that Treacy was an organizer and leader of the criminal activity by virtue of the nature of his participation in the criminal activity.  As discussed above, *see supra* at 6,  Treacy was involved in virtually every facet of this criminal conspiracy.  Treacy approved backdated stock option grants and participated in the process of selecting dates and prices with the benefit of hindsight.  He oversaw the accounting, finance, legal and human resources departments, which were responsible for administering Monster's stock option program and accounting for stock option grants. Treacy signed documents, including SEC filings and management representation letters to Monster's outside auditors, that contained materially false statements and false financial information.  Indeed, Treacy oversaw the granting process during some of the most egregious backdating.

Consequently, the evidence adduced at trial plainly demonstrated that Treacy was "an organizer or leader of criminal activity that involved five or more participants or was otherwise extensive" and the Court should apply a four-level enhancement to Treacy's sentence pursuant to U.S.S.B. § 3B1.1(a).

**B.     Treacy's Motion For a Downward Departure Should Be Denied**

Treacy also moves for a downward departure on grounds that the total offense level

overstates the seriousness of the offense and to mitigate the "cumulative effects" of overlapping

enhancements pursuant to *United States* v. *Lauersen*, 348 F.3d 329 (2d Cir. 2003) and *United*

*States* v. *Jackson*, 346 F.3d 22 (2d Cir. 2003). (Br. 24-27). Treacy's motion is meritless and

should be denied.

      Although the commentary to § 2B1.1 contemplates that a downward departure may be

warranted in cases "in which the offense level determined under this guideline substantially

overstates the seriousness of the offense," this is not such a case. Unlike in *Ebbers* or *Adelson*,

cited by Treacy in support of his argument, where loss was determined by looking at the market

capitalization loss after the fraud was disclosed, the PSR uses Treacy's gain from the offenses as

an alternative measure of loss. Treacy benefitted from the fraudulent scheme in a variety of

ways, most notably, his receipt of over one million options (adjusted for a stock split and a spin-

off of a Monster division) on eight different grant dates and his receipt of bonuses for the 1997-

2001 years based on Treacy achieving certain earnings and profitability goals which Treacy

would not have met but for the scheme. Thus, Treacy's concrete gain from his exercise of

backdated options and his receipt of bonuses from the Company is an extremely conservative

amount and can hardly be said – as Treacy claims – to "grossly overstate[] the seriousness of the

offense." (Br. 25).

      Treacy's argument with respect to a downward departure based on the "cumulative

effects" of overlapping enhancements is equally unavailing. Upon a motion for rehearing, the

Second Circuit panel that decided *Lauersen* and *Jackson* reiterated its original position that:

> when the addition of *substantially overlapping enhancements*
> results in a significant increase in the sentencing range minimum
> (as it does at the higher end of the sentencing table), a departure
> may be considered. What is present to a degree not adequately

> considered by the Commission is the combined effect of the
> aggregation of the substantially overlapping enhancements and the
> large increase in the sentencing range minimum at the higher end
> of the sentencing table.

*United States* v. *Lauersen*, 362 F.3d 160, 164 (2d Cir. 2004) (emphasis in original), *judgment*

*vacated in light of Booker by Lauersen* v. *United States*, 543 U.S. 1097 (2005).  The Second

Circuit, however, emphasized that "not many combinations of enhancements will be substantially

overlapping." *Id.* at 167.  For example, the court made clear that enhancements for leadership

role and abuse of trust do not substantially overlap with each other. *Id.* at 168 n.12.

The Government respectfully submits that the enhancements applicable in this case are

not "substantially overlapping," inasmuch as no two such enhancements are triggered by the

same facts.  Indeed, fraud offenses such as this one do not necessarily involve five or more

participants.  Accordingly, there is no "substantial overlap" between Treacy's loss/gain

enhancement and the enhancement for organizing and leading the offense.  Nor do fraud cases

applying an enhancement based on loss or gain necessarily involve officers of publicly-traded

companies, such as here where Treacy served as the COO and President of Monster from 1998-

2002.  Similarly, the fact that Treacy's crimes resulted in losses to more than 250 victims has

independent significance separate and apart from the loss in this case.  In short, because Treacy's

sentencing enhancements do not substantially overlap, a departure under *Lauersen* and *Jackson* is

unwarranted.

## C.   Restitution Should Be Imposed

Section 3553(a)(7) of Title 18 of the United States Code requires the Court to consider

"the need to provide restitution to any victims of the offense" in fashioning a sentence.

Restitution is mandatory in this case because Treacy was convicted of conspiring to commit

31

securities fraud, file false reports with the SEC, make false and misleading statements to

Monster's outside auditors and falsify books and records and a substantive count of securities

fraud and identifiable victims have suffered pecuniary harm as a result of his criminal conduct.

*See* 18 U.S.C. § 3663A(c)(1); *United States v. Dupes,* 513 F.3d 338, 345 (2d Cir. 2008) ("The

Mandatory Victims Restitution Act (MVRA) makes full restitution mandatory for certain crimes,

including securities fraud, 18 U.S.C. § 3663A, and requires a court to determine the total amount

of loss to each victim."); *United States* v. *Reifler*, 446 F.3d 65, 116 (2d Cir. 2006) (reiterating its

holding that the MVRA encompasses offenses involving pump-and-dump securities fraud

schemes).  Contrary to Treacy's assertions, Monster Worldwide Inc. is a "victim" as that term is

defined under the statutory framework.  *See* 18 U.S.C. §§ 3663(a)(2), 3663A (defining "victim"

in a conspiracy as "any person directly harmed by the defendant's criminal conduct in the course

of the scheme, conspiracy or pattern."); *United States* v. *Cummings*, 189 F. Supp.2d 67, 75-76

(S.D.N.Y. 2002) (holding that corporation, of which the defendant was the former chief financial

officer, was a victim of the defendant's accounting fraud scheme).

Determining the amount of restitution and the process for enforcement of a restitution

order is within the Court's discretion.  *United States v. Kinlock*, 174 F.3d 297, 299 (2d Cir.

1999).  Section 3663A(b)(4) provides that victims must be reimbursed for, among other things,

"other expenses incurred during participation in the investigation or prosecution of the offense or

attendance at proceedings related to the offense."  In *United States* v. *Amato*, 540 F.3d 153 (2d

Cir. 2008), the defendants, a lawyer and an officer in the business from which criminal activity in

the case originated, were convicted of conspiring to commit mail and wire fraud and the

substantive offenses of mail and wire fraud.  The Second Circuit affirmed the district court's

32

restitution order for the corporation, holding that "'other expenses' incurred during the victim's participation in the investigation or prosecution of the offense or attendance at proceedings related to the offense may include attorney fees and accounting costs." *Id.* at 159.  Similarly, in *United States* v. *Battista*, ___F.3d_____, 2009 WL 2392886, at *6-7 (2d Cir. Aug. 6. 2009), the Second Circuit held that the NBA was a "victim" of the crime of conspiracy to transmit wagering information and that certain attorney fees incurred by the NBA were recoverable under the Victim and Witness Protection Act ("VWPA").

Although the Government is aware that other victims who were compensated in the class action settlement will not be included in the criminal restitution order, we are constrained by controlling precedent in this Circuit, *Amato*, to agree that the Company is a victim for purposes of restitution under § 3663A.  Monster has filed a detailed victim impact statement with supporting documentation describing the loss it sustained as a result of the defendant's criminal actions.  In that statement, the Company asks for $56 in restitution: (1) $13,446,203 representing the additional paid-in capital the Company would have received upon exercise had Treacy's own stock options not been backdated; (2) $15.7 million in attorney's and other professional fees and expenses incurred as a result of conducting an internal investigation of Monster's stock options practices and accounting for such options and in connection with its investigation and assistance in the prosecution of Treacy; and (3) the $25.1 million the Company paid to shareholders in settlement of their class action suit alleging violations of the federal securities laws based on the same underlying conduct that formed the basis for the criminal charges in this case.  The Government respectfully submits that categories (1) and (2) fall within the plain language of the MVRA and VWPA and Second Circuit precedent, specifically *Amato* and *Battista*, interpreting

33

those statutes, and that the Court should therefore include those amounts in its restitution order.[18]

**D.      Section 3553(a) Factors Militate Against Leniency**

Section 3553(a) provides that the sentencing "court shall impose a sentence sufficient but not greater than necessary, to comply with the purposes set forth in paragraph (2) of this subsection," and then sets forth seven specific considerations, including (1) the nature and circumstances of the offense and the history and characteristics of the defendant; (2) the need for the sentence imposed — (A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense; (B) to afford adequate deterrence to criminal conduct; (C) to protect the public from further crimes of the defendant; and (D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner– ; (3) the kinds of sentences available; (4) the kinds of sentence and the sentencing range established [in the Sentencing Guidelines]; (5) any pertinent policy statement [issued by the Sentencing Commission]; (6) the need to avoid unwarranted sentence disparities; and (7) the need to provide restitution to any victims of the offense.

---

[18]      With respect to the third category of expenses Monster seeks in restitution, the $25.2 million Monster paid to its shareholders to settle the class action, Monster is correct that the *dicta* in *Cummings* lends support to its argument that it is entitled to that amount in restitution. *See Cummings*, 189 F. Supp.2d at 78-79. Unlike the company in *Cummings* that had already been reimbursed for the $10 million resulting from its payments to shareholders in settlement of the securities fraud class action suits, Monster represents that it has not yet been reimbursed for the amount it incurred to settle the class action suit that was before Your Honor. Thus, Monster may be entitled to restitution under § 3664(j)(1) for this amount since Monster is a "person who provided . . . compensation" to victims, the Company's shareholders, through the settlement of the class action.

1.      **The Nature And Circumstances Of The Offense And Characteristics Of The Defendant**

As discussed above, this was a serious offense that lasted almost a decade and had significant consequences, both reputational and pecuniary, for both the Company and its shareholders. Treacy played a central role in this long-running scheme and reaped millions of dollars in illegal profits. During the course of the scheme, Treacy was the officer at the Company who had primary responsibility for interacting with the Company's investors and analysts about the Company's financial performance. Treacy and his co-conspirators repeatedly lied to the public, the auditors and the SEC about how they were picking grant dates for option grants and how they were accounting for it. Treacy told the investing public one thing but did another. Indeed, the hefty Guidelines range reflects the seriousness of Treacy's offense.

The Government acknowledges that the defendant's life is not defined by his crimes alone. The Government does not contest the defendant's claim that he possesses many positive attributes, has a loving family and caring circle of friends, and has contributed to society in charitable ways. However, the Government would also note that, in comparison with many defendants that appear before this Court, the defendant has had significant advantages and opportunities in life. The defendant graduated from college and business school (PSR ¶¶ 80-81), and prior to working at TMP and Monster, held various jobs in the finance and accounting departments at WPP Group (and its subsidiary Ogilvy North America) and Texaco, Inc. (PSR ¶¶ 86-87). In addition, the defendant has held high level positions at Monster and its predecessor since 1994. (PSR ¶ 85). In addition to serving on the Board of Directors of Monster, Treacy has also served as an advisor and investor on the board of directors of several companies both in the

35

U.S. and overseas.  (PSR ¶ 84).

This backdrop of relative advantage that Treacy has enjoyed renders his conduct all the more inexcusable.  Treacy's achievements and advantages in life should, if anything, operate to enhance his sentence rather than to mitigate it.  This assessment is compounded by the fact that the defendant was the COO and President of Monster and served on the Board of Directors at the time he engaged in the conspiracy.  The defendant held positions of trust vis a vis Monster's shareholders and was the day-to-day leader of Monster.  The defendant's leadership role at Monster and the fiduciary relationship he had with its shareholders renders his role as a leader and organizer of the scheme particularly egregious.

Furthermore, Treacy continues to deny his involvement in the crimes for which he was convicted.  This continued unwillingness to accept responsibility for his actions further militates in favor of a substantial sentence.

> **2.      The Need To Reflect The Seriousness Of The Offense, Promote Respect For The Law And Provide Just Punishment For The Offense/ The Need To Afford Adequate Deterrence To Criminal Conduct**

The offense at issue here was an extensive and deceptive fraudulent scheme that Treacy and his conspirators carried out for close to a decade.  Treacy operated as a leader of the scheme despite his fiduciary obligations to shareholders and the investing public.  Treacy and his co-conspirators repeatedly lied to the Company's shareholders, auditors and the SEC.  And when the backdating scheme was disclosed and Treacy was confronted, he repeatedly lied to the WSJ and the public about his conduct and his role in the scheme.  This sort of calculated, persistent deception by the very person who is charged with guarding the interests of shareholders cries out for a substantial sentence.

As for the need to deter criminal conduct, should Treacy, who perpetrated this multi-million dollar fraud over several years while holding the positions of COO and President of Monster and while serving on its Board of Directors, be spared a substantial sentence of incarceration, it would send a woefully inadequate message to others contemplating similar behavior. Although the Government is not claiming that the conduct in this case rises to the level of the accounting fraud schemes perpetrated at WorldCom or Enron, the offenses of which Treacy were convicted were nonetheless serious economic crimes that caused substantial tangible pecuniary harm to both the Company and its shareholders. In terms of the harm caused, the defendant, motivated by greed and the desire to retain and increase his power and control at Monster, misrepresented the true financial health of Monster to numerous individuals and entities. Accordingly, it is necessary to fashion a sentence for Treacy to reflect the seriousness of the offenses of which he was convicted, to promote respect for the law, to provide just punishment for the offense and to afford adequate deterrence to such criminal conduct.

### 3.    The Need to Avoid Unwarranted Sentence Disparities

Treacy asks this Court to impose a lenient sentence on him to avoid unwarranted sentencing disparities. (Br. 36). As an initial matter, Treacy's argument that this Court should compare Treacy to similarly-situated employees at Monster and other public companies who have not been prosecuted is entirely contrary to the caselaw in this Circuit and should be rejected.

Under Section 3553(a)(6), the sentencing court must consider "the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct." 18 U.S.C. § 3553(a)(6). This sub-section reflects Congress's goal of avoiding unwarranted sentencing disparities among defendants with similar criminal histories

37

who are guilty of similar criminal conduct. *See United States* v. *Joyner*, 924 F.2d 454, 460 (2d

Cir. 1991).  The Second Circuit has repeatedly reaffirmed that sentencing disparities among

defendants are not "unwarranted" under Section 3553(a)(6) where the defendants are not

"similarly situated." *Fernandez*, 443 F.3d at 32 (citing *United States* v. *Boscarino,* 437 F.3d 634,

638 (7th Cir. 2006) ("[A] sentencing *difference* is not a forbidden 'disparity' if it is justified by

legitimate considerations, such as rewards for cooperation.") (emphasis in original); *United*

*States* v. *Schneiderhan*, 404 F.3d 73, 83 (1st Cir. 2005) (finding no unwarranted sentencing

disparity where the co-defendants who were subjects of comparison "pleaded guilty to

obstructing justice, eliminating the 'lack of remorse' rationale that influenced the sentence

imposed on defendant")); *accord United States* v. *Ebbers*, 458 F.3d 110, 129 (2d Cir. 2006).

The federal defendants who were convicted of securities fraud offenses involving the

backdating of option grants (Carole Argo, Gregory Reyes[19] and William Sorin) are easily

distinguishable from Treacy.   First, all these defendants' Guidelines ranges were significantly

lower than Treacy's (Reyes's Guidelines range was 15-21 months' imprisonment, Argo's was

97-121 months' imprisonment, and Sorin's was 135-168 months' imprisonment[20] while Treacy's

Guidelines range is 324-405 months' imprisonment).  *See Gall v. United States*, 128 S.Ct. at 600

("[A]voidance of unwarranted disparities was clearly considered by the Sentencing Commission

when setting the Guidelines ranges" . . .so when a district court "correctly calculate[s] and

---

[20]      Although the Government has not seen the sentencing transcript for Sorin, it is the
Government's understanding that he pled guilty pursuant to a plea agreement applying an offense
level of 33, which if Sorin was in Criminal History Category I, would yield a Guidelines range of
135-168 months' imprisonment.

carefully review[s] the Guidelines range, he necessarily g[ives] significant weight and

consideration to the need to avoid unwarranted disparities."). Second, both Reyes's and Argo's

personal benefits from the backdating scheme paled in comparison to Treacy's proceeds: Judge

Breyer found that Reyes did not receive any of the options he backdated (Reyes 11/27/07

Sentencing Order at 10), Argo exercised only a small portion of the options she received,

realizing a gain of $236,000 which she disgorged prior to Indictment, while Treacy, even under

the most conservative estimate, realized over $7 million in profits from his participation in the

backdating scheme. Finally, both Argo and Sorin[21] pleaded guilty to their respective offenses and

received a three-level reduction under § 3E1.1 for acceptance of responsibility.    In sum, the

defendants cited by Treacy in his sentencing memorandum are not "similarly situated" to Treacy

and, therefore, any disparity between the sentence imposed on those defendants and the sentence

imposed on Treacy would be warranted. Treacy's role was multifaceted and integral to the

scheme and the backdating scheme at Monster, unlike the scheme in Brocade and Safenet, was

pervasive and lasted close to a decade (stemming from 1996 when Treacy and his co-conspirators

participated in the backdating of a stock gift to Treacy and others).

---

[21]      Sorin was convicted of a conspiracy to commit securities fraud under § 371 and,
thus, had a five-year statutory maximum.

## CONCLUSION

For all of the reasons stated, the Court should sentence defendant James J. Treacy to a sentence sufficient but not greater than necessary to comply with 18 U.S.C. § 3553(a), impose a forfeiture order in accordance with 18 U.S.C. § 981(a)(1)(C) and 28 U.S.C. § 981(a)(C), and impose a restitution order in accordance with 18 U.S.C. §§ 3663, 3663A and 3664.

Dated:      New York, New York
            August 26, 2009

                        Respectfully submitted,

                        PREET BHARARA
                        United States Attorney

            By: /s/_____
                        Deirdre A. McEvoy
                        Assistant United States Attorney
                        (212) 637-2309

CERTIFICATE OF SERVICE

DEIRDRE A. McEVOY deposes and says that she is employed in the office of the

United States Attorney for the Southern District of New York,

And that on  August 26, 2009, she caused a copy of the Government's Sentencing

Memorandum to be served electronically and by First Class Mail, upon:

Evan Barr, Esq.
Steptoe & Johnson LLP
750 Seventh Avenue
New York, New York 10019
EBarr@steptoe.com

I declare under penalty of perjury that the foregoing is true and correct, pursuant

to Title 28, United States Code, Section 1746.

Dated:       New York, New York
             August 26, 2009


__/s/_____
DEIRDRE A. McEVOY